**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KELVIN X. MORRIS** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, Acting Secretary,** | : | **CIVIL ACTION NO. 01-3070** |
| **Pennsylvania Department of Corrections;** | : | |
| **CONNER BLAINE, Superintendent, State** | : | |
| **Correctional Institution at Greene; and,** | : | |
| **JOSEPH P. MAZURKIEWICZ,** | : | |
| **Superintendent, State Correctional** | : | |
| **Institution at Rockview** | : | |

**RODRIGUEZ, J.**

**O P I N I O N**

Presently before the Court is the Petition for a Writ of Habeas Corpus filed by Kelvin X. Morris ("Morris" or "Petitioner"). On November 30, 1983, a jury convicted Morris of first-degree murder and robbery in the Court of Common Pleas of Philadelphia County. Following a penalty phase hearing, the same jury sentenced Morris to death. After denying post-trial motions, on September 8, 1987, the trial court imposed the death sentence and a consecutive sentence of ten to twenty years imprisonment on the robbery conviction. Over the subsequent 18 years, Morris filed appeals and petitions for post-conviction relief in Pennsylvania state courts, and two petitions for a writ of habeas corpus in federal court. The second federal petition was filed in June 2001, subjected to a temporary stay and subsequent orders for new and supplemental briefing and, ultimately, transferred to the United States District Court for the District of New Jersey in May 2006. Even though the difficulties of the legal issues presented in this case are compounded by the passage of many years since Petitioner's murder trial, this Court concludes,

after a careful review of the entire record and the briefs in this action, that defense counsel's failure to conduct a reasonable investigation of mitigating evidence in anticipation of Morris's capital sentencing hearing, failure to present available mitigating evidence at that hearing, and failure to make a sufficient argument at that hearing violated Morris's Sixth Amendment right to effective assistance of counsel. Accordingly, this Court grants relief to Morris under 28 U.S.C. § 2254 in the form of vacating the sentence of death.

In addition, on Morris's claims challenging his conviction, this Court concludes that an evidentiary hearing is required on Morris's claim that trial counsel operated under a conflict of interest that impaired his ability to provide adequate representation sufficient to satisfy the demands of the Sixth Amendment.

## Table of Contents

I.   FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    A.  The Murder of Robert McDonald . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    B.   The Police Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    C.  Trial and Sentencing Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    D.  Post-Trial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

    E.  Morris's Direct Appeals and Pennsylvania State Post-Conviction Proceedings . . . .  17

    F.  Morris's Petitions for a Writ of Habeas Corpus in Federal Court . . . . . . . . . . . . . .  22

II.   GOVERNING LEGAL PRINCIPLES UNDER 28 U.S.C. § 2254 . . . . . . . . . . . . . . .  24

    A.  AEDPA: Exhaustion of State Court Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

    B.  When a Federal Habeas Court Can Review Procedurally Defaulted Claims . . . . . .  25

      1.  *"Independent and Adequate" State Law Grounds* . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      2.  *Pennsylvania's PCRA One-Year Limitations and Relaxed Waiver Rule* . . . . . . . . 27

  C.  Merits Analysis Under § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

  D.  Claims Raised in Second PCRA Petition and Federal Habeas Petition . . . . . . . . . . 32

III.    CLAIMS FOR RELIEF FROM SENTENCE OF DEATH . . . . . . . . . . . . . . . . . . . . . . 33

  A.  Counsel's Ineffectiveness at Penalty Phase: Failure to Present Mitigating
      Evidence and Inadequate Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      1.  *Legal Standard under <u>Strickland v. Washington</u>* . . . . . . . . . . . . . . . . . . . . . . . . . 36

      2.  *Mitigating Evidence That Was Available At The Time of Sentencing Hearing* . . . 40

      3.  *Deficiency of Counsel's Performance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

      4.  *Prejudice* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      5.  *Closing Argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

  B.  Improper Jury Instructions and Verdict Sheet: <u>Mills v. Maryland</u> . . . . . . . . . . . . . 62

  C.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

IV.    CLAIMS FOR RELIEF FROM GUILTY VERDICT . . . . . . . . . . . . . . . . . . . . . . . . . 75

  A.  Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Murder of Robert McDonald

On August 9, 1980, at approximately 3:00 a.m., Philadelphia police were summoned to investigate an alarm at the Pep Boys Auto Parts Store at 48th and Girard Avenue in Philadelphia, Pennsylvania. Police discovered that the front window to the store had been broken. The manager of the store, Robert McDonald, arrived several minutes later and walked through the store with an officer. Upon finding everything in order, the police officer left, and McDonald then called the glass company to fix the window. At approximately 4:30 a.m., William Linaberry, an employee of the glass company, arrived at the store and began boarding up the broken window. He noticed a group of adolescent boys in the Arco gas station lot across the street, along with a man. Linaberry and McDonald were still outside the store when the man crossed the street from the gas station, approached Linaberry and McDonald, and asked what had happened. The man was carrying a yellow plastic bag. He then drew a hand gun and said to McDonald: "Put the money in the bag." McDonald replied, "What money?" The man then shot McDonald twice, killing him. After the first shot hit McDonald, Linaberry quickly crawled under his van. He heard a second shot, and then heard the sound of the killer's footsteps running away. Philadelphia police arrived shortly after and, based on Linaberry's statements, dispatched a description of the suspect over the police radio.

### B.  The Police Investigation

It was ten days after the incident that Philadelphia police issued an arrest warrant for Petitioner Kelvin Morris for the murder and robbery of Robert McDonald. The morning of the murder, homicide detectives showed Linaberry approximately three to four hundred photographs. The next day, police showed Linaberry a second set of approximately sixty

photographs. Linaberry did not positively identify any suspects based on these two photo spreads.

Two days later, on August 12, 1980, detectives interviewed Ronald Johnson, then twelve years old, who was one of the boys who had been at the gas station the night of the murder. Johnson told the officers that he was with friends in the park at 48th and Lancaster Avenue at 4:00 a.m. on August 9, 1980, and they went to the Arco gas station to get sodas. A man carrying a plastic bag approached and told them to leave, and they ran.[1] Johnson ran up the block but said that he turned around and watched what happened at the Pep Boys store. He watched the man approach the two men at the Pep Boys store, have a brief conversation, pull a gun, and shoot one of the men. Johnson gave a description of the killer to the police. A police artist drew a composite sketch of the suspect based on Johnson's description.

The next day, August 13, 1980, a homicide detective showed Linaberry a third set of photographs, and this time Linaberry identified a photograph of Artie Morris, who was Petitioner's brother.[2] The detective asked Linaberry whether he was sure the man in the photograph was the killer. Linaberry responded that he was sure, and he signed a statement to that effect.

That same day, the same array of photographs was shown to Joseph Tyrone Flowers, one of the other young boys who had been at the gas station the night of the murder. Flowers also

---

[1]   At trial, Ronald Johnson testified that the man came from the back of the Pep Boys, walked over to the gas station and was about fifteen feet from Johnson. He testified that the gas station was well lit and that he got a look at the man's face for about two to three minutes. (N.T., 11/21/83, at 8-9).

[2]   Artie died sometime after Kelvin's conviction, apparently of a drug overdose. (Pet. Ex. "3," Aff. Odessa Melton, ¶ 6; Pet. Ex. "7," Aff. David Madden, ¶ 10); Pet. Ex. "8," Aff. Ronald Handy).

5

positively identified Artie Morris as the man he saw at the gas station that night.

An arrest warrant was issued for Artie Morris. On August 14, 1980, police questioned Artie and his live-in girlfriend, Regina Handy. They both told police that Artie's brother Kelvin had arrived at their apartment on the afternoon of August 11, 1980, announced that he was in trouble for a shooting, and asked to stay with them, which he did through August 14, 1980. Handy further told the police that she had received a telephone call from a family member implicating Kelvin in the shooting at the Pep Boys store.

Police then called Linaberry to return to the police station. They showed him a fourth set of photographs on August 18, 1980. This set of eight photographs included a photograph of Petitioner Kelvin Morris. Linaberry immediately identified Petitioner Kelvin Morris as the shooter.[3] Linaberry said he had been mistaken about his first identification of Kelvin's brother, Artie, and that he was positive that Kelvin was the shooter.

On the same day as Linaberry's positive photo identification of Kelvin Morris, a homicide detective showed sixteen photographs to twelve-year-old Ronald Johnson at the home of Joseph Tyrone Flowers. From these displays, Ronald Johnson positively identified Petitioner Kelvin Morris as the man who came up to him at the gas station and whom he saw shoot Robert McDonald.

Joseph Tyrone Flowers, however, maintained his original identification of Artie Morris as the shooter.

Philadelphia police issued an arrest warrant for Kelvin Morris on August 19, 1980.

---

[3]  In all, Linaberry was shown four sets of photographs: several hundred on August 9, 1980; approximately sixty on August 10, 1980; one photo array on August 13, 1980 from which he identified Artie Morris; and one photo array of eight on August 18, 1980 from which he identified Kelvin Morris, the Petitioner. None of these photo arrays included photographs of *both* Artie and Kelvin Morris at the same time.

Morris was arrested in Suffolk City, Virginia on October 22, 1980, and he was brought back to Philadelphia on May 20, 1982.[4]

### C.  Trial and Sentencing Proceedings

A pretrial suppression hearing was held over the course of several days in November 1982, at which time Morris was represented by Susan B. Ercole, Esq. After the hearing, Ms. Ercole was granted leave to withdraw as counsel, and in early January 1983, Leon Tucker, Esq. was appointed to represent Morris. After numerous scheduling delays, Morris's seventeen-day trial for the murder and robbery of Robert McDonald began on November 3, 1983 before the Honorable Eugene Gelfand in the Pennsylvania Court of Common Pleas.

The evidence presented at trial of Kelvin Morris's guilt consisted primarily of identifications by two eyewitnesses, along with Morris's inculpatory statements to two other witnesses. The two eyewitnesses were William Linaberry and Ronald Johnson. Linaberry identified Morris as the person whom he saw shoot McDonald. Ronald Johnson, who was twelve years old at the time of the murder and fifteen years old at the time of trial, testified that Morris was the man who told Johnson and his friends to run away at the gas station across the street from the Pep Boys on the night of the murder.

The witnesses testifying as to Morris's inculpatory statements were a family friend in Virginia, James Willie, and a Virginia police officer, Thomas Newsome. Willie, a former employee of Kelvin Morris's uncle, testified that he met Kelvin Morris when Morris came to live with his uncle in Suffolk City, Virginia in the middle of August 1980. Willie testified that Morris moved in with him at the end of August; Morris told Willie he had to move out of his

---

[4]  The 19-month delay was caused by Kelvin Morris's arrest and trial on unrelated criminal charges in Virginia.

uncle's house because the uncle had learned that Morris was in some kind of trouble. Willie testified that a couple of weeks after Morris moved in, Morris told him that he had robbed a Pep Boys store in Philadelphia, that there were two men there, that he had shot one, and that the other "ran and got under a car or a truck." Although Willie testified that he reported this to the Suffolk City, Virginia Police Department two days later, there was no written documentation of Willie's statements to the Suffolk City police until October 3, 1983—which was three years after Willie testified he first went to the police and one month before Morris's murder trial. On cross-examination, defense counsel elicited testimony from Willie that he was being investigated for forging the name of Morris's uncle on several checks.

Finally, Officer Thomas Newsome, of the Suffolk City, Virginia, Police Department testified that he was involved in the interrogation of Morris after his arrest on October 22, 1980. The arrest was for the Virginia charges, although Officer Newsome was not allowed to testify about those charges in this case. Officer Newsome testified that after Morris was apprised of his rights, Officer Newsome told Morris that he was wanted in Philadelphia in connection with the robbery of a store and the shooting of a clerk. Officer Newsome stated that Morris immediately replied, "I did it to keep up with the crowd." (N.T., 11/23/83, p.83). Officer Newsome did not write down the statement or obtain Morris's signature, and he testified at trial that he was recalling the conversation and Morris's alleged confession from memory.

The defense consisted of attacking the credibility of the four main prosecution witnesses and making a case for mistaken identity and police mismanagement. Defense witness William Meekins testified that he was jogging past Pep Boys on the night of the murder and saw a car and a van at Pep Boys, and a man standing nearby who was holding a bag, but the man did not look anything like Kelvin Morris. Lamont Bruce, who described himself as a "close associate"

8

of Kelvin Morris, testified that he was living nearby Pep Boys at the time of the murder and on the night of August 9, 1980, he heard two shots, looked out the window, and saw three young men running away, none of whom was Kelvin Morris. Defense counsel drew from Linaberry that he had initially selected another man's photograph as that of the killer, although counsel did not disclose at that time that the other man was Artie, Kelvin's brother. Kelvin's sister and brother both testified that the police first came to their house looking for Artie, not Kelvin. The defense did not present the testimony of Joseph Tyrone Flowers who was the only eyewitness who maintained throughout the investigation that it was Artie, not Kelvin, whom he saw that night. Nor did the defense present any alibi testimony for Kelvin or question the police about whether the yellow plastic bag was recovered and tested for fingerprints. The defense did not argue that Artie was the actual perpetrator.

During closing argument, defense counsel suggested that the eyewitnesses who testified for the prosecution, Linaberry and Johnson, did not have as solid an opportunity to see and remember the killer's face as they testified to, that they gave conflicting and changing descriptions of the killer, and that they only focused on Kelvin's photograph under pressure by the police. Defense counsel also suggested that Willie's testimony was not credible because of the threat of a criminal investigation over the forgery of Kelvin's uncle's checks.

On November 30, 1983, the jury in the Court of Common Pleas of Philadelphia County convicted Petitioner Kelvin X. Morris of first-degree murder and robbery. The penalty proceedings took place on the following day in front of the same jury. The government relied on the testimony presented at trial. Defense counsel presented only two witnesses at the sentencing hearing: Kelvin Morris and his mother, Sarah Morris. Sarah Morris testified that Kelvin was twenty-three years old, was one of seven siblings, and had an eight-year-old son. Kelvin's father

9

had been killed a year before the trial. Sarah Morris also testified that Kelvin had been

hospitalized once for about one to two weeks in 1977 at a psychiatric hospital after Kelvin had

thrown a bottle which hit his brother, Artie, and resulted in Artie's eye being removed. His

mother noticed emotional differences in Kelvin after that hospital stay—specifically, that Kelvin

became easily agitated, and when agitated his skin took on an unusual, bluish tint. Kelvin Morris

confirmed his mother's testimony and further testified that after his hospital stay he refused to

continue group therapy.

Defense counsel's closing argument to the jury on the sentencing consisted of less than

ten sentences and did not rely on any mitigating circumstances that were statutorily available.[5]

---

[5] The sentencing code in effect at the time of Kelvin Morris's trial was 42 Pa. Cons. Stat.
§ 9701 et al. (1982). The code provided that "[a]fter a verdict of murder of the first degree is
recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing
in which the jury shall determine whether the defendant shall be sentenced to death or life
imprisonment." 42 Pa. Cons. Stat. § 9711(a)(1). In that sentencing hearing, "evidence may be
presented as to any matter that the court deems relevant and admissible on the question of the
sentence to be imposed and shall include matters relating to any of the aggravating or mitigating
circumstances specified in subsections (d) and (3)." Id. at § 9711(a)(2). Mitigating circumstances
included the following:

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform
his conduct to the requirements of law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a
defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the
substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the
homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and
the circumstances of his offense.

42 Pa. Cons. Stat. § 9711 (e) (1982).

Nor did defense counsel refer to any testimony by Kelvin Morris or his mother that had just been presented. The closing argument, in its entirety, was as follows:

> At this stage of the proceedings, you have convicted my client, convicted him of first degree murder; with that you have stated my client took the life of Robert McDonald—we are beyond that stage now. Quite sure you realize one life was already taken. I ask you not to bring back the death penalty on my client. I ask you, should two lives be taken—an eye for an eye? I ask you to find that that would not be appropriate under the circumstances in this case. During voir dire, you indicated that you could return the death penalty in a proper case. I ask mercy on behalf of my client. I ask you if you thought sincerely that this is not the proper case. Thank you.

(Tr., 12/1/83, at 19-21).

The jury found two aggravating circumstances—that the killing was committed in the perpetration of a felony and that the defendant knowingly created a grave risk of death to another person in addition to the victim—and no mitigating circumstances. A sentence of death was returned.

### D.  Post-Trial Motions

Morris filed several post-trial motions. An evidentiary hearing was held two years after the trial on December 9, 1985. The hearing was held before Judge Gelfand "to put forth testimony on the allegations of ineffectiveness of trial counsel, Leon Tucker."[6] (N.T., 12/9/85, at 2). Mr. Tucker testified at this hearing that he could not recall much about Kelvin Morris's trial, including what his reasons may have been as to: (1) whether he had properly objected to any testimony suggesting that Kelvin Morris had been arrested for a crime in Virginia (id., at 6-10, 37-40); (2) whether he had considered the impeachability of defense witnesses before putting them on the stand (id., at 10-13, 35-36); (3) whether he had properly objected to several statements in the prosecutor's closing argument (id., at 13-19, 30-34); or (4) whether he had failed to investigate an alibi defense provided by Morris (id., at 42).

Defense counsel also testified that he recalled being brief in his closing argument at the sentencing hearing because the evidence of guilt at trial had been strong and so he attempted to just seek mercy for his client in the hope that the jury would come back with a life sentence as opposed to a sentence of death:

> Q:  Did you at any time, knowing there was a chance you could lose and knowing there was a chance the death penalty could be argued by the commonwealth, did you prepare an argument to the jury for penalty purposes?
>
> A:  I did.
>
> Q:  You did in fact prepare —

---

[6]  The allegations of ineffective assistance of counsel that were raised in post-trial motions included ineffectiveness based on: (a) failure to object to the testimony of a police officer that he arrested Morris in Virginia; (b) failure to object to the Commonwealth's impeachment of defense witness William Meekins with evidence that he was convicted of robbery in 1972; (c) failure to object to improper prosecutor remarks during closing argument; and (d) failure to call Joseph Flowers as a witness. (Resp. Ex. "7," Direct Appeal Brief for Appellant, at Appendix "C" and "D").

A:      Yes.

Q:      Now, Mr. Tucker, if I were to tell you that having had the benefit of the notes of testimony that your closing speech at the sentencing stage to the jury totaled one hundred and twenty-seven words, do you feel you were adequately prepared to argue the sentencing phase of this case?

* * *

A:      Again, I can't recall specifically what happened back then. I know that an extensive amount of time was used to prepare this trial, concentrating for the most part on trial. A great deal of time was spent doing research on the death penalty, mitigating and aggravating circumstances, what have you.

Q:      Yes.

A:      I can't recall specifically what occurred after the jury came back with first degree. I recall being very brief with the jury in my argument at the sentencing stage. I recall specifically asking for mercy for my client and basically that was it and I think at that point, without speculating, yeah, without speculating, I think that at that point it was probably under the circumstances what I thought was the best thing to do at that point. The trial had lasted for a long period of time, don't recall specifically the days, I recall a lot of the evidence being—well attempting to be somewhat lopsided in the Commonwealth's favor. And at that point I recall attempting just to seek mercy for my client in the hope that they would come back with a life sentence as opposed to the death penalty.

(N.T., 12/9/85, at 22-24).[7]

---

[7] On cross-examination by the prosecutor, Mr. Tucker provided further information:

Q:   You said you prepared for the death penalty argument. What did you do to prepare for the death penalty argument?

A:   I spoke to my client. It was customary for me to meet with my client on Saturday mornings at the prison. Also spent time up in the cell room during luncheon recesses talking to my client.

(N.T., 12/9/85, at 26).

Also on cross, the prosecutor probed the reasons for the short length of the closing argument:

Q: Now, when you gave your speech [to] the jury at the sentencing, you didn't read anything that was handwritten?

A: No.

Q: The reason for doing to the contrary that you think it is more effective just to speak off—the appearance of speaking off the top of your head; is that correct?

A: Yes.

Q: You also said that the evidence at the trial was lopsided in favor of the Commonwealth, by that what do you mean exactly, sir?

A: The number of witnesses, and what they allegedly saw or heard.

Q: Number of witnesses, the quality of the witnesses' testimony; is that what you are referring to?

A: Yes.

Q: That the same testimony which the jury obviously just relied upon in finding your client, Mr. Morris, guilty of first degree murder; is that correct?

A: Based on the verdict I would think so, yes.

Q: So, then, at that point, you are making a strategic choice to ask for mercy on behalf of your client?

A: That was part of it. In my mind had to be something else, because, well —

Q: You keep saying there had to be something else, as best you can remember, something else along what lines?

A: If I knew that I think I'd be better situated to answer the question in total.

Q: Could you give us parameters of what you might be talking about? I know you are not real specific on it, but —

A: What I was saying, before, I hate to speculate, but it would appear to me that there was some specific reason why I did not state more than one hundred and twenty-seven words. Now, you asked me for reasons—you know—I don't know the specific answer to that.

Q: Would that reason, whatever, would it have emanated from yourself, client, or someone else?

A: Probably a combination of both, perhaps my client and myself, or perhaps my client, again, sort of borderlining on conjecture, I didn't want to do that, may have very well been

He recalled two witnesses that had been called for mitigation purposes, but little else. He

testified that in other cases he usually made handwritten notes as to why he chose certain

strategies, but in Kelvin Morris's case there were no handwritten notes in the file—nothing from

which to refresh his recollection as to why he did or did not investigate or present certain

evidence:

> Q:    Your efforts to get the jury to give you mercy, was it backed up by any witnesses from his family?
>
> A:    As I recall, yeah, someone did testify, I think his mother testified on his behalf—and the defendant himself—if I'm not mistaken, testified.
>
> Q:    As I understand your testimony today you felt—and still feel—that your one hundred and twenty-seven words adequately summed up what it is that you wanted to say, in fact you spoke those amount of words because you chose not to speak anymore.
>
> A:    Again, I don't recall specifics, obviously hindsight is always the best sight, always better than twenty-twenty, I would think there was probably something else, I don't have any notes that I've seen that would refresh my recollection, the file was turned over to your office and I didn't see any notes recently, but it would appear in my mind knowing how detailed I attempt to be that there had to be a specific reason why I was so brief.
>
> Q:    That's the whole point, I have known you for a number of years, I do recall giving you those notes the last time.
>
> A:    Well, the notes of testimony, I'm referring to—I'm referring to my handwritten notes. Ordinarily I write notes, detailed notes as to why I do certain things and usually put things of record, whether in court or sidebar, whatever, for whatever reason I don't have any notes on what happened at that time.
>
> Q:    It is not your position that you turned those notes over—
>
> A:    I recall turning the file over, I don't know if there were any notes, but reviewing

my client—someone else—I can't imagine who—I did also, would involve me.

(Id. at 27-29).

15

whatever notes are in the file, now, I didn't see notes regarding that.

(Id., at 24-25).

On September 8, 1987, the Honorable Albert F. Sabo[8] denied Morris's post-trial motions by oral opinion; the parties rested on their briefs, and the judge provided no reasoning supporting his denial ("If you are resting on what was in the briefs, the Commonwealth briefs, the defense brief, they adequately covered all the issues. The Court is satisfied that there was no error committed by the trial judge that would justify a new trial; therefore, the motion for a new trial and/or arrest of judgment is denied.") (N.T., 9/8/87, at 8). Judge Sabo also formally imposed the death sentence on the first-degree murder charge and a consecutive term of ten to twenty years on the robbery charge.[9] (Id. at 15-16).

---

[8]  The Honorable Eugene Gelfand, who presided over Morris's trial and the post-trial evidentiary hearing, died on March 27, 1987. The case was reassigned to the Honorable Albert F. Sabo for resolution of the post-trial motions and new defense counsel was appointed.

[9]  The transcript of September 8, 1987 refers to another post-trial evidentiary hearing held on November 12, 1986, but no transcript of that hearing appears in the court file. That hearing apparently involved testimony by another court-appointed defense counsel and following that testimony, the defense requested a continuance to attempt to locate four witnesses: Anthony Taylor, Anthony Stokes, Joseph Flowers, and Emmanuel Johnson. Of those four witnesses, the defense was only able to locate Joseph Flowers, who was incarcerated. At the hearing on September 8, 1987, Judge Sabo denied the defense request to subpoena Flowers.

**E.  Morris's Direct Appeals and Pennsylvania State Post-Conviction Proceedings**

On October 7, 1987, another court-appointed attorney filed an appeal on Morris's

behalf.[10] On September 22, 1989, the Pennsylvania Supreme Court affirmed Morris's conviction

and death sentence on direct appeal. Commonwealth v. Morris, 564 A.2d 1226 (Pa. 1989). With

respect to Morris's claim of ineffective assistance of counsel at the death penalty hearing, the

---

[10] On direct appeal, Morris asserted the following claims: (1) the trial court erred in denying his motion for a mistrial based on Officer Newsome's reference to an offense in Virginia, from which the jury could have inferred that Morris was involved in unrelated criminal activity, and trial counsel rendered ineffective assistance in failing to request an appropriate curative instruction relating to this reference; (2) the trial court erred in allowing the introduction of a composite sketch of the killer, which Morris asserted was hearsay; (3) the prosecutor made improper remarks in his closing, stating that two defense witnesses were "robbers—have no reason in the world to tell the police the truth" and "if it was not the manager of Pep Boys, it would have been somebody else," and trial counsel rendered ineffective assistance for failing to object to these improper remarks and failing to request an appropriate curative instruction; (4) trial counsel rendered ineffective assistance in failing to investigate Ron Johnson's juvenile records and to cross-examine him in regard to bias concerning the record; (5) trial counsel was ineffective for failing to investigate and/or call witnesses helpful to the defense, including eyewitnesses Joseph Flowers and Ronald Johnson and alibi witnesses Christina Clark and Margaretta Wise; and (6) trial counsel rendered ineffective assistance by failing to seek vacation of the death sentence and imposition of life imprisonment. (Resp. Ex. "7," Direct Appeal Brief).

As to the sixth claim, the allegations of ineffective assistance of counsel at the sentencing phase rested on the following grounds: (1) trial counsel was ineffective for failing to challenge the sufficiency of the evidence to establish aggravating circumstance 42 Pa. C.S.A. § 9711(d)(7) (that the defendant, in the commission of the murder, knowingly created a grave risk of death to another person); (2) trial counsel was ineffective for failing to point to mitigating factor § 9711(e)(4) (the age of the defendant at the time of the crime) and argue to the jury that Morris's age of 20 at the time of the offense was a mitigating factor; (3) trial counsel was ineffective for failing to argue to the jury the existence of mitigation factor § 9711(e)(1) (the defendant has no significant history of prior criminal convictions); (4) trial counsel was ineffective for failing to present the records from Morris's psychiatric hospital stays in January 1977 and May 1977, and failing to present any supporting testimony, which would have shown that Morris had a "longstanding psychiatric and/or emotional difficulty that manifested itself in violent behavior toward himself and members of his family," (id. at 74), and would support a mitigation argument under § 9711(e)(8) (any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense); (5) trial counsel was ineffective in his closing argument at the penalty phase for failure to argue any of the mitigating circumstances as described above, and simply asking for a "mercy" verdict; and (6) post-verdict counsel were ineffective for failing to raise the penalty phase arguments described above. (Id. at 59-76).

Pennsylvania Supreme Court's ruling, in its entirety, was as follows:

> The appellant next makes five assignments of ineffective assistance by his trial counsel. [Footnote: Specifically, he argues that: (1) trial counsel failed to investigate and/or properly examine a Commonwealth witness; (2) trial counsel failed to investigate and/or have witnesses, helpful to the appellant's defense, testify; (3) trial counsel failed to object to improper closing arguments by the prosecution; (4) trial counsel failed to request appropriate curative instruction for the prosecution's improper closing remarks and the improper admission of evidence which created an inference of unrelated criminal activity; and (5) that trial counsel failed to seek vacation of the death sentence and imposition of life imprisonment.] We have reviewed each and believe them to be baseless.

564 A.2d at 1230 and n.10.

On April 2, 1990, Morris filed a *pro se* petition for state post-conviction relief under the Pennsylvania Post-Conviction Relief Act, 42 Pa. C.S. § 9541 et seq. ("PCRA"). Thereafter, on October 18, 1993, new court-appointed counsel filed an amended PCRA petition. On January 18, 1995, the PCRA court denied relief without holding an evidentiary hearing. Petitioner appealed the denial of his PCRA petition to the Pennsylvania Supreme Court.[11] The Pennsylvania Supreme Court affirmed the denial of PCRA relief. Commonwealth v. Morris, 684 A.2d 1037 (Pa. 1996). On June 23, 1997, the United States Supreme Court denied *certiorari*. Morris v. Pennsylvania, 521 U.S. 1106 (1997).

On December 12, 1996, Morris filed a second *pro se* PCRA petition in the Philadelphia County Court of Common Pleas. New counsel filed an amended PCRA petition on October 27,

---

[11] The claims raised in the amended PCRA petition through appeal were as follows: (1) trial counsel rendered ineffective assistance for failure to "life qualify" the jury; (2) trial counsel rendered ineffective assistance for failure to present an alibi defense; (3) trial counsel was ineffective for failing to call relevant witnesses on the issue of misidentification, including Joseph Flowers and Artie Morris; and (4) trial counsel was ineffective for failing to investigate the existence of fingerprint analysis of the yellow plastic bag. (Resp. Ex. "8," Petitioner's First PCRA Appeal Brief).

1997. The second petition, together with supplemental petitions, raised twenty-three claims.[12]

---

[12] The amended second PCRA petition raised the following eighteen claims: (1) Morris was denied his constitutional right to counsel where his trial counsel had a conflict of interest in that he simultaneously represented Morris as well as his brother, Artie Morris, in a civil matter, even though Artie Morris had been identified as a perpetrator in the offense; (2) trial counsel rendered ineffective assistance at the penalty phase for failing to investigate, develop and present mitigating evidence about Morris's abusive childhood, long history of serious mental illness and organic brain damage, and for making an inadequate and incoherent closing argument to the jury; (3) Morris is entitled to a new trial because his conviction was based upon unconstitutionally unreliable identification evidence; (4) trial and appellate counsel rendered ineffective assistance for failing to conduct constitutionally adequate investigation and consequently, for failing to discover exculpatory evidence; (5) Morris was denied his constitutional rights to confrontation and due process when the trial court prevented the defense from cross-examining the juvenile eyewitness, Ronald Johnson, concerning his juvenile record, and when the prosecutor deliberately misled the court and counsel as to Ronald Johnson's record; (6) Morris is entitled to a new trial because the prosecutor failed to disclose exculpatory Brady evidence; (7) the trial court erred in admitting evidence of an unrelated criminal offense in violation of the Pennsylvania and United States Constitution; (8) Morris is entitled to relief because of prosecutorial misconduct during the closing argument at the verdict phase; (9) Morris is entitled to relief from his death sentence due to prosecutorial misconduct at the penalty phase; (10) Morris is entitled to relief from his death sentence because the trial court erred in excluding relevant evidence of mitigating circumstances at the penalty phase hearing—*i.e.*, evidence concerning Morris's history of mental health problems (hearsay as to what the doctors reportedly told Morris's mother about Morris, "that he was suffering from seizures that could make him violent and that the doctors had prescribed "Mellarill" for Morris); (11) Morris is entitled to relief from his conviction and sentence due to the Commonwealth's use of peremptory challenges to strike prospective jurors in a discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79 (1986) and the Pennsylvania Constitution; (12) Morris is entitled to relief from his death sentence because the (d)(7) aggravating circumstance is unconstitutionally vague and overbroad, the evidence was insufficient to support a finding of this aggravating circumstance, and application of this aggravating circumstance violated Morris's double jeopardy rights; (13) Morris is entitled to relief from his death sentence because the court's jury instructions and verdict sheet unconstitutionally indicated that the jury unanimously had to find the existence of a "mitigating circumstance" before it could give effect to that circumstance in its sentencing decision; (14) Morris is entitled to relief from his death sentence because the jury was not instructed that a sentence of life imprisonment would make him ineligible for parole; (15) Morris is entitled to relief from his death sentence because the trial counsel failed to properly instruct the jury on the nature and use of aggravating and mitigating circumstances; (16) the trial court erred in its instruction to the jury (verdict phase) regarding "prior statements of identification" and its failure to give an adequate cautionary instruction regarding the consideration of identification testimony; (17) all previous counsel were ineffective for failing to previously raise the issues presented in the within petition, or to properly investigate and prepare the case; and (18) Morris is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described in the petition.

19

Briefing on the second petition was not completed until April 1998. While the second petition

was pending, the governor of Pennsylvania signed a death warrant scheduling Morris's

execution for January 27, 2000. Morris moved for a stay of execution. On December 21, 1999,

the PCRA trial court found that it lacked jurisdiction to review the claims because the second

petition had been filed beyond the one-year time limitation of the PCRA. Commonwealth v.

Morris, No. 409-413, slip. op. (Pa. Commw. Ct. Dec. 21, 1999). Because the court determined

that it lacked jurisdiction, it did not address any claim on the merits.[13] The PCRA court also

_____

Morris also requested an evidentiary hearing and argued that the PCRA court was not
prohibited from reviewing the claims because Pennsylvania's "relaxed waiver rule" in capital
cases allowed the court to review ostensibly time-barred claims.  (Resp. Ex. "16," Second
Amended PCRA Petition).

Additional claims raised in supplemental petitions included the following: (18) trial counsel
was ineffective for failing to properly investigate and present impeachment evidence relating to
the testimony of James Willie that Morris had confessed to him and that he (Willie) had
provided Suffolk, Virginia police with the information in August, 1980—the chief impeachment
evidence being that Willie was charged with check forgery by petitioner's uncle, Albert Morris,
in September 1983, prior to taking Willie's formal statement in October 1983; (19) trial counsel
was ineffective for failing to properly investigate and litigate a motion to suppress evidence of
Morris's October 22, 1980 statement to Sergeant Newsome of Suffolk, Virginia, and that trial
counsel was ineffective for failing to properly prepare to impeach the testimony of the
Commonwealth's witnesses concerning the circumstances of Morris's arrest and the taking of
the subsequent statement; (20) trial counsel was ineffective for failing to investigate and present
evidence of Morris's mental state at the motion to suppress evidence hearing, which would have
made him incapable of voluntarily waiving his Miranda rights; (21) Morris is entitled to relief
from his death sentence in that it was the result of racial discrimination; (22) Morris is entitled to
discovery and an evidentiary hearing regarding possible participation of any of the
Commonwealth's witnesses in a witness security program; and (23) Morris is entitled to relief
because the trial Assistant District Attorney had a "conflict of interest" as he "may have been
related to the owners of the Pep Boys store where the crime occurred."(Resp. Ex. "6," Opinion
of Judge James J. Fitzgerald, III, denying PCRA relief, 12/21/99)

[13] On one particular claim—that the trial court's penalty phase instructions and verdict
sheet unconstitutionally indicated that the jury had to unanimously find a mitigating
circumstance in its sentencing decision in violation of Mills v. Maryland, 486 U.S. 367
(1988)—the PCRA trial's ruling contradicts itself. The court appears to rule on the merits, while
simultaneously concluding that it lacked jurisdiction to rule on the merits:

granted a stay of execution while Morris filed an appeal.

Sixteen months later, the Pennsylvania Supreme Court vacated, on procedural grounds,

the PCRA court's order staying the execution. Commonwealth v. Morris, 771 A.2d 721 (2001).

Morris's execution was then scheduled for June 28, 2001. The Pennsylvania Supreme Court

granted another stay of execution while it resolved Morris's appeal of the jurisdictional dismissal

of his second PCRA petition.

On May 1, 2003, the Pennsylvania Supreme Court affirmed the denial of PCRA relief,

holding that the second petition had been untimely and that the court accordingly lacked

jurisdiction to entertain it. Commonwealth v. Morris, 822 A.2d 684 (Pa. 2003).[14] The Court also

vacated the stay of execution.

---

Accordingly, Frey v. Fulcomer, [132 F.3d 916 (3d Cir. 1997], does not provide a basis for this Court to assume jurisdiction of the claim. Further, Pennsylvania law differs with lower federal court interpretations of the Constitutional principles set forth in Mills v. Maryland, supra.

Thus, *on the merits* the Third Circuit Court's decision in Frey v. Fulcomer, supra, is not considered controlling by this court, *which holds that the jury instructions and verdict sheet in this case did not create a likelihood that a juror would believe that the finding of a mitigating circumstance had to be found by the jury unanimously.*

In conclusion, this court finds that the within second or subsequent petition is untimely under the PCRA, and *this court lacks jurisdiction to grant relief*. Further, *on the merits*, petitioner's claim that he is entitled to relief from the death sentence on the grounds that the trial court's instruction and the verdict slip misled the jury in[to] likely believing that it had to find the existence of a mitigating circumstance unanimously is without merit.

Therefore, petitioner's within second or subsequent PCRA petition is hereby DISMISSED.

Commonwealth v. Morris, No. 409-413, slip. op. at 21 (emphasis added).

[14]   The Pennsylvania Supreme Court specifically ruled that it was without jurisdiction to review Morris's claim that the penalty phase jury instructions and verdict sheet unconstitutionally indicated that the jury had to unanimously find mitigating circumstances in violation of Mills v. Maryland, 486 U.S. 367 (1988). 822 A.2d at 698. See supra note 12.

### F.  Morris's Petitions for a Writ of Habeas Corpus in Federal Court

While the second PCRA petition was pending in the state court system, petitioner filed a

Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of

Pennsylvania on October 28, 1997 pursuant to 28 U.S.C. § 2254.[15] The court recognized that

many of the claims that Morris sought to litigate in federal court were identical to the claims he

was then currently pursuing in state court. Accordingly, by Memorandum and Order dated

March 18, 1998, the Eastern District court dismissed the Petition as a "mixed petition" under

Rose v. Lundy, 455 U.S. 509 (1982), without prejudice to Morris's right to file an amended

petition, which would relate back to the October 28, 1997 federal filing, upon exhaustion of his

state court remedies. By Order dated May 28, 1998, the Third Circuit dismissed the

Commonwealth's appeal of that order for lack of standing, without prejudice to the

Commonwealth's right to argue in any further proceeding that any amended habeas corpus

petition should be regarded as untimely or otherwise defective under the AEDPA.

---

[15]  By the time Morris's claims reached federal court, he had already been represented by seven different attorneys. Susan Ercole, Esq., who was initially appointed to represent Morris, represented him during the litigation of pretrial motions before Judge Robert Latrone and at the beginning of jury selection. Ms. Ercole became ill during jury selection and was unable to continue her representation. Leon Tucker, Esq., was appointed to take over from Ms. Ercole and represented Morris through the trial and penalty phases. Mr. Tucker withdrew following the filing of post-verdict motions. Daniel P. Alva, Esq., represented Morris during part of the post-verdict proceedings. At some point, Mr. Alva withdrew and Thomas Moore, Esq., represented Morris. Following the denial of post-verdict motions and the formal imposition of sentence, Mr. Moore withdrew. Daniel Preminger, Esq., entered his appearance and represented Morris on direct appeal. Bernard L. Siegel, Esq., represented Morris in his initial PCRA proceedings. In his second PCRA proceedings, Morris was represented by Billy H. Nolas, Esq., and Robert B. Dunham, Esq., of the Center for Legal Education, Advocacy and Defense Assistance ("LEADA"). On his federal *habeas corpus* petition, Morris has been represented by Stuart B. Lev, Esq. and Christina Swarns, Esq., of the Defender Association of Philadelphia, Federal Court Division, Capital Habeas Corpus Unit.

On June 16, 1998, Morris moved in the Eastern District court for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b), requesting that the court's Order dated March 18, 1998  be vacated. Morris asked that instead of dismissing the case under Rose v. Lundy, the court retain jurisdiction over the petition and hold the case in abeyance pending exhaustion of state remedies. By Order dated July 7, 1998, the district court denied the Rule 60(b) motion. Morris appealed to the Third Circuit, which affirmed. Morris v. Horn, 187 F.3d 333 (3d Cir. 1999).

On June 20, 2001, Morris filed a second Petition for Writ of Habeas Corpus ("Petition"), raising twenty-four claims, and an Emergency Motion for a Stay of Execution in the Eastern District. On June 21, 2001, the court granted a stay of execution. Briefing was thereafter suspended pending disposition of Morris's appeal of his second PCRA petition to the Pennsylvania Supreme Court. On May 1, 2003, after the Pennsylvania Supreme Court affirmed the denial of PCRA relief, Commonwealth v. Morris, supra, 822 A.2d 684 (Pa. 2003), the Eastern District court ordered that the federal habeas case proceed. Additional briefs were filed, and in spring 2006 the case was transferred here to the United States District Court for the District of New Jersey for resolution.

23

## II.     GOVERNING LEGAL PRINCIPLES UNDER 28 U.S.C. § 2254

### A.  AEDPA: Exhaustion of State Court Remedies

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs federal court review of habeas petitions. Congress enacted AEDPA "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206 (2003). AEDPA imposes on federal courts certain procedural requirements and standards for analyzing federal habeas petitions.

Under AEDPA, a federal court may not review a petition for a writ of habeas corpus unless the petitioner has first exhausted all state court remedies. 28 U.S.C. §2254(b)(1); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1998). This exhaustion requirement is predicated on the principle of comity which ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of state courts in protecting federally guaranteed rights. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

To satisfy this exhaustion requirement, the petitioner must "afford each level of the state courts a fair opportunity to address the claim." Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); see McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999). "This requires that the claim brought in federal court be the substantial equivalent of that presented to the state courts." Evans v. Court of Common Pleas, 959 F.2d 1227, 1231 (3d Cir. 1992). To "fairly present" a claim, a habeas petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless, 172 F.3d at 261 (citing Anderson v. Harless, 459 U.S. 4, 6 (1982) and Picard v. Connor, 404

U.S. 270, 277-78 (1971)). Essentially, to preserve a claim for federal habeas review, a petitioner must present the claim to the state courts in terms of the denial of a federal right. <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995) (per curiam). Making a "somewhat similar state-law claim" is insufficient. <u>McCandless</u>, 172 F.3d at 261. The state courts need not discuss or base their decisions upon the presented claims for those claims to be considered exhausted; what matters is that the petitioner *presented* those claims and gave the state courts an opportunity to rule on them. <u>Doctor</u>, 96 F.3d at 678.

The exhaustion requirement may be excused when the claims would be procedurally barred by the state court, *i.e.*, it would be futile for the petitioner to seek relief in the state court system or if there otherwise is "an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B); <u>see</u> <u>Szuchon v. Lehman</u>, 273 F.3d 299, 323 n.14 (3d Cir. 2001) ("Exhaustion will be excused as 'futile' if 'the state court would refuse on procedural grounds to hear the merits of the claims'"); <u>McCandless v. Vaughn</u>, 172 F.3d 255, 260 (3d Cir. 1999) (exhaustion deemed satisfied where state procedural rules bar petitioner from seeking relief in state court).

### B.  When a Federal Habeas Court Can Review Procedurally Defaulted Claims

Even though a state court refused to review the merits of a claim on procedural grounds (or would refuse if presented with that claim), a federal court may still be precluded, by principles of federalism and comity, from federal habeas review. <u>See</u> <u>Coleman</u>, 501 U.S. at 729-32. Claims deemed exhausted because of a state procedural bar are "procedurally defaulted," and federal courts may only consider the merits of procedurally defaulted claims under limited circumstances. "The procedural default doctrine precludes a federal habeas court from 'reviewing a question of federal law decided by a state court if the decision of that court rests on

25

a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" Bronstein v. Horn, 404 F.3d 700, 707 (3d Cir. 2005) (quoting Coleman, 501 U.S. at 729) (emphasis supplied by Bronshtein)); Wilson v. Beard, 426 F.3d 653, 664 (3d Cir. 2005) ("[A] claim is not procedurally defaulted merely because a state court concluded that it was waived under a state procedural rule; rather, it must also be shown that the state rule constitutes an "adequate" and "independent" ground barring review.").

If a petitioner's federal claim is defaulted by a state procedural rule that is not "independent" of federal law or otherwise "adequate," the federal court may proceed to consider the merits of his claim. Furthermore, a federal habeas court may always review the merits of a defaulted claim if the petitioner can establish "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the procedural default. Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002) (citing Coleman, 501 U.S. at 750).

### 1. *"Independent and Adequate" State Law Grounds*

In the inquiry of whether a state procedural rule is "independent and adequate," the state procedural rule is not "independent" when it substantially mirrors the requirements of federal constitutional law. See, e.g., Bronshtein, 404 F.3d at 722 ("[W]e understand [the Pennsylvania case] to represent an interpretation of what Batson requires, not an independent state procedural rule."). A state procedural rule is not "adequate" to support a judgment unless it is "firmly established and regularly followed" at the time the alleged default occurred. Ford v. Georgia, 498 U.S. 411, 423-24 (1991); Bronshtein, 404 F.3d at 707; Doctor, 96 F.3d at 684 ("A state rule is adequate only if it is 'consistently and regularly applied.'"). This test ensures, among other things, "that federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule." Bronshtein, 404 F.3d at 707. In determining whether a

particular state rule is adequate, a federal habeas court must undertake three steps: (1) identify the state procedural rule that precluded state PCRA review; (2) identify the time at which the alleged default occurred; and (3) decide whether the rule was firmly established and regularly followed at the time the alleged default occurred. See Bronshtein, 404 F.3d at 708.

Accordingly, this Court now turns to the state procedural rule relied on by the state court to bar Petitioner's claims in his second PCRA petition—the one-year time limitation for filing PCRA petitions under Pennsylvania law—and examines whether the state rule is independent of a federal question and, pursuant to the aforementioned three steps, adequate to bar federal habeas relief in this case.

### 2.   *Pennsylvania's PCRA One-Year Limitations and Relaxed Waiver Rule*

The Court of Common Pleas dismissed Morris's second PCRA petition on the grounds that it was untimely under 42 Pa. C.S. § 9545(b), which requires PCRA petitions to be filed within one year of the completion of direct review.[16] Commonwealth v. Morris, No. 409-413,

---

[16] In dismissing Morris's second PCRA petition, the court stated:

Since the wording of [§] 9545 specifically encompasses "a second or subsequent petition,"petitioner's within petition should have been filed within one year from the date judgment of sentence became "final." Subsection 9545(b)(3) states that a judgment is final at the "conclusion of direct review, including discretionary review in the Supreme Court of the United States . . . ." Since petitioner's direct appeal to the Supreme Court of Pennsylvania was disposed on September 22, 1989, by the Pennsylvania Supreme Court's affirmance of the judgment of sentence, . . . and a subsequent petition for certiorari to the United States Supreme Court was not filed, petitioner's judgment of sentence became final at the expiration of a ninety day period following the affirmance of the judgment of sentence, or, on or about December 20, 1989. . . . For timeliness purposes, one year from the date the judgment became final would be on or about December 20, 1990.

The within petition was not filed until December 12, 1996, well after a year from the date petitioner's judgment became final, and it was filed after the effective date of the November 1995 Amendments to the Act, which were effective on January 16, 1996 . . . .

The within petition was filed within one year of the effective date of the Act[;] however, the

slip. op. (Pa. Commw. Ct. Dec. 21, 1999). The Pennsylvania Supreme Court affirmed that decision.[17] Commonwealth v. Morris, 822 A.2d 684 (Pa. 2003). Therefore, the state procedural rule at issue is the rule that required capital defendants to file a PCRA petition within one year of the completion of direct review.

Next, the Court must identify the time at which the alleged procedural default occurred—that is, the time that Morris's one-year window to file a second or successive PCRA petition under § 9545(b) expired. Morris asserts that the default occurred in 1990 (one year from the date the judgment became final); the Commonwealth asserts that the default occurred in 1996 (when Morris filed his second PCRA petition). The Court finds it unnecessary to resolve the disagreement between Morris and the Commonwealth as to the precise date of the default because regardless of whether Morris's default occurred in 1990 or 1996, the one-year limitation for filing a PCRA petition was neither firmly established nor regularly followed until well after 1996—at the earliest on November 23, 1998, the date Commonwealth v. Albrecht, 720 A.2d 693, 700 (1998), was decided.[18]

---

within petition is a second or subsequent petition and does not qualify for the one year grace period since [it] is not petitioner's first petition . . . .

Accordingly, the within petition, being a second or subsequent petition, is not timely filed under the Act.

Commonwealth v. Morris, No. 409-413, slip. op. at 14-15 (Pa. Commw. Ct. Dec. 21, 1999).

[17] The Pennsylvania Supreme Court concluded: "[W]e are without jurisdiction to review the instant petition. . . . Furthermore, we affirm the order of the PCRA court denying [petitioner's] second Petition for Post Conviction Relief at this time." Commonwealth v. Morris, 822 A.2d 684, 699 (Pa. 2003).

[18] The Commonwealth essentially concedes this point in its supplemental briefing. It had originally argued the PCRA one-year limitation was independent and adequate and thus barred federal habeas review of any claims that Petitioner raised for the first time in his second PCRA petition. However, the Third Circuit's decision in Bronshtein v. Horn, 404 F.3d 700 (3d Cir.

28

Prior to 1996, the Supreme Court of Pennsylvania applied a "relaxed waiver" rule in conducting PCRA review of capital convictions. The Pennsylvania Supreme Court believed it had a "duty to transcend procedural rules" in capital cases because of the "overwhelming public interest" in preventing unconstitutional executions and, thus, for a time, a claim of constitutional error in capital cases would not be considered waived by a failure to preserve it. Bronshtein, 404 F.3d at 708 (quoting Commonwealth v. McKenna, 383 A.2d 174, 180-81 (1978) and Szuchon v. Lehman, 273 F.3d 299, 326 (3d Cir. 2001)). Although the one-year PCRA time limitation became effective on January 16, 1996, it was not until more than two years later that the Pennsylvania Supreme Court announced that the one-year PCRA time limitation would be strictly enforced, and the "relaxed waiver" rule would no longer be applied. Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998) ("While it has been our 'practice' to decline to apply ordinary waiver principles in capital cases, . . . we will no longer do so in PCRA appeals."). One month after Albrecht was decided, the state supreme court held in Commonwealth v. Peterkin, 722 A.2d 638 (Pa. 1998), that the "relaxed waiver" rule would not supercede the PCRA time bar in capital cases. Finally, on March 2, 1999, in Commonwealth v. Banks, 726 A.2d 374 (Pa. 1999), the state supreme court "unequivocally" announced that the PCRA time limits are jurisdictional and not subject to judicial relaxation. See Bronshtein, 404 F.3d at 709. As recognized by the Bronshtein court, it was "less than perfectly clear" that the "relaxed waiver" rule would no longer be applied in capital cases until the state supreme court decided Banks. Id.

---

2005) (which was issued after the Commonwealth had filed its original response to this petition), effectively put this argument to rest. As the Commonwealth admits in its supplemental memorandum: "[I]t appears that Bronshtein may render the PCRA time-bar not 'adequate' to bar federal habeas review of the claims petitioner raised for the first time in his time-barred second PCRA action." (Resp. Supp. Mem., at 3). The Commonwealth also concedes that "even if petitioner's date of default was 1996, . . . it would nonetheless be before Albrecht, and presumably under Bronshtein the PCRA time-bar would not be adequate." (Id. at 3 n.1.)

In Bronshtein, the Third Circuit determined that it was not necessary for purposes of that case to decide whether Albrecht, Peterkin, or Banks "marked the critical point in time" at which the Pennsylvania Supreme Court reversed the "relaxed waiver" rule and strictly enforced the one-year time limitation in PCRA appeals because the petitioner's default had occurred before the earliest of the three dates. Bronshtein, 404 F.3d at 709. Thus, because the one-year time limitation had not been firmly established or regularly applied at the time of the petitioner's default, the Third Circuit held that the "relaxed waiver" rule was not "adequate" to bar federal habeas review of claims that had been time-barred under Pennsylvania PCRA rules. Id.

In light of the Bronshtein decision, this Court similarly concludes that whether Morris's default occurred in 1990 or 1996, Morris did not have fair notice that the Pennsylvania Supreme Court was going to decline to apply the "relaxed waiver" rule in his case. Therefore, strict enforcement of the one-year time limitation for PCRA appeals was neither firmly established nor regularly applied at the time of Morris's default, and the one-year time limitation is not "adequate" to bar federal habeas review of the claims raised in Morris's second PCRA petition.

### C.  Merits Analysis Under § 2254

Once a federal habeas court determines that a petitioner has exhausted state remedies or that a merits review is warranted despite a procedural default, the court must determine what standard governs the review of each of the petitioner's claims. If a state court has adjudicated the merits of a claim, the federal habeas court's standard of review is narrow; it must apply the deferential standards of the AEDPA. See Hameen v. Delaware, 212 F.3d 226, 248 (3d Cir. 2000). Under those deferential standards, a state prisoner's habeas petition must be denied unless the adjudication was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2); Jacobs v. Horn, 395 F.3d 92, 99 (2005). A federal habeas court must presume that a state court's findings of fact are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. Id.

A state court decision is "contrary to" Supreme Court precedent under § 2254(d)(1) where the state court reached a "conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  A state court decision is an "unreasonable application" under § 2254(d)(1) if the court "identifies the correct governing legal rule from the Supreme Court's cases, but unreasonably applies it to the facts of a particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407; Jacobs, 395 F.3d at 100.

These deferential standards of review do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Jacobs, 395 F.3d at 100 (quoting Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002)). If it is not clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined under United States Supreme Court law, federal habeas courts apply pre-AEDPA standards of review. Jacobs, 395 F.3d at 100. Prior to AEDPA, federal habeas courts conducted a *de novo* review over pure legal questions and mixed questions of law and fact. Id. (citing Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)). The state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence under § 2254(e)(1). Jacobs, 395 F.3d at 100.

### D.  Claims Raised in Second PCRA Petition and Federal Habeas Petition

In this case, all of Morris's claims in his second PCRA petition were procedurally defaulted; the state court refused to review them based on Morris's failure to file those claims within Pennsylvania's PCRA one-year limitations period. See Part I. E. supra. Ordinarily, this Court would consequently be barred from reviewing those claims. However, because the state procedural rule used to dismiss those claims was not an "independent and adequate" ground to bar federal habeas review, see Part II. B. supra, a merits review by this Court is not barred. And because none of the claims that were presented for the first time in the second PCRA petition were reviewed by the state courts on the merits, this Court does not proceed under AEDPA's deferential review for those claims. For any claim that had been previously litigated on the merits, either on direct appeal or in Morris's first PCRA petition, this Court will apply AEDPA's deferential standards. With these principles in mind, the Court now turns to the merits of Morris's claims.

III.    **CLAIMS FOR RELIEF FROM SENTENCE OF DEATH**

Morris seeks relief from his sentence of death on several grounds, including that: (1) counsel was ineffective at the penalty phase for failure to investigate, develop,  and present significant mitigating evidence of Morris's abusive childhood and long history of mental illness, and for making an inadequate and incoherent closing argument (Claim II); (2) the Commonwealth engaged in prosecutorial misconduct at the penalty phase (Claim X); (3) the trial court improperly excluded relevant mitigating evidence (Claim XI); (4) the (d)(7) aggravating circumstance was unconstitutionally vague and overbroad, the evidence was insufficient to support a finding of this aggravating circumstance, and application of this aggravating circumstance violated Morris's double jeopardy rights (Claim XIII); (5) the jury instructions and verdict sheet at the penalty phase unconstitutionally indicated that the jury had to unanimously find a mitigating circumstance before it could give effect to that circumstance in its sentencing decision (Claim XIV); (6) the jury was never instructed that Morris would be ineligible for parole if he was sentenced to life imprisonment (Claim XVI); (7) the trial court failed to properly instruct the jury on the nature and use of aggravating and mitigating circumstances (Claim XVII); (8) the death sentence was a product of improper racial discrimination and violates the Constitution (Claim XXI); (9) all prior counsel were ineffective for failing to previously raise the issues presented in this petition (Claim XXIV); and (10) relief is warranted because of the cumulative effect of the errors alleged in the petition (Claim XXV).

For the reasons that follow, this Court concludes that Morris is entitled to relief from his sentence of death on three grounds. First, relief is warranted on the claim that trial counsel was ineffective in failing to investigate, develop, and present significant mitigating evidence at the penalty hearing. Second, relief is warranted on the claim that the prosecutor engaged in

33

impermissible and prejudicial actions at the penalty hearing which violated Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Third, relief is warranted on the claim that the penalty phase jury instructions and the verdict sheet, taken together, created a barrier to the sentencing jury's consideration of all mitigating evidence in violation of Morris's rights under the Eighth Amendment and <u>Mills v. Maryland</u>, 486 U.S. 367 (1988). All other claims that Morris raises in this petition with respect to his sentence of death are dismissed as moot.

### A.  Counsel's Ineffectiveness at Penalty Phase: Failure to Present Mitigating Evidence and Inadequate Closing Argument

In Claim II, Morris contends that he was deprived of effective assistance of counsel during the sentencing phase of trial because counsel failed to investigate, develop, and present significant mitigating evidence about Morris's abusive childhood, long history of serious mental illness, and organic brain damage. The crux of Morris's claim is that trial counsel was ineffective for failing to seek out, interview, and present testimony from Morris's family, friends, and mental health experts. Morris also contends that trial counsel was constitutionally ineffective for making an inadequate closing argument at the penalty phase.

In his direct appeal brief, Morris raised the narrow claim that trial counsel was ineffective for failing to present Morris's psychiatric records. Morris also raised the claim of an inadequate closing argument. The Pennsylvania Supreme Court summarily denied both of these claims without any explanation or citation to any law. 564 A.2d at 1230 and n.10 ("We have reviewed each [of Morris's five claims of ineffective assistance of counsel] and believe them to be baseless.").

34

The ineffectiveness/mitigation claim that Morris makes here was raised in his second PCRA petition and is much broader than the narrow claim based on presentation of records that he raised in his appeal. The Commonwealth concedes as much in its brief. ("The ineffectiveness/mitigation evidence claims that petitioner would raise on federal habeas (which the state supreme court refused to review in his time-barred second PCRA action) bear little resemblance, both factually and legally, to the relatively narrow claims presented to and rejected by the state supreme court on direct appeal.") (Resp. Brief, at 72). Thus, because there is no dispute that the ineffectiveness/mitigation argument that Morris makes here was raised for the first time in his second PCRA petition, the Court reviews this claim *de novo* for the reasons set forth *supra* in Part II.D. As for Morris's argument based on an inadequate closing argument, the Court reviews this claim under the AEDPA deferential standards.

The Court will first consider the standard for ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), then review the mitigating evidence that was available at the time of Morris's sentencing hearing, and finally analyze whether trial counsel's conduct "was so defective as to require reversal." Strickland, 466 U.S. at 687. Under the circumstances here, the performance of Morris's trial counsel fell below an objective standard of reasonableness due to counsel's failure to investigate Morris's background and a wealth of mitigating evidence, and that Morris suffered prejudice as a result of counsel's deficient performance. As a result, Morris is entitled to relief from his sentence of death.

### 1.  *Legal Standard under Strickland v. Washington*

The United States Constitution protects the fundamental right to a fair trial, and the Sixth Amendment defines the basic elements of a fair trial: a speedy and public trial, by a jury, with knowledge of the criminal charges and the ability to subpoena and confront witnesses, and with the assistance of counsel. The right to counsel, which is crucial to ensure the integrity of the trial process, has evolved into a constitutional right to have the reasonably effective assistance of counsel. "That a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the constitutional command." Strickland v. Washington, 466 U.S. 668, 685 (1984).[19]

When seeking to overturn a conviction or a death sentence based on ineffective assistance of counsel, a convicted defendant must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. The defendant also must show that the deficient performance caused prejudice to the defense. Id. at 687. Counsel must act with "reasonableness under prevailing professional norms" as guided by "American Bar Association standards and the like." Id. at 688. A court evaluating counsel's performance must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that

---

[19]  Although the Supreme Court decided Strickland in 1984, one year after Morris's trial and sentencing, this Court applies Strickland as the benchmark for assessing trial counsel's performance. The Court does so because by 1983, "all the Federal Courts of Appeals . . . held, the proper standard for attorney performance is that of reasonably effective assistance," which is the standard that Strickland reiterated. Strickland, 466 U.S. at 687.

36

counsel is strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment." Id.

Strategic choices made after thorough investigation of law and facts relevant to plausible

options are "virtually unchallengeable." Id. "Strategic choices made after less than complete

investigation are reasonable precisely to the extent that reasonable professional judgments

support the limitations on investigation. In other words, counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary.

In any effectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments." Id. at 690-91.

Under Strickland, the court's first function is to identify the prevailing professional

norms that existed at the time of Morris's sentencing with regard to investigation and

presentation of mitigating evidence in a death penalty case, then determine whether trial

counsel's conduct at sentencing fell below these norms and, if so, whether the petitioner suffered

prejudice thereby. One source for determining the prevailing professional norms is found in the

American Bar Association standards for criminal justice. Strickland, 466 U.S. at 688; Wiggins v.

Smith, 539 U.S. 510, 524 (2003) (recognizing ABA Guidelines as "standards to which we long

have referred as 'guides to determining what is reasonable'" with respect to the investigation and

presentation of mitigating evidence in capital cases).

Although the first ABA Guidelines for capital defense work were adopted in February

1989, more than five years after Morris was sentenced to death, the 1989 guidelines simply

reflected prevailing norms in the profession that had already existed. See American Bar

Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases

37

1989, Introduction, located at http://www.abanet.org/deathpenalty/resources/docs/ 1989Guidelines.pdf (hereinafter "1989 ABA Guidelines"). Consequently, they are effective standards by which to judge the reasonableness of counsel's conduct in this case. See Marshall v. Cathel, 428 F.3d 452 (3d Cir. 2005) (using ABA guidelines as prevailing professional norms even though case had been tried in 1986 because "even then [counsel] well knew that 'the unique nature of modern capital sentencing proceedings . . . derives from the fundamental principle that death is different.'") (quoting Schiro v. Farley, 510 U.S. 222, 238 (1994)); Hamblin v. Mitchell, 354 F.3d 482, 487 (6th Cir. 2003) (concluding that although the case was tried before the 1989 ABA guidelines were published, the 1989 and 2003 standards represented prevailing professional norms under Strickland because the standards were merely codification of "longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.").

Under those guidelines, counsel representing a defendant faced with the death penalty had a duty to ensure that all reasonably available mitigating evidence is presented to the jury in the most effective possible way. 1989 ABA Guidelines, 11.8.2(D). Preparation for the sentencing phase should begin immediately upon counsel's entry into the case, and the preparation should include thorough discussions with the client about the penalty strategy. Counsel should prepare by investigating the following witnesses and evidence: (1) witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client; (2) expert witnesses to provide medical, psychological, sociological or other explanations for the offense for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc.; (3) witnesses with knowledge and opinions about the lack of effectiveness of the death penalty

itself; and (4) witnesses drawn from the victim's family or intimates who are willing to speak against killing the client. Id., Guideline 11.8.3.

In addition to *investigation* of mitigating evidence, the ABA Guidelines also provide standards about counsel's duty of *presentation* of mitigating evidence in capital cases. Counsel should present all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence. Id., Guideline 11.8.6. Among the topics counsel should consider presenting are "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Wiggins, 539 U.S. at 524 (citing 1989 ABA Guideline 11.8.6).

Under Strickland, a petitioner must also demonstrate that he was prejudiced by trial counsel's deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. With respect to challenges to a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

### 2.   *Mitigating Evidence That Was Available At The Time of Sentencing Hearing*

Morris argues that his trial counsel failed to conduct any investigation into his background and personal history, and performed no mental health investigation in preparation for the penalty phase. In support of his contention that there was a wealth of mitigating circumstances that should have been investigated, Morris points to, *inter alia*, his abusive childhood; significant history of serious mental health problems; several severe head traumas; significant impairments resulting from organic brain damage; and psychiatric evaluations and treatment on several occasions. Moreover, Morris demonstrates that there were nearly a dozen potential witnesses who would have provided an abundance of mitigating evidence about him, his background, and his impaired mental health, but that his counsel did not seek out, interview, or present testimony from these family members and friends.[20] In addition, Morris argues that counsel failed to properly prepare him and his mother, Sarah Morris, for their penalty phase testimony.[21] Morris further contends that his trial counsel failed to seek and obtain the available records about him, including school records and correctional records. Morris argues that counsel's failures were particularly egregious because, although counsel was aware that Morris

---

[20] In support of his habeas petition, Morris contends that a number of potential witnesses were available to testify on his behalf, including: (1) two of his siblings (Jamie Morris, younger sister, Pet. Ex. "15"; Michael Morris, younger brother, Pet. Ex. "16"); (2) three of his uncles (William Morris, Pet. Ex. "10"; Albert Morris, Pet. Ex. "20"; Edward Morris, Pet. Ex. "21"); (3) two of his aunts (Bernice Scott, Pet. Ex. "18"; Dora Mae Morris, Pet. Ex. "19"); and (4) two family friends (David Madden, Pet. Ex. "7"; Odessa Melton, Pet. Ex. "3"). These individuals submitted affidavits summarizing what their testimony would have been at Morris's sentencing hearing if trial counsel had contacted them and informed them that they could participate in the proceedings.

[21] Kelvin Morris's mother, Sarah Morris, testified in an affidavit: "I testified at [Kelvin's] trial. The lawyer never asked me about [Kelvin's] background or our family life. He barely spoke to me before I went on the witness stand. I would have testified to everything in this affidavit if I had been given the chance." (Pet. Ex. "17," Aff. Sarah Morris, ¶ 25).

received psychiatric treatment, he did not retain a mental health expert, did not have Morris evaluated, and did not present expert mental health testimony to the sentencing jury.

The affidavits of Morris's family members and friends and the other evidence in support of his habeas petition provide an overwhelming amount of highly compelling evidence to establish that Morris suffered an abused, neglected, and violent childhood; endured a number of significant head traumas; and has mental health problems. Sarah Morris (the petitioner's mother), Jaime Morris and Michael Morris (the petitioner's siblings), William, Albert, and Edward Morris (the petitioner's uncles), Bernice Scott and Dora Mae Morris (the petitioner's aunts), and David Madden and Odessa Melton (close family friends) all testified about the abuse, neglect, and violence that Kelvin suffered during his childhood and about Kelvin's apparent mental problems. His father was an alcoholic who frequently became verbally abusive and beat his wife and children and who could not keep a job, leading to financial problems. Kelvin was extremely sensitive to these incidents and protective of both his parents during their fights. His father frequently beat Kelvin when Kelvin tried to stop the fighting. At one point, his mother stabbed his father in the chest, and Kelvin rushed to his father's side to try to stop the bleeding. During this incident, and many others, Kelvin deteriorated into uncontrollable shaking, crying, and screaming. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 2-10; Pet. Ex. "15," Aff. Jaime Morris, ¶¶ 2-4; Pet. Ex. "16," Aff. Michael Morris, ¶¶ 2-7; Pet. Ex. "10," Aff. William Morris, ¶¶ 7; Pet. Ex. "20," Aff. Albert Morris, ¶¶ 2–4; Pet. Ex. "21," Aff. Edward Morris, ¶¶ 2; Pet. Ex. "18," Aff. Bernice Scott, ¶¶ 2; Pet. Ex. "19," Aff. Dora Mae Morris, ¶¶ 3; Pet. Ex. "7," Aff. David Madden, ¶¶ 2).

Kelvin also exhibited odd behavior and learning problems from an early age. Three times during his childhood, he fell to the ground from varying heights, requiring hospital visits and stitches in his head. One of the family friends testified that he also was hit by a car as a child, leaving him unconscious all the way to the hospital. (Pet. Ex. "3," Aff. Odessa Melton, ¶ 3). He was described as moody, often in a trance-like state where he did not seem to hear a person who was talking to him. He suffered from frequent, severe headaches and would swing suddenly from withdrawn and quiet to wildly agitated when he got one of those headaches. The headaches caused nausea and dizziness. He would often appear disoriented and delusional, seeming to talk to people who were not there or rant incoherently, laughing inappropriately, streaming in and out of conversations, and becoming suspicious and paranoid of others, including his teachers. He had a difficult time communicating or expressing his thoughts, and he became very confused, distraught, and upset as a result of his inability to communicate and the fact that he could not understand or control what was happening to him. His inability to remember even simple things caused serious difficulties in school and in employment. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 10, 13-17, 19-20; Pet. Ex. "15," Aff. Jaime Morris, ¶¶ 4-5, 7; Pet. Ex. "16," Aff. Michael Morris, ¶¶ 8-10; Pet. Ex. "10," Aff. William Morris, ¶¶ 2-5; Pet. Ex. "20," Aff. Albert Morris, ¶¶ 5-6, 10-14; Pet. Ex. "21," Aff. Edward Morris, ¶¶ 3–9; Pet. Ex. "18," Aff. Bernice Scott, ¶¶ 3-6, 8; Pet. Ex. "19," Aff. Dora Mae Morris, ¶¶ 4, 6-11).

His aunt testified that Kelvin could not manage his fears. When he was young, he saw his grandfather kill a chicken for dinner. Kelvin was horrified and cried uncontrollably, and he never got over seeing that chicken get killed. He became terrified of chickens and came to believe they wanted to kill him, even as an adult. (Pet. Ex. "18," Aff. Bernice Scott, ¶ 7).

42

The family lived in a crime-ridden neighborhood. Kelvin was exposed to criminal gang activity in school and in the neighborhood and was a witness to robberies on the street and classmates bringing guns and knives to school. Kelvin was bullied at school and on his way home, and got in numerous fights. His friend remembers Kelvin becoming dazed several times from being hit on the head with clubs and bricks. (Pet. Ex. "7," Aff. David Madden, ¶¶ 3). When he was teenager, he was stabbed in the chest. He became anxious about going to school, and his mother often rushed him to the emergency room on Sunday nights because of his severe asthma attacks. When Kelvin was about thirteen, he and his friend became heavily involved with drinking and drugs. They drank whatever they could get, smoked marijuana, took a lot of pills, and did methamphetamine and other drugs. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 18, 21; Pet. Ex. "10," Aff. William Morris, ¶¶ 6; Pet. Ex. "7," Aff. David Madden, ¶¶ 3-4).

His mental instability crested at one point during his teenage years in an incident that his sister describes as "a complete nervous breakdown." (Pet. Ex. "15," Aff. Jaime Morris, ¶ 6). In response to one of his father's tirades, Kelvin began trembling, screaming and crashing through the house uncontrollably. His mother called the police, and Kelvin was taken to the hospital. He was prescribed Mellarill. Several days after Kelvin stopped taking the drug, his mother came home and found him in a trance on the front steps. She called the police again, and this time he stayed in the hospital for several days. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 22-23; Pet. Ex. "15," Aff. Jaime Morris, ¶¶ 6; Pet. Ex. "16," Aff. Michael Morris, ¶¶ 7).

All of these family members and friends assert that they were available and willing to present mitigating evidence at Morris's penalty hearing, if they had had an opportunity to do so, but defense counsel never contacted them.

Morris also contends that trial counsel should have investigated and presented mental health experts to explain his bizarre behavior, diagnosed mental illness, treatment with anti-psychotic medication, childhood trauma, multiple head injuries, learning problems, and an abnormal EEG. On the day before the penalty phase began, Morris's counsel indicated to the trial court that he was having difficulty obtaining unidentified "medical records." (N.T., 11/30/83 at 63-65). Nothing in the transcript indicates what medical records defense counsel was talking about, what counsel's attempts consisted of, what difficulties he encountered, or whether he succeeded in obtaining the medical records.

Had trial counsel obtained Morris's psychiatric records, he would have learned the following. Records from Morris's six-day stay at a psychiatric hospital in January 1977 when Morris was seventeen years old reveal, *inter alia*, that: (1) Morris was involuntary committed to the facility after he became violent at home on several occasions, one of which involved him throwing a bottle that hit his brother Artie in the eye, necessitating removal of the damaged eye; (2) he tried to jump from a upper floor window; (2) he entered the facility very agitated and angry, and continued to be restless and anxious for about three days, talking about being afraid of losing control; (3) he asked for a staff member to put him in restraints so he could control his impulsiveness; and (4) he was treated with Haldol, Cogentin and prescribed Mellaril upon release. One record, the Psychiatric Admission Summary, says that upon admission he was "excited, rambling and irrelevant," his "associations were loose," there was "a pressured speech," "affect was inappropriate," he "appeared to be responding to auditory voices and looked disorganized," he "was out of touch with reality," and he suffered an "acute schizophrenic episode." Other records of the same stay, however, say that although he was sad and guilty over the incident with his brother, his mental status upon admission appeared normal,

44

with no incoherence, disorientation, delusions, or hallucinations. The impression was that Morris had an "explosive personality." (Pet. Ex. "31," Philadelphia Psychiatric Center, Discharge Summary, January 22, 1977; Psychiatric Admission Summary, January 16, 1977; Mental Status Examination, January 16, 1977). The results of his EEG were abnormal, showing "slow activity over the frontal, central and temporal areas on the left," indicating a need for additional neurological evaluation. (Id., Discharge Summary; Electroencephalography Report, January 19, 1977).

Four months after his initial psychiatric hospital stay, Morris was again hospitalized, this time for nine days in May 1977. This second stay was precipitated by violent rages against his younger brothers. Upon commitment, he was anxious, nervous, belligerent and hostile, but he subsequently calmed down. He was given Haldol, Cogentin, Dalmane, and a prescription for Mellaril. His diagnosis again was "explosive personality," and his prognosis was "guarded." (Id., Discharge Summary, May 16, 1977).

Correctional records from 1981 reveal, *inter alia*, that an evaluation conducted by a Virginia prison psychologist concluded that Morris was borderline retarded with a verbal IQ of 69, a non-verbal IQ of 60, and no reading skills. (Pet. Ex. "28," Virginia Department of Corrections - Adult Services, Psychological Summary, September 9, 1981). These records relate Morris's unstable childhood, alcoholic father, learning difficulties, history of street fights, psychiatric hospitalizations, and substance abuse. He was described as an "individual with a very damaged ego who is possibly brain damaged." (Id.).

45

Records from Morris's psychiatric treatment at Central State Hospital in Petersburg, Virginia, where he was hospitalized from January 21, 1981 through February 17, 1981, reveal further mitigating factors.[22] These records contain, *inter alia*, a social history interview conducted with Morris's mother by one of the hospital social workers. The interview reveals information about Morris's history of dizzy spells and blackouts, childhood head injuries, his personality changes, episodes of paranoia, childhood drug use, and need for psychiatric assistance, as well as his father's alcohol addiction over the previous sixteen years. (Pet. Second Supp. Mem. Ex. "2," Social History Report and Questionnaire from Central State Hospital Records).

During the second state PCRA proceedings, fourteen years after Morris's conviction, Morris's counsel requested two mental health evaluations. Dr. Carol Armstrong, a psychologist and neuropsychologist, concluded to a reasonable degree of certainty that Morris suffered from organic brain damage; an extreme mental and emotional disturbance; and multiple cognitive deficits, including impairments in memory, concept formation, flexibility, and impulse control. (Pet. Ex. "4," Aff. Carol Armstrong). Dr. Lawson Bernstein, a medical doctor and psychiatrist, concluded to a reasonable degree of certainty that Morris suffered from a number of serious and debilitating neurological, psychiatric, and cognitive impairments, including organic brain damage and post traumatic stress disorder. (Pet. Ex. "5," Aff. Lawson Bernstein). Both experts agree that this mental health information could have been developed and presented at the time of Morris's trial and sentencing.

---

[22] In these federal habeas proceedings, respondents requested discovery of all records from the petitioner's psychiatric treatment at Central State Hospital in Petersburg, Virginia. Respondents' Motion for Discovery (Document No. 28, filed August 18, 2004). The Court in the Eastern District of Pennsylvania granted this request by Order dated May 25, 2005.

Morris argues that such mental health testimony would have established significant mitigating evidence under two factors of Pennsylvania mitigation law that was in effect at the time of his sentencing—specifically, Section 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance") and Section 9711(e)(3) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.").

The Commonwealth argues that Morris cannot base his ineffectiveness claim on the failure to produce psychiatric records because the transcript reveals that Morris instructed his trial counsel not to pursue the psychiatric records. Moreover, the Commonwealth argues, presenting the psychiatric records would have done Morris more harm than good because the indications of an explosive, violent, and dangerous personality found in the records would have been damaging to Morris at the penalty phase. The Commonwealth further argues that the sentencing jury was adequately presented with mitigating evidence in the form of the testimony of both Sarah and Kelvin Morris, and trial counsel had no reason to suspect that Kelvin suffered from an abusive or traumatic childhood.

### 3.   *Deficiency of Counsel's Performance*

As explained in United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989), "counsel can hardly be said to have made a strategic choice . . . when s/he has not yet obtained the facts on which such a decision could be made." Under such circumstances, counsel's behavior is "not colorably based on tactical considerations but merely upon a lack of diligence." Id. at 712. The duty to investigate set forth in Strickland is particularly significant when applied to mitigating evidence, which the Supreme Court has recognized plays an important role in ensuring that a capital trial is not only "consistent and principled but also humane and sensible to the uniqueness of the individual." Eddings v. Oklahoma, 455 U.S. 104, 110-11 (1982). Where a jury in a capital case has been precluded from hearing mitigating evidence concerning the defendant's character or background because counsel has made an objectively unreasonable decision not to look for it, counsel's performance violates the dictates of Strickland. See Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510, 519-34 (2003); Outten v. Kearney, 464 F.3d 401 (3d Cir. 2006); Marshall v. Cathel, 428 F.3d 452 (3d Cir. 2005); Laird v. Horn, 159 F. Supp.2d 58 (E.D. Pa.), aff'd on other grounds, 414 F.3d 419 (3d Cir. 2001).

Counsel in capital cases are under an obligation to understand the fundamental shift in their duties once their client has been found guilty and a sentencing hearing begins:

> The existence of a penalty phase in capital trials makes such trials radically different from ordinary criminal trials. A full capital trial is in fact two separate but intimately related trials: a preliminary guilt trial focusing on issues pertaining to the commission of a capital offense, and a subsequent penalty trial about the convicted defendant's worthiness to live. The guilt trial establishes the elements of the capital crime. The penalty trial is a trial for life. It is a trial for life in the sense that the defendant's life is at stake, and it is a trial about life, because a central issue is the meaning and value of the defendant's life.

Marshall v. Hendricks, 307 F.3d 36, 99 (3d Cir. 2002) (citation omitted). "The penalty phase

focuses not on absolving the defendant from guilt, but rather on the production of evidence to make the case for life. The purpose of the investigation is to find witnesses *to help humanize* the defendant, given that the jury has found him guilty of a capital offense." Marshall, 307 F.3d at 103 (emphasis in original). Reasonable counsel should recognize that "death is different," see Marshall v. Cathel, 428 F.3d at 467, and that a person facing the death penalty has a constitutionally protected right to have available mitigating evidence presented on his behalf. Williams v. Taylor, 529 U.S. 362, 393 (2000) (stating that the petitioner "had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer").

In this case, trial counsel presented extremely limited mitigating evidence. At the sentencing hearing, Morris's counsel presented only two witnesses: Kelvin Morris and his mother, Sarah. From Sarah Morris, counsel elicited only Kelvin's date of birth; his in-patient status at the Philadelphia Psychiatric Center in January 1977; that Kelvin had five brothers and one sister with whom he had no problems; that Kelvin's father was killed one year prior to trial; that Kelvin had an eight-year old son; and that Kelvin sometimes became agitated and his skin turned a bluish tint. From Kelvin, counsel elicited the basic facts testified to by Sarah, along with the testimony that upon his release from the hospital, he was instructed to attend group therapy, but did not do so. See supra Section I.C.

Other than this brief and summary information, there is no evidence that trial counsel conducted any inquiry into Morris's childhood and medical history in connection with the penalty phase. He failed to investigate the availability of a wealth of significant mitigating evidence; consequently, he had no basis upon which to make a reasonable decision to limit any such investigation. Sarah Morris testified that trial counsel never even asked her about Kelvin's

background or their family life; he "barely spoke to [her]" before she testified in defense of her son's life. The cursory investigation that he did do should have put him on notice that Kelvin's childhood and mental health should have been fully explored. See Wiggins, 539 U.S. at 525 (finding the scope of investigation of mitigation evidence unreasonable in light of what counsel actually knew from limited review of defendant's social services records). Like the defense counsel in Wiggins, trial counsel here "abandoned [his] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." Wiggins, 539 U.S. at 524. Had he sought out and interviewed Morris's family members and friends and obtained Morris's psychiatric and correctional records, he would have found the mitigating evidence that was available, *supra*, all of which was relevant to mitigation under Pennsylvania law and explicitly set out as mitigation evidence in the "well-defined" norms of the ABA Guidelines. Wiggins, 539 U.S. at 524.

The Commonwealth argues that Morris cannot seek federal habeas relief on this ground because he instructed his trial counsel not to examine his psychiatric records. The record is unclear on this point. After the guilty verdict and on the day before the penalty phase began, counsel indicated to the trial court that he was having difficulty obtaining some unidentified medical records:

> The Court:    And, Mr. Tucker, in terms of presentation of mitigation circumstances, now, what is your time requirement?
>
> Mr. Tucker:   I will have to make at least two phone calls to determine that, Your Honor.
>
> \* \* \*
>
> I know that I will need a court order to have one of the people come, I know that.
>
> The Court:    A psychiatrist?

| | |
|---|---|
| Mr. Tucker: | A doctor, and it deals with medical records. |
| Mr. Strauss: | Only thing I will ask, if he is going to introduce a doctor I would like to have access to the records that the doctor will testify from. So if he can give me that, which I am entitled to — |
| Mr. Tucker: | I don't have them, I cannot get them — |
| The Court: | What he is saying, until he gets the court order he cannot get them, but once he does he will try to make the[m] available to you. |

(N.T., 11/30/83, at 63-65).

After a lunchtime recess, counsel told the trial court, without reference to the medical records, that the defense would be ready to proceed with a mitigation case by 10:00 the following morning. But shortly thereafter, after argument by the prosecutor on a separate issue, trial counsel asked for ten minutes to talk to Petitioner off the record. A short recess was granted. Back on the record, the court noted the late hour (quarter to four in the afternoon) and ordered the penalty phase to begin the next morning. The court also addressed trial counsel's intention to secure medical records: "And I know you will endeavor to present records in the event your client decides to proceed with any presentation of testimony regarding mitigating circumstances." (Id. at 81). Trial counsel asked for another "moment" to speak to Petitioner, after which he stated: "I have been instructed not to pursue the records." (Id. at 82). The prosecutor asked for that to be put on the record by the defendant, and in response, the court announced:

| | |
|---|---|
| The Court: | Inasmuch as we are not proceeding this evening, Mr. Strauss, and Mr. Tucker has advised the court, as just indicated, *that the defendant does not desire to proceed with any testimony*, we will have the record so indicate at this time—but if the defendant is desirous to maintain such a position when we are about to proceed with the sentencing aspect of this trial we will give him an opportunity to place that position on the record. Suppose we recess until 10:00 o'clock tomorrow. |

(N.T., 11/30/83, at 82) (emphasis added).

There is no record of any further discussion about the doctor, the medical records, a court order, or Petitioner's instructions to his counsel. The penalty phase proceeded the next day with trial counsel presenting only the testimony of Sarah Morris and Petitioner. At the most, this transcript suggests that Petitioner may have instructed his counsel not to obtain some unidentified medical records. It is not clear whether these medical records were the psychiatric records from Morris's psychiatric hospitalization in January 1977, the records from his psychiatric hospitalization in May 1977, his psychiatric correctional records from 1981, or some other medical records. This transcript does *not* support an assertion that Petitioner instructed his counsel not to present *any* mitigating testimony (as the trial court suggested). It does not support an assertion that Petitioner instructed his counsel not to present the relevant psychiatric records (as the government argues). Nor does it support an assertion that Petitioner instructed his counsel only to present testimony by himself and his mother, but no other mitigating evidence.[23]

The only thing this transcript does show very clearly is that trial counsel had not taken steps to secure these medical records until the penalty phase was ready to begin, which violated counsel's clearly established duty to begin investigating mitigating circumstances at the start of the case. See 1989 ABA Guidelines, 11.8.2 and 11.8.3.

---

[23] Consequently, this case is far removed from the recent case of Schriro v. Landrigan, — U.S. —, 127 S.Ct. 1933 (May 14, 2007), in which the Supreme Court held that a federal habeas court did not abuse its discretion in refusing to hold an evidentiary hearing to develop the petitioner's argument that defense counsel was ineffective for failing to introduce mitigating evidence against the petitioner's instructions. In Schriro—unlike in Morris's case here—the petitioner's instructions not to present any mitigating evidence were clear, defense counsel thoroughly explained the consequences of the petitioner's instructions to him, and the trial court ensured that the record was clear on both of these counts. The Court thus held that the federal habeas court's determination that the petitioner would not have been able to show a colorable claim of prejudice under Strickland was reasonable and that it acted within its discretion in refusing to hold an evidentiary hearing.

Despite the Commonwealth's claim to the contrary, trial counsel's failure to investigate and present the available mitigating evidence at the sentencing hearing cannot be characterized as a strategic decision. He neither interviewed petitioner's family members and friends, nor obtained available mental health records, nor presented the wealth of available mitigating evidence. The government speculates that trial counsel's failure to present mental health evidence was strategic because the mental health evaluations may have disclosed that petitioner possibly suffered from an "explosive personality." But there is no evidence that trial counsel ever examined the psychiatric records. Moreover, post-hoc speculation regarding possible reasons for trial counsel's actions does not render his performance constitutionally adequate. As explained by the Fourth Circuit, "courts should not conjure up tactical decisions an attorney could have made, but plainly did not. . . . Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another." Griffin v. Warden, 970 F.2d 1355, 1358-59 (4th Cir. 1992); see also Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer.").

Trial counsel himself could not explain why he failed to investigate or present mitigating evidence at the sentencing hearing. At the post-trial hearing on ineffective assistance of counsel held on December 9, 1985, trial counsel testified that he had no idea what his reasons had been for presenting so little mitigation evidence at the penalty phase. He recalled that the evidence of guilt at trial had been strong and so he attempted to just seek mercy for his client in the hope that the jury would come back with a life sentence as opposed to a sentence of death. Because of counsel's inability to articulate, only two years after the trial and death sentence, why he chose to present so little mitigation evidence, his choices are not entitled to the Strickland presumption

that he "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. There is simply no basis upon which to conclude that counsel's failure to investigate readily available mitigation evidence was a strategic decision made after thorough investigation of law and facts relevant to plausible options.[24]

There was little effort put forth at the penalty hearing to "humanize" Kelvin Morris. Counsel appeared not to understand, or to reject, his fundamental obligation to shift the focus from Morris's guilt to the circumstances of Morris's life once the guilt phase of the trial resulted in a conviction and the penalty phase had begun. There is no strategic explanation for trial counsel's failure to investigate the wealth of mitigating evidence available in this case. The mitigation evidence that was available and not presented would have served to "humanize" the defendant and was highly relevant to the sentencing jury's consideration of whether to sentence Morris to death. As a result, trial counsel's performance was objectively unreasonable. See White v. Singletary, 972 F.2d 1218, 1224 (11th Cir. 1992) (stating that "it should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness").

---

[24]   Given trial counsel's inability to recall his trial strategy with respect to the investigation and presentation of mitigating evidence in 1985, it appears unlikely that holding a evidentiary hearing now to explore these same issues would reveal any new information. Cf. Marshall v. Hendricks, 307 F.3d 36, 106-08 (3d Cir. 2002) (remanding claim of ineffective assistance of counsel in investigating and presenting mitigating evidence for district court to hold evidentiary hearing because there was no record of why counsel chose not to contact many mitigation witnesses).

The extent of trial counsel's investigation into Morris's childhood and mental condition was the equivalent of, or less than, that of counsel in those cases in which courts have found the failure to investigate and present mitigating evidence in a capital case was objectively unreasonable under Strickland. See Wiggins, 539 U.S. at 519-534 (concluding that defense counsel's investigation and presentation of mitigation was unreasonable where counsel relied exclusively on a psychological report, a pre-sentence report, and social service records that contained only limited reference to petitioner's troubled life history); Williams, 529 U.S. at 395-96 (finding ineffective assistance of counsel where counsel did not begin to prepare for the penalty hearing until a week before trial began, failed to conduct an investigation that would have uncovered extensive records graphically describing the petitioner's neglected and abused childhood, failed to introduce evidence that petitioner was borderline mentally retarded and uneducated past the sixth grade, and failed to seek prison records that would have shown that the petitioner was well-behaved in prison); Jermyn v. Horn, 266 F.3d 257, 303-12 (3d Cir. 2001) (concluding that counsel's investigation and presentation of mitigating evidence at penalty phase fell below professional standards where counsel presented only two witnesses who provided minimal information and failed to contact family members who could testify about petitioner's abused childhood; failed to obtain school records that corroborated the abuse; and failed to call available medical health experts to testify about abuse and the impact of that abuse on petitioner's mental state). Just like in Wiggins, Williams, and Jermyn, trial counsel here failed to investigate evidence about Morris's neglected and abused childhood and mental condition, and failed to obtain mental health records, school records, and prison records that would have demonstrated significant mitigating evidence.

The fact that trial counsel presented *some* mitigating evidence at Morris's penalty phase does not render his investigation and presentation reasonable, when the evidence that was presented bore little resemblance to the picture of Morris's childhood and mental condition encompassed in the mitigating evidence that counsel failed to discover. See Jermyn v. Horn, 266 F.3d at 311 ("[T]he fact that counsel presented some mitigating evidence of a different nature and quality seems largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of the available mitigating evidence (presented at trial and at the PCRA hearing) might have led to a different result."); Laird v. Horn, 159 F. Supp.2d at 116 ("[T]he fact [that] trial counsel presented some mitigating evidence does not warrant the conclusion that his failure to investigate other potential sources of mitigating evidence was thus reasonable.").

### 4. *Prejudice*

This Court further finds that Morris was prejudiced by his counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial, which resulted in a questionable penalty phase outcome. In any death penalty case in Pennsylvania, the jury's decision on the death penalty must be unanimous. Jermyn, 266 F.3d at 308. Accordingly, a petitioner can satisfy the prejudice prong if he can show that the presentation of the available mitigating evidence would have convinced even one juror to find that the mitigating factors outweighed the aggravating factors. Id. Therefore, this Court must weigh the totality of mitigating evidence that could have been presented at trial with the aggravating evidence that was presented and ask "had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." Wiggins, 539 U.S. at 534, 536.

The jury at Morris's trial found two aggravating circumstances: that the killing was committed in the perpetration of a felony, and that the defendant knowingly created a grave risk of death to another person in addition to the victim. The jury found no mitigating circumstances. Under the jury instructions, because there were no mitigating circumstances found to weigh against the aggravating circumstances, the jury returned with a sentence of death.

Had counsel properly investigated and presented evidence of Morris's childhood and mental health, the jury would have learned of the cruelty and neglect that Morris suffered at the hands of his alcoholic and abusive father; the numerous head injuries and severe headaches he suffered as a child; his strange and erratic behavior and learning disabilities; his paranoia and irrational fears; the street fights and violence he experienced; his psychiatric hospital stays and anti-psychotic medications; and the records indicating cognitive impairments and possible brain damage. The Court recognizes that within the available mitigating evidence, there is a history of

57

explosive violent actions by Morris that the Commonwealth could have used to offset the

mitigating narrative. But as found in <u>Williams</u>, trial counsel's failure to introduce a

comparatively large amount of evidence that would have weighed in Morris's favor could not

have been justified by a decision to forego *all* mitigating evidence for fear that the government

would highlighting some unfavorable evidence. 529 U.S. at 396. Given the substantial amount of

powerful mitigating evidence that would have been available in this case had trial counsel

conducted even a cursory investigation into Morris's background, the Court concludes, that

absent trial counsel's egregious errors, there is a reasonable probability that at least one juror

could have found the mitigating evidence stronger than the aggravating circumstances.[25] This

Court does not believe that the sentencing jury had a complete psychological picture of Morris.

<u>See</u> <u>Jermyn</u>, 266 F.3d at 311 ("While the jury clearly was aware that [petitioner] claimed that he

suffered from a mental illness, the lack of directed and specific testimony about [petitioner's]

childhood and its impact on [his] mental illness left the jury's awareness incomplete."); <u>Wiggins</u>,

539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the

mitigating side of the scale, there is a reasonable probability that at least one juror would have

struck a different balance.").

---

[25] This conclusion assumes that the jurors had a correct understanding that each of them
was permitted to individually consider mitigating circumstances. However, as discussed <u>infra</u>
Part III B., in light of the <u>Mills</u> error that occurred in this case, it is not likely that Petitioner's
actual jury had a constitutionally adequate understanding of the trial court's mitigating
circumstances charge.

Because Morris's trial counsel's performance at sentencing fell below an objective standard of reasonableness due to counsel's failure to conduct a constitutionally adequate investigation into Morris's background and to present many possible sources of mitigating evidence, and because Morris suffered prejudice as a result of counsel's deficient performance, the Court concludes that Morris is entitled to relief from his death sentence. On this basis, Morris's writ of habeas corpus is granted and it is ordered that Morris be given a new sentencing hearing.

### 5.   *Closing Argument*

Morris also claims that counsel was ineffective for delivering an inadequate and harmful closing argument in which he failed to challenge the aggravating circumstances and did not argue in favor of any mitigating circumstances. Morris raised this argument for the first time on direct appeal, but it is difficult to tell whether the Pennsylvania Supreme Court ruled on this claim. In its opinion addressing Morris's claims on direct appeals, the Pennsylvania Supreme Court ruled as follows with respect to Morris's claims of ineffective assistance of counsel:

> The appellant next makes five assignments of ineffective assistance by his trial counsel. [Footnote: Specifically, he argues that: (1) trial counsel failed to investigate and/or properly examine a Commonwealth witness; (2) trial counsel failed to investigate and/or have witnesses, helpful to the appellant's defense, testify; (3) trial counsel failed to object to improper closing arguments by the prosecution; (4) trial counsel failed to request appropriate curative instruction for the prosecution's improper closing remarks and the improper admission of evidence which created an inference of unrelated criminal activity; and (5) that trial counsel failed to seek vacation of the death sentence and imposition of life imprisonment.] We have reviewed each and believe them to be baseless.

Commonwealth v. Morris, 564 A.2d 1226, 1230 n. 10 (Pa. 1989). Not only does this ruling by the Pennsylvania Supreme Court fail to specifically identify Morris's argument based on a

constitutionally inadequate closing argument, but it also does not specifically identify the law or grounds upon which its ruling was based.

By presenting the same argument to the Pennsylvania courts, Morris exhausted his state court remedies, but because it is not "clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States," this Court will review this claim *de novo*. See Jacobs, 395 F.3d at 100.

There is no *per se* rule as to what constitutes a constitutionally adequate closing argument in a death penalty case; the sufficiency of the closing argument is often considered in the context of the totality of counsel's effectiveness throughout the rest of the trial. See Marshall, 313 F. Supp.2d at 454 (citing, *inter alia*, Strickland, 466 U.S. at 688 (refusing to adopt *per se* rules for determining what is reasonable representation); Bell v. Cone, 535 U.S. 685, 701 (2002) (rejecting an ineffective assistance of counsel claim based in part on counsel's failure to make a plea for his client's life); Romero v. Lynaugh, 884 F.2d 871, 875-77 (5th Cir. 1989) (affirming district court's decision that counsel's brief penalty phase closing argument which did not include a plea for his client's life was not deficient where counsel was otherwise prepared for and involved in all aspects of the trial and provided the jurors with mitigating evidence)), aff'd, Marshall v. Cathel, 428 F.3d 452 (3d Cir. 2005).

The district court in Marshall concluded that "given the complete lack of investigation prior to the penalty phase and [trial counsel]'s limited and cursory closing statement, [trial counsel]'s decision not to ask the jury to spare his client's life seems incomprehensible." 313 F. Supp.2d at 454. The Third Circuit concurred with this conclusion on appeal. 428 F.3d at 465.

Here in Morris's case, trial counsel's decision not to reference any mitigating factors in his closing argument at the penalty phase, coupled with his lack of investigation, preparation, and presentation of mitigating evidence, is similarly incomprehensible. Counsel's closing argument—the purpose of which was supposed to be to persuade a jury to spare the defendant's life within the limits available under the law—was only six sentences long, did not challenge any of the aggravating circumstances put forth by the prosecution, did not reference any mitigating circumstances available under Pennsylvania's death penalty statute, and pointed out no facts other than that the victim was dead and the jury had convicted his client. Given the jury's obligation to weigh mitigating evidence against aggravating evidence, the closing argument did little other than to lay the foundation for a death verdict. It is apparent from counsel's testimony at the post-trial hearing that he had no strategic reason for presenting such an incomplete closing argument and, in fact, it appears that his only "strategy" at the penalty phase was simply to give up because he thought the prosecution's case of guilt was a strong one. ("The trial had lasted for a long period of time, don't recall specifically the days, I recall a lot of evidence being—well attempting to be somewhat lopsided in the Commonwealth's favor. And at that point I recall attempting just to seek mercy for my client in the hope that they would come back with a life sentence as opposed to the death penalty."). (N.T., 12/9/85, at 22-24). Coupled with counsel's deficiencies in failing to investigate, prepare, and present mitigating evidence, this closing argument was constitutionally deficient under the Supreme Court's holding in Strickland. Moreover, Morris was prejudiced by these deficiences. There is no basis upon which this Court can conclude that the death verdict, despite counsel's shortcomings, was otherwise based on the law and the facts.

### B. Improper Jury Instructions and Verdict Sheet

In the alternative, habeas relief on the death sentence is warranted based on the unconstitutional penalty phase jury instructions and verdict sheet. Morris argues that the penalty phase jury instructions and the verdict sheet, taken together, created a barrier to the sentencing jury's consideration of all mitigating evidence in violation of the Eighth Amendment. Morris largely relies on Mills v. Maryland, 486 U.S. 367 (1988), in which the United States Supreme Court held that a death sentencing scheme violated the Eighth Amendment if it required jurors to agree unanimously that a particular mitigating circumstance existed before they could consider that circumstance in their sentencing determination. Morris raised this argument for the first time in his second PCRA petition (see Section I.E, supra, at n.11, item 13), and thus this Court reviews this claim de novo (see Section II.D., supra).[26]

The Supreme Court held in Beard v. Banks, 542 U.S. 406 (2004), that Mills announced a new rule of constitutional law that would not apply retroactively to any case that became final prior to Mills. However, Mills was decided on June 6, 1988, over fifteen months before direct review of Morris's case ended on September 22, 1989. Thus, there is no retroactivity problem in applying Mills to Morris's case because Mills was binding on the Pennsylvania Supreme Court at the time it concluded direct review of Morris's case. See Teague v. Lane, 489 U.S. 288

---

[26]  Although the PCRA court did say that it was ruling on the merits in dismissing Petitioner's Mills' claim, it simultaneously held that it was without jurisdiction to rule on the Mills claim. See Section I.E., supra, at n. 12. In reviewing that decision, the Pennsylvania Supreme Court affirmed that it was without jurisdiction to rule on the Mills claim. See Section I.E., supra, at n. 13. Where a state court disposes of a federal claim on sufficient state law procedural grounds, but also discusses the merits of that claim in the alternative, the state law grounds control for purpose of federal habeas review. Sistrunk v. Vaughn, 96 F.3d 666, 673-75 (3d Cir. 1996). Therefore, the Pennsylvania Supreme Court's holding that it had no jurisdiction to rule on the Mills claim controls this analysis, and the PCRA's ambiguous statement that it was ruling on the merits of the Mills claim will not be considered here.

(1989); cf. Albrecht v. Horn, — F.3d —, 2007 WL 1149263, * 6-13 (3d Cir. Apr. 19, 2007)

(although conceding that Mills violation occurred, holding habeas relief was not warranted on

that ground because the petitioner's case had become final prior to Mills). Therefore, Mills

provides the governing analysis here.

      In Mills, the Supreme Court vacated a death sentence after concluding that there was a

"substantial probability that reasonable jurors, upon receiving the judge's instructions in this

case, and in attempting to complete the verdict form as instructed, well may have thought they

were precluded from considering any mitigating evidence unless all 12 jurors agreed on the

existence of a particular such circumstance." 486 U.S. at 384. The Court emphasized that a

sentencer in a capital case may not be precluded from considering any relevant mitigating

evidence, and any state sentencing scheme that required a finding of juror unanimity before a

mitigating factor could be considered in determining whether to impose a sentence of death is

unconstitutional. Id. at 374-75. Because the ultimate consequence of an improper sentencing

ground is death, "the Court has demanded even greater certainty [than in review of convictions]

that the jury's conclusions rested on proper grounds." Id. at 376-77 (citing, inter alia, Lockett v.

Ohio, 438 U.S. 586, 605 ("[T]he risk that the death penalty will be imposed in spite of factors

which may call for a less severe penalty . . . is unacceptable and incompatible with the

commands of the Eighth and Fourteenth Amendments")). "The decision to exercise the power of

the State to execute a defendant is unlike any other decision citizens and public officials are

called upon to make. Evolving standards of societal decency have imposed a correspondingly

high requirement of reliability on the determination that death is the appropriate penalty in a

particular case." 486 U.S. at 383-84.

Under <u>Mills</u>, the proper inquiry in determining whether a state sentencing scheme unconstitutionally precluded a sentencing jury from considering relevant mitigating evidence focuses not on whether the sentencing scheme *could* be interpreted in a way that renders it constitutional, but rather whether there is a "substantial possibility" that a reasonable jury could have believed they were required to reach unanimity on a mitigating factor before they could weigh that mitigating factor against any aggravating factors. "Unless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." <u>Id.</u> at 377 (concluding that although a constitutionally sufficient interpretation of the Maryland sentencing scheme at issue in that case was "plausible," habeas relief was warranted because the Court could not rule out "with any degree of certainty" the possibility that the jury interpreted the instructions and verdict sheet in a different way).

The Court recognized two hypothetical situations that would lead to an unacceptable result:

> If eleven jurors agree that there are six mitigating circumstances, the result is that no mitigating circumstance is found. Consequently, there is nothing to weigh against any aggravating circumstance found and the judgment is death even though eleven jurors think the death penalty wholly inappropriate. . . .

> [Or] [a]ll 12 jurors might agree that some mitigating circumstances were present, and even that those mitigating circumstances were significant enough to outweigh any aggravating circumstance found to exist. But unless all 12 could agree that the same mitigating circumstance was present, they would never be permitted to engage in the weighing process or any deliberation on the appropriateness of the death penalty.

<u>Id.</u> at 373-74. If an interpretation of a state sentencing scheme could lead to one of those hypothetical situations, a sentence of death is unconstitutional. "Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." <u>Id.</u> at 384.

The sentencing scheme in Morris's case will be analyzed under these principles from

Mills. In this case, the trial court began the sentencing jury instructions as follows:

> Ladies and gentlemen of the jury, you have found the defendant, Kelvin Morris, guilty of murder in the first degree, and your verdict was recorded as you are aware. We are now going to hold a sentencing hearing during which counsel—if they desire—may present additional evidence and argument and you as jurors will decide whether the defendant is to be sentenced to death or life imprisonment.

> Now, whether you sentence the defendant to death or life imprisonment will depend upon what if any aggravating or mitigating circumstances you find are present in this case.

> Loosely speaking, aggravating and mitigating circumstances are circumstances concerning the killing and killer which make a first degree case—a first degree murder case—either more serious or less serious and impel either the imposition of a death sentence or a sentence of life imprisonment.

> The Crimes Code under which we function in this state defines precisely what constitutes aggravating and mitigating circumstances.

> Now, I will give you detailed instructions later in this hearing as to what they are and the extent to which they may apply in this case.

> I will now, however, tell you that aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt, while mitigating circumstances must be proved by the defendant by a preponderance of the evidence, and they are different—both in which you have to weigh [sic]—and I will explain them more fully when the time is appropriate.

> Suffice for now, the Commonwealth does have a heavier burden in proving aggravating circumstances than the defendant does in proving mitigating circumstances.

(N.T., 12/1/83, at 2-5).

At the conclusion of the sentencing hearing, the trial court continued its sentencing

instructions:

> Members of the jury, you must now decide whether this defendant is to be sentenced
> to death or to life imprisonment. The sentence will depend on your findings
> concerning aggravating and mitigating circumstances.
>
> *The Crimes Code provides that the verdict must be a sentence of death if the jury
> unanimously finds at least one aggravating circumstance and no mitigating
> circumstance, or if the jury unanimously finds one or more aggravating
> circumstances which outweigh any mitigating circumstances.*
>
> Now, ladies and gentlemen, let me say that to you again.
>
> *The Crimes Code provides that the verdict must be a sentence of death if the jury
> unanimously finds at least one aggravating circumstance and no mitigating
> circumstance, or if the jury unanimously finds one or more aggravating
> circumstances which outweigh any mitigating circumstances.* The verdict must be
> a sentence of life imprisonment in all other cases.

(N.T., 12/1/83, at 31-32) (emphasis added).

The instructions continued:

> Now, when your retire to deliberate, I will give you a penalty determination sheet
> which incorporates all the information that I have just indicated to you as to the
> aggravating and mitigating circumstances.
>
> The Commonwealth has the burden of proving aggravating circumstances beyond
> a reasonable doubt.
>
> The defendant has the burden of proving mitigating circumstances, but only by a
> preponderance of the evidence. Now, this is a lesser burden of proof than beyond a
> reasonable doubt.
>
> * * *
>
> All the evidence that you heard in this case from both sides, including evidence that
> you heard  during the trial-in-chief as to aggravating or mitigating circumstances,
> and the evidence that you have heard at this hearing is important for you to consider
> and it is proper for you to consider.
>
> * * *

The verdict is now going to be for you, ladies and gentlemen of the jury, remember and consider all the evidence and give all the evidence whatever weight to which it is entitled.

\* \* \*

*Remember, again, that your verdict must be unanimous. It cannot be reached by a majority vote or vote of any percentage. It must be the verdict of each and every one of you.*

Also, remember that *your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances.* And in all other cases your verdict must be a sentence of life imprisonment.

(N.T., 12/1/83, at 35-41) (emphasis added).

The trial court then explained the verdict sheet to the jurors:

I will give you a verdict slip to take with you in order to record your verdict and findings, and you will note that on this verdict slip if sets forth the aggravating circumstances and the mitigating circumstances, and on the third page it indicates a place for you to note a special finding regarding the aggravating circumstances and mitigating circumstances. And it indicates—"We the jury have found unanimously at least one aggravating circumstance and no mitigating circumstance and the aggravating circumstance—circumstances, is—are, or; or one or more aggravating circumstances which outweigh any mitigating circumstances and the aggravating circumstance—circumstances, is—are."

Now, to repeat, if you find one aggravating circumstance, then the verdict must be death.

If you find one or more aggravating circumstances which outweigh any mitigating circumstances then the verdict must be death; in all other instances the verdict must be life imprisonment.

If after conscientious and thorough deliberation you are unable to agree unanimously on your findings and verdict, you should report that to me.

If in my opinion at that time further deliberations will not result in unanimous agreement on the sentence, it will then be my duty to sentence the defendant to life imprisonment.

(N.T., 12/1/83, at 41-43).

The verdict sheet is consistent with these instructions. That verdict sheet reads as follows:

> We, the jury, empaneled in the above entitled case, having heretofore determined that the defendant, is guilty of murder of the first degree, do hereby find:
>
> AGGRAVATING CIRCUMSTANCE(S)
> [List of the statutory aggravating circumstances, each one followed by a "( )" that the jury is to check if it finds that aggravating circumstance.]
>
> MITIGATING CIRCUMSTANCE(S)
> [List of the statutory mitigating circumstances, each one followed by a "( )" that the jury is to check if it finds that mitigating circumstance.]
>
> _____
>
> We the jury have found unanimously
>
> [ ]   at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) (is) (are) _____.
> [ ]   one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s) (is) (are) _____.
>
> We the jury unanimously render the following sentencing verdict:
>
> DEATH                              ( )
> LIFE IMPRISONMENT        ( )
>
> [Lines for signatures of all twelve jurors]

(Pet. Reply Mem. "Ex. F," First Degree Murder Verdict Penalty Determination Sheet, July 1982

("Verdict Sheet").

68

Upon reviewing these instructions and the verdict sheet together, it is evident that there is a substantial possibility that a reasonable jury could have believed they were required to reach unanimity on a mitigating circumstance before they could weigh that mitigating circumstance against any aggravating circumstances. No less than five times was the jury explicitly told that the verdict must be death if they unanimously found at least one aggravating circumstance and no mitigating circumstance, or if they unanimously found one or more aggravating circumstances which outweigh any mitigating circumstances. The only reasonable interpretation of that explicit instruction is that for both aggravating and mitigating circumstances, all jurors must reach an agreement.

In addition to the explicit instructions on unanimity in aggravating and mitigating circumstances, the jurors were given instructions on the different burdens of proof for aggravating and mitigating circumstances. Significantly, the trial court was silent as to unanimity when discussing burdens of proof, which could reasonably have led the jury to conclude that both aggravating and mitigating circumstances must be discussed and unanimously agreed to, as is typically the case when considering whether a burden of proof has been met.

Moreover, the verdict sheet emphasized a need for unanimity in finding "no mitigating circumstance." The verdict sheet makes clear that the jury is to consider in its sentencing decision only aggravating and mitigating circumstances that "We, the jury . . . do hereby find." Reasonable jurors could interpret the verdict sheet to mean that if the jury does not unanimously find a mitigating circumstance, the weighing process is not reached. The format of the verdict sheet makes confusion on this point likely. The checklists of aggravating and mitigating circumstances are followed by spaces for the signatures of the twelve jurors. This format makes sense if the jury is to check and give effect to those mitigating circumstances that it unanimously

finds. Moreover, the verdict sheet lacks instructions that would imply that there is a different standard for aggravating circumstances from that for mitigating circumstances, and it lacks any language from which the jury could infer that a mitigating circumstance might be marked if only one (or fewer than all) jurors had found that circumstance to exist.

There is absolutely no basis in these jury instructions and verdict sheet upon which a juror could reasonably believe that he or she was permitted to consider a mitigating circumstance in determining the penalty without a finding of unanimity on that mitigating circumstance. These instructions easily could have led to one or both of the hypothetical situations recognized by the Mills Court as resulting in an unconstitutional sentence of death.

Moreover, there is no question that the jury in Morris's case was confused about its job at sentencing. On the verdict sheet, the jurors did *not* check the box which said, "We the jury have found unanimously [   ] at least one aggravating circumstance and no mitigating circumstance." Instead, the jurors checked the second box, which said, "We the jury have found unanimously [ ] one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s) (is) (are) 'murder, felony, risk of death to another person.'" ((Pet. Reply Mem. "Ex. F," First Degree Murder Verdict Penalty Determination Sheet, July 1982 ("Verdict Sheet")). Yet, during the announcement in open court of the sentencing verdict, the trial court asked the jury, "Have you found any mitigating circumstances?" The jury foreman replied, "No, we have not." (N.T., 12/1/83, at 46). This statement, which was not objected to and to which no correction was made, was in direct contrast to the checkmark on the verdict sheet. It is evident that the jury suffered confusion that likely prevented it from considering factors that may have resulted in a less severe penalty.

Indeed, changes in Pennsylvania law made after Morris's trial seem to acknowledge the constitutional problems with the jury instructions and the verdict sheet used in Morris's case. Similar changes in the law of Maryland were recognized by the <u>Mills</u> Court as "evidence" that a jury could have been misled by the older sentencing scheme. 486 U.S. at 381-83. After noting that Maryland, on an emergency basis, changed the language of its jury instructions and verdict sheet to make clear that jurors need not reach unanimity on mitigating factors before considering them in sentencing a defendant, the Court explained: "We can and do infer from these changes at least *some* concern on the part of [Maryland courts] that juries could misunderstand the previous instructions as to unanimity and the consideration of mitigating evidence by individual jurors." <u>Id.</u> at 382. Like Maryland, Pennsylvania changed its standard jury instructions on how jurors were to find and weigh aggravating and mitigating circumstances, and Pennsylvania no longer uses the language of the jury instructions and verdict sheet that were used in Morris's case. The Pennsylvania Standard Criminal Jury Instruction now recommends the following instruction:

When voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present despite what other jurors may believe. This is different from the general findings to reach your ultimate sentence of either life in prison or death. The specific findings as to any particular aggravating circumstance must be unanimous. All of you must agree that the Commonwealth has proven it beyond a reasonable doubt. That is not true for any mitigating circumstance. Any circumstance that any juror considers to be mitigating may be considered by that juror in determining the proper sentence. This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances. It is closely related to the burden of proof requirements. Remember, the Commonwealth must prove any aggravating circumstance beyond a reasonable doubt while the defendant only has to prove any mitigating circumstance by a preponderance of the evidence. Your final sentence—life imprisonment or death—must be unanimous. All of you must agree that the sentence should be life imprisonment or that the sentence should be death because there is at least one aggravating circumstance and no mitigating circumstance or because the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances found by any juror.

Pa. Standard Crim. Jury Instruction 15.2502H(3). This instruction clears up the reasonable likelihood of constitutional error that occurred in Morris's case. The updated verdict slip, which has the following language, does the same:

The aggravating circumstance(s) unanimously found (is)(are):

The mitigating circumstance(s) found by one or more of us (is)(are):

Pa. R. Crim. P. 808. Although these changes do not prove Morris's claim, like the changes in Maryland law that the Mills Court noted, the changes in Pennsylvania law constitute some evidence favoring the conclusion that there is a substantial possibility that the jury in Morris's case sentenced Morris to death on less than full consideration of all relevant factors which may call for a less severe penalty.

72

Considered as a whole, the jury instructions and verdict sheet in Morris's case, along with the manifestation of jury confusion on the record and the changes in Pennsylvania law, leave no doubt that there was a substantial possibility that the jury "well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Mills, 486 U.S. at 384. This violated Morris's Eighth Amendment rights. Given that the direct outcome of the unconstitutional sentencing scheme was a sentence of death and that there was enough evidence on the record for a juror to find mitigating circumstances, the error was not harmless. Mindful of the Court's admonition that no risk of improper jury consideration in a death penalty determination can be tolerated, Morris is entitled to relief from his sentence of death on this ground.[27]

---

[27]  The Third Circuit reached the same conclusions when reviewing virtually identical jury instructions and verdict sheets in Frey v. Fulcomer, 132 F.3d 916 (3d Cir. 1997), and Banks v. Horn, 271 F.3d 527, 540-51 (3d Cir. 2001), rev'd, Horn v. Banks, 536 U.S. 266 (2002). (remanding for lower court to conduct Teague analysis on whether Mills could be applied retroactively), reaff'd on reconsid'n, Banks v. Horn, 316 F.3d 228 (3d Cir. 2003), rev'd sub. nom, Beard v. Banks, 542 U.S. 406 (2004) (holding that Mills announced new rule of law that could not be applied retroactively). Although neither Frey nor Banks controls the analysis in this case, the reasoning of the Third Circuit is persuasive.

### C.  Conclusion

Counts II (failure to investigate and present mitigating evidence) and XIV (<u>Mills</u> claim) of Petitioner's petition for a writ of habeas corpus are granted, and Petitioner's sentence of death is vacated, without prejudice to the right of the Commonwealth of Pennsylvania to conduct a new capital sentencing hearing. Because the Court vacates Petitioner's sentence based on the claims found in Counts II and XIV, it need not consider the claims that seek the vacating of his sentence contained in Counts VII, VIII, IX, X, XI, XII, XIII, XIV, XVI, XVII, XXI, XXVII, and XXIV). These claims are DISMISSED as moot without prejudice.

## IV.    CLAIMS FOR RELIEF FROM GUILTY VERDICT

Morris also seeks to have his conviction vacated on the grounds that numerous constitutional errors occurred during his trial and post-trial proceedings. He challenges the identification evidence, arguing that the circumstances surrounding the photographic arrays, composite sketch, and in-court identification resulted in unreliable evidence, and that the trial court improperly instructed the jury.

He also challenges the testimony of the juvenile eyewitness, Ronald Johnson. He argues that the Commonwealth failed to disclose, and the trial court refused to allow defense counsel to ask about, Johnson's criminal record. He further claims that the prosecution failed to disclose other exculpatory and impeaching evidence regarding Johnson, including the promises and threats that police officers made to Johnson to secure his testimony; that Johnson had given the police a description of the shooter that was inconsistent with the appearance of Morris; and that Johnson did not believe that Morris was the shooter.

Morris also claims that the Commonwealth failed to disclose other exculpatory evidence, including information from Anthony Stokes, one of the other juveniles who was at the gas station that night, that he was pressured and threatened by police to conform his statements to the prosecution's theory of the case and that he told the police that he did not think Morris was the shooter.

Further, Morris claims that the Commonwealth failed to disclose evidence that bore upon whether Petitioner's brother, Artie Morris, could have been the shooter. According to Petitioner, given that Artie had been identified by two eyewitnesses, this information was <u>Brady</u> material that should have been disclosed.

Morris's other claims include the arguments that: (1) trial and appellate counsel rendered ineffective assistance by failing to investigate and discover exculpatory evidence; (2) the admission of evidence of the incident in Virginia denied him his rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution; (3) trial counsel rendered ineffective assistance in failing to investigate and present evidence that Morris's mental state rendered him incapable of intelligently and voluntarily waiving his Miranda rights; (4) the prosecutor made improper statements during closing arguments at the verdict phase; (5) the Commonwealth used its peremptory jury strikes in a racially discriminatory manner in violation of Morris's Sixth, Eighth, and Fourteenth Amendment rights; (6) trial counsel was ineffective for failing to investigate and present critical impeachment evidence; and (7) all prior counsel were ineffective for failing to previously raise the issues presented in the petition. Morris argues that not only does each of his claims in this petition provide an independent basis for relief, but also that the cumulative effect of the errors warrants relief.

But Petitioner's primary ground for relief, which also underlies all of his claims of ineffective assistance of counsel, is that his trial attorney had a conflict of interest. Petitioner asserts that his trial counsel represented Petitioner's brother, Artie Morris, in a civil case seeking monetary damages at the same time that trial counsel was defending Petitioner in this murder case, even though Artie had been identified by several witnesses as the perpetrator of the murder. Morris raised this conflict of interest argument for the first time in his second PCRA petition and, thus, for the reasons set forth supra in Part II.D, the Court reviews this claim de novo.

76

### A.  Conflict of Interest

The protection promised by the right to counsel in <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), rests on the premise that the accused's counsel will advocate with undivided loyalty on behalf of his client. <u>Strickland v. Washington</u>, 466 U.S. at 692 (explaining that duty of loyalty to a client is "perhaps the most basic of counsel's duties," and "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests"). Where counsel works solely to protect the interests of his client, the law assumes counsel discharged his duties adequately and will inquire into only serious mistakes that prejudiced the defendant. <u>Id.</u> at 693. But where counsel's loyalties are divided by an actual conflict there is no longer good reason to assume that counsel protected the defendant's interest, and the defendant is deprived of the zealous advocate promised by <u>Gideon</u>. <u>See</u> <u>Cuyler  v. Sullivan</u>, 446 U.S. 335, 349-50 (1980). Once it is established that multiple representations produced an actual conflict of interest that adversely affected the lawyer's performance, the defendant need not demonstrate prejudice. <u>Cuyler</u>, 466 U.S. at 349. The conflict and adverse effect alone demonstrate a denial of the "right to have the effective assistance of counsel." <u>Id.</u> at 350.

An ineffective assistance claim based on an actual conflict of interest arises after trial upon the discovery of a previously unnoticed conflict of interest on the part of trial counsel. <u>United States v. Morelli</u>, 169 F.3d 798, 810 (3d Cir. 1999). "[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." <u>Id.</u> (quoting <u>Cuyler</u>, 446 U.S. at 348). An "actual conflict" exists only when there is some choice to be made about a material factual or legal issue, and the interests of the clients (or the attorney) push in conflicting directions. <u>Morelli</u>, 169 F.3d at 810. In a case, like here, where an attorney represented two clients with allegedly conflicting interests and

where the attorney allegedly failed to act, the Third Circuit has used the following standard.

First, the petitioner "must demonstrate that some plausible alternative defense strategy or tactic

might have been pursued. He need not show that the defense would necessarily have been

successful if it had been used, but that it possessed sufficient substance to be a viable

alternative." Morelli, 169 F.3d at 810 (citing United States v. Gambino, 864 F.2d 1064, 1070 (3d

Cir.1988) and Hess v. Mazurkiewicz, 135 F.3d 905, 910 (3d Cir.1998)). And second, "he must

establish that the alternative defense was inherently in conflict with or not undertaken due to the

attorney's other loyalties or interests." Morelli, 169 F.3d at 810. When an actual conflict is

demonstrated under the two steps above, the petitioner is entitled to a reversal for inadequate

assistance of counsel without demonstrating prejudice. Morelli, 169 F.3d at 810; Hess, 135 F.3d

at 910; Strickland, 466 U.S. at 692.

 Although an actual conflict is more easily ascertained when "an attorney takes positive

steps on behalf of one client prejudicial to another," see Morelli, 169 F.3d at 810, often the

"evil" of joint representation of conflicting interests "is in what the advocate finds himself

compelled to *refrain* from doing." Holloway v. Arkansas, 435 U.S. 475, 490 (1978) (emphasis in

original). And there is difficulty in determining the impact of what counsel *did not do* as a result

of an actual conflict of interest, which is precisely the reason why a petitioner need not show

prejudice in such cases. As explained by the Fifth Circuit in Castillo v. Estelle, 504 F.2d 1243

(5th Cir. 1974): "When there is a conflict of interest such as exists in this case, the prejudice may

be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a

cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no

clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, as it is here, a denial of the right to effective representation exists, without a showing of specific prejudice." See also Holloway, 435 U.S. at 490-91 ("It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.").

Thus, a petitioner who establishes that his attorney rejected a plausible strategy or tactic because it conflicted with the interests of another client is entitled to relief. An attorney's financial stake in the civil case of his other client implicates ethical dilemmas and issues of divided loyalties and interests no less serious than those which arise in the case of joint representation of co-defendants. See, e.g., United States v. Rosenwald, 898 F.2d 585, 586 (7th Cir. 1990) (finding conflict of interest where defense counsel in criminal case also represented prosecution witness in civil action); McConico v. Alabama, 919 F.2d 1543 (11th Cir. 1990) (finding unconstitutional conflict of interest where defense counsel in murder trial raising a claim of self-defense also represented beneficiary of murder victim's life insurance policy and a finding of self-defense would have affected insurance payment); Zuck v. State of Alabama, 588 F.2d 436, 439 (5th Cir.1979) (finding actual conflict of interest where defense counsel in murder trial represented prosecutor in unrelated civil case and was concerned that prosecutor would fire

his law firm if he engaged in vigorous defense of criminal client). "The pragmatic pressure on counsel in cases such as these is purely financial—the lawyer does not want to lose a client whether that client is seeking advice on civil or on criminal matters." Rosenwald, 898 F.2d at 587. As stated by the Fifth Circuit in Zuck, "the Sixth Amendment requires that a defendant may not be represented by counsel who might be tempted to dampen the ardor of his defense in order to placate his other client." 588 F.2d at 439.

The Commonwealth does not dispute that at the same time that Petitioner's trial counsel represented Petitioner for the murder of Robert McDonald, he also represented Petitioner's brother, Artie Morris, in a civil rights/personal injury civil lawsuit.  Instead, the Commonwealth argues that trial counsel did not operate under a conflict of interest because accusing Artie of the crime would not have been a plausible defense strategy, and even if the defense had argued to the jury that Artie, not Kelvin, had committed the crime, that strategy would not have exposed Artie to the risk of criminal prosecution given that he had already been picked up, questioned, and released by Philadelphia police with respect to the murder.

The Commonwealth's case rested primarily on eyewitness identification, and Morris's trial defense was one of mistaken identity. Despite the Commonwealth's characterization of "the overwhelming evidence of Petitioner's guilt," (Resp. Sur-Reply Br., at 34-39), the problems associated with eyewitness identification have long been well-recognized. See United States v. Brownlee, 454 F.3d 131, 141  (3d Cir. 2006) ("It is widely accepted by courts, psychologists and commentators that '[t]he identification of strangers is proverbially untrustworthy.'") (quoting Felix Frankfurter, *The Case of Sacco and Vanzetti: A Critical Analysis for Lawyers and Laymen*

30 (Universal Library ed., Grosset & Dunlap 1962) (1927), and also citing <u>United States v.</u>

<u>Wade</u>, 388 U.S. 218, 228 (1967) (stating that "[t]he vagaries of eyewitness identification are

well-known; the annals of criminal law are rife with instances of mistaken identification"); C.

Ronald Huff et al., *Guilty Until Proven Innocent: Wrongful Conviction and Public Policy*, 32

Crime & Delinq. 518, 524 (1986) ("the single most important factor leading to wrongful

conviction in the United States . . . is eyewitness misidentification")). In fact, "mistaken

eyewitness identifications are responsible for more wrongful convictions than all other causes

combined." <u>Brownlee</u>, 454 F.3d at 141 (quoting A. Daniel Yarmey, *Expert Testimony: Does*

*Eyewitness Memory Research Have Probative Value for the Courts?*, 42 Canadian Psychology

92, 93 (May 2001) ("[E]yewitness evidence presented from well-meaning and confident citizens

is highly persuasive but, at the same time, is among the least reliable forms of evidence.")). To a

jury, "there is almost *nothing more convincing* than a live human being who takes the stand,

points a finger at the defendant, and says[,] 'That's the one!' " <u>Brownlee</u>, 454 F.3d at 141

(quoting <u>Watkins v. Sowders</u>, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting)) (emphasis in

original).

     A general defense of mistaken identity based on instances of other identifications,

witness uncertainty, discrepancies between witness descriptions and the appearance of the

defendant, and issues concerning the circumstances surrounding the original opportunity to

observe the perpetrator is, in the absence of other evidence, certainly a sound defense strategy.

<u>Brownlee</u>, 454 F.3d at 137-144. A more compelling defense strategy—and one that was

available in this case—is to "solve the crime" by presenting to the jury a specific individual who

is the actual perpetrator. The other individual in this case, of course, was actually identified before trial by two eyewitnesses as the person who shot and killed Robert McDonald on August 9, 1980. William Linaberry, the Commonwealth's main witness, and Joseph Tyrone Flowers (called by neither side) identified Artie Morris as the killer. Although Linaberry subsequently retracted that positive identification when he selected Kelvin Morris in a photo array (the fourth he saw) and identified him in court, defense counsel made no attempt when cross-examining Linaberry at trial to elicit the fact that Linaberry had initially identified Artie Morris. That is, after defense counsel had finished cross-examining the Commonwealth's main eyewitness, although the jury was aware that Linaberry had "positively" identified another individual as the killer, defense counsel did not disclose that the other person was the petitioner's brother, Artie Morris, who was also represented by defense counsel. (N.T., 11/18/83, at 106-117). Indeed, when the prosecutor, on re-direct, attempted to elicit testimony from Linaberry as to the identity of the person first identified, defense counsel prevented the jury from learning that  Artie Morris was initially identified as the killer:

> Prosecutor:      By the way, looking—not at the defendant's photograph—but the other photograph—the one that you first said you were positive about, did you later find out who that person was?
>
> Linaberry:      Yes.
>
> Defense counsel:   Objection, Your Honor.
>
> The Court:      I'll sustain that.

(N.T., 11/18/83, at 140-141).

The jury later did hear from defense counsel during his closing argument that the person initially positively identified by Linaberry was Artie Morris, but that information was presented in the context of a larger argument based on general misidentification; defense counsel argued to the jury that due to the stressful nature of the circumstances, uncertainty, and a desire to help the police solve the crime, Linaberry gave conflicting descriptions of the killer and "would have identified anyone, even you [the jury members.]" (N.T., 11/28/83, at 30-31). Significantly, defense counsel did not use this closing argument to point the finger at Artie as the real perpetrator.

Likewise, defense counsel did not call Joseph Tyrone Flowers to testify despite the fact that Flowers identified Artie Morris as the murderer and refused to change his identification in response to police pressure. Flowers was one of the group of boys standing across the street from the Pep Boys store when Linaberry arrived to repair the window. Unlike Linaberry, Flowers never wavered from his original identification of Artie Morris as the man who shot Robert McDonald. The jury never heard about this identification, however.

Apart from two eyewitnesses identifying Artie as the shooter, defense counsel also had available to him the record from the suppression hearing held a year before the trial. At that hearing, an investigating police officer testified that the reason why Artie's photograph was selected to be shown to Linaberry was that he had received information from an unknown male "out on the street." Solely as a result of that conversation out on the street, Artie became a "prime suspect" in the murder. (N.T., 11/16/82, at 91-93). It was only after the police had picked up and questioned Artie that they issued an arrest warrant for his brother, Kelvin. There is no

83

indication that this record triggered an investigation by defense counsel into the reasons why Artie had initially become a prime suspect.

Rather than building a defense that coupled the more general misidentification strategy with the identification of his other client as a specific alternative suspect, counsel attempted to serve both his clients. A defense strategy that shifted the focus to Artie Morris also would have compelled investigation into Artie's alibi, his criminal record, character, his motive and opportunity to commit the crime. Instead, defense counsel did not investigate Artie's alibi, an oversight that was compounded by the Commonwealth's failure to disclose that Artie's alibi witness, Regina Handy, failed a polygraph that was administered by the Philadelphia police. Counsel's failure to pursue a defense that targeted Artie—the only other person identified by witnesses as the killer—resulted in a failure to interview witnesses who later indicated that Artie possessed a gun prior to the murder and later admitted his involvement.[28] (Pet. Ex. "7," Aff. David Madden; Pet. Ex. "8," Aff. Ronald Handy; Pet. Ex. "9," Aff. Fielding Simpkins). During his closing argument, defense counsel persisted in his determination to insulate Artie. Instead of arguing that the evidence pointed to Artie, he instead suggested that the prior identifications

---

[28]  Petitioner submitted affidavits from three family friends in support of this federal habeas petition, all of which are signed and dated in 2001. All three individuals assert that until that time, no lawyer or anyone else representing Kelvin Morris ever asked them about what they knew about the case. David Madden asserts that after Kelvin Morris's conviction and death sentence, Artie confessed that he had been the shooter. (Pet. Ex. "7," Aff. David Madden, at ¶¶ 7-11).

Ronald Handy asserts that about a month before the murder, Artie showed him a long-barreled, black .38 revolver. He further asserts that a few months after the murder, Artie confessed that he had been the shooter. (Pet. Ex. "8," Aff. Ronald Handy, at ¶¶ 2, 4-6).

Fielding Simpkins also asserts that Artie confessed to him that he was the shooter. (Pet. Ex. "9," Aff. Fielding Simpkins, at ¶¶ 3-6).

were part of a pattern of misidentifications that were somehow abetted by the police.

Perhaps the most telling example is found in the argument concerning the identification testimony of the Commonwealth's second eyewitness, Ronald Johnson. Johnson was twelve years old at the time of the murder and was one of the group of boys standing in the gas station lot when Linaberry arrived to repair the window the boys had broken. Leaving aside the argument that the Commonwealth failed to disclose material evidence about Johnson's criminal record, the most salient feature of Johnson's testimony for purposes of this issue is not that the only person he identified was Petitioner, but that before making any identification, he assisted in the preparation of a composite sketch. The sketch, which according to defense counsel's closing argument portrayed an individual with a damaged right eye, most closely resembled Artie, who had lost his right eye and had a glass eye in its place. Instead of highlighting the resemblance and tying it to Linaberry's identification of Artie (and what would have been Flower's similar testimony), defense counsel instead argued that the similarity between the sketch and Artie was due to police manipulation instead of an accurate description of the real killer:

> Looking closer at that testimony of Ronald Johnson, he also told you that he compared a sketch—or he prepared a sketch, or he was involved in the preparation of the sketch—view that in conjunction with the testimony of Michael Morris. You heard the testimony, the police came to their house looking for someone named Artie, his brother, and they took a photograph. They took a photograph of Artie Morris and that was a couple of days after the incident.
>
> Of course that was before he prepared that alleged sketch—Ronald Johnson, that is.
>
> You heard the testimony of [Artie]'s eye, having a glass eye, you saw the photograph and sketch—anything unusual about that right eye? I submit to you, yes, there was, that right eye was almost closed. Who was that sketch of and how did they compare that sketch? That was not a sketch of my client. That sketch was

supposed to have been the sketch with Artie Morris, and it is obvious with the one eye, the right eye almost closed, the Commonwealth would have you believe that young Ronald Johnson sat down with an artist and they composed this sketch. I submit to you again—highly improbable, almost impossible—even if you would say that that sketch is similar to my client. I submit to you that—before even reaches that point—how did they come up with it? It is obvious—this is—the police officers came to the house looking for Artie, they arrested Michael, took him down, took photographs of him also, didn't arrest him for anything, let him go back home—that's how that sketch was prepared.

(N.T., 11/28/83, at 38-40).

The only objectively plausible explanation for the failure to pursue this strategy is that the dual representation put defense counsel in an "untenable position of serving two clients with incompatible needs" when their interests intersected. United States v. Pungitore, 910 F.2d 1084, 1184 (3d Cir. 1990). Defense counsel had to choose between mounting the most compelling and comprehensive defense available for Petitioner and protecting his other client's penal and financial interest (as well as his own financial stake) by not pursuing a defense that damaged the civil claim, raised the possibility of prosecution for the murder, or put him at odds with his civil client by building a defense that accused him of the murder. Defense counsel was hardly in a position to investigate Artie's possible involvement by interviewing him as a potential witness. He had an attorney-client relationship with Artie and owed him a duty of loyalty equal to that which he owed Petitioner. Accusing Artie of murder, interviewing witnesses to refute his alibi, substantiate the alternative suspect theory, and develop evidence reflecting poorly upon his character, would hardly have fortified the foundation of a productive attorney-client relationship.

In assessing the conflict that arose from this dual representation, it is also crucial that defense counsel stood to gain more from his relationship with Artie than his relationship with

86

Kelvin. Artie, unlike Kelvin, had selected defense counsel to represent him. Defense counsel was appointed to represent Kelvin. Attacking Artie ran the risk of alienating a client pursuing a civil claim that could produce an award for both Artie and his attorney. Thus, defense counsel's interests were aligned with and tied to Artie.

The Commonwealth fails to appreciate this aspect of the conflict. Instead, the Commonwealth focuses on the fact that Artie and his potential as a suspect were known to the prosecution. The Commonwealth relies on United States v. Gambino, 864 F.2d 1064,1071 (3d Cir. 1988), for the proposition that no conflict of interest exists where the government already possesses the evidence implicating counsel's other client in the crime. The Commonwealth's position is that because Artie was already known to them as a potential suspect, defense counsel had no reason to refrain from a defense that pointed directly at Artie. But the Commonwealth's reliance on Gambino is at once too broad and too narrow.

The facts in Gambino that gave rise to the proposition relied upon by the Commonwealth included a post-conviction record that disclosed a highly plausible defense strategy that specifically rejected an effort to implicate defense counsel's other client in a heroin sale. Defense counsel's decision was based on the evidence at trial and a realization that implicating his other client based on unpersuasive evidence would have contradicted and undermined a more plausible defense theory. Moreover, the court concluded that there was "no actual conflict of interest in the sense that anything which [defense counsel] could have done at the trial on behalf of [the criminal defendant] but omitted to do could have prejudiced [his other client]." Id. at 1071. The plurality's statement concerning the relevancy of the government's awareness of the other client

as a potential suspect must be read in light of this factual context. Otherwise, the proposition relied upon by the Commonwealth—that there is no conflict of interest when the attorney's second client is already known to the government as a potential suspect—would vitiate nearly all conflict claims, including those involving joint representations in the same case.

Moreover, the narrow holding in Gambino upon which the Commonwealth relies is only relevant in respect to the penal interests of an attorney's second client. As the Gambino court itself recognized, apart from avoiding the risk of exposing his second client to potential prosecution, an attorney might have other reasons not to point the finger at his second client: "[A]n attorney might not advance an alternative defense because of his *other* loyalties or interests." 864 F.2d at 1072 (citing United States v. Fahey, 769 F.2d 829, 836 (1st Cir. 1985)) (emphasis added). The decision in Gambino, therefore, establishes only that the government's awareness of counsel's other client as a potential suspect is one fact that is significant to the determination of whether there existed an actual conflict that adversely affected counsel's performance. At the same time, the court recognized that counsel's other interests and loyalties might be equally important to the determination of whether an actual conflict existed and whether it adversely influenced counsel's performance. It is primarily this latter circumstance that provides the appropriate analytic framework in this case on the actual conflict that existed.

Unlike Gambino, assuming the existence of an attorney-client relationship between defense counsel and Artie, an actual conflict of interest existed in this case. Defense counsel was in the either/or position of pursuing a strategy that although helpful to Petitioner, was adverse to the interests of both Artie and himself. Also unlike Gambino, the path counsel chose is not

otherwise explainable except by reference to the conflict. The extent of his investigation and his

trial decisions all reflect an impulse to protect Artie from implication in the murder, a strategy

that makes no objective sense given the fact that two witnesses identified him as the killer, and a

limited investigation would have provided evidence that Artie manufactured an alibi. This case

is also different from Gambino in that Petitioner can easily identify a plausible alternative trial

strategy that goes to the heart of the conflict. Consequently, assuming that an attorney-client

relationship existed between defense counsel and Artie, Petitioner is able to establish that a

conflict existed and that it adversely affected his counsel's performance.

However, more development of the existence and scope of the attorney-client

relationship between defense counsel and Artie is required before relief can be granted. In his

Petition, Morris asserts that "[i]n the summer of 1983, Artie Morris was seriously injured in an

altercation at a Philadelphia County prison. Shortly thereafter, while Petitioner was awaiting

trial, [defense counsel] undertook to represent Artie Morris in civil litigation arising out of the

prison injury, eventually filing suit on his behalf in both state and federal courts and negotiating

a substantial monetary settlement." (Pet. for Writ of Habeas Corpus, 6/19/01, at ¶ 22). The

evidentiary support for this assertion consists of two sets of documents: (1) three letters on

defense counsel's letterhead dated September 8, 1983, in which defense counsel wrote to Guiffre

Medical Center, Wills Eye Hospital, and the Philadelphia Detention Center stating that he

represented Artie Morris and requesting copies of Artie Morris's medical records (Pet. Ex. "6");

and (2) an excerpt from a deposition on April 10, 1985, in a case captioned Artie Morris v.

David Owens, Individually and as Superintendent of the Philadelphia County Prison, et al., Civ.

No. 84-5540, in which defense counsel is listed as counsel for Artie Morris (Pet. Ex. "25"). In this two-page deposition excerpt, Artie Morris is being questioned about an injury to his eye he sustained in prison. In response to a question about whether he filed a complaint, he answered, "I called Mr. Tucker."(Pet. Ex. "25," at 48:10-16).

Although the Commonwealth never disputes the fact that defense counsel represented Artie Morris at the same time he represented Kelvin Morris in this murder trial, relief cannot be granted without further development of the evidentiary basis for this claim. Under 28 U.S.C. §2254(e)(2), a habeas petitioner cannot receive an evidentiary hearing in federal court when he "has failed to develop the factual basis of a claim in State court proceedings," unless the case meets several strict conditions listed in § 2254(e)(2)(A)(i),(ii) and (B). The inquiry into whether a petitioner has "failed to develop" the factual basis of a claim in state court focuses on whether the petitioner was diligent in his efforts. Williams v. Taylor, 529 U.S. 420, 435 (2000). Diligence requires, at a minimum, a finding that the petitioner sought an evidentiary hearing in state court and gave the state court the first chance to review a particular claim. Id. at 436-37. That the state court refused a request for a hearing does not necessarily bar a federal court from granting a hearing, as long as the petitioner exercised diligence in investigating and pursuing his claims in state court. That principle holds true even where the state court's refusal is based on a finding that the  petitioner's claims were procedurally barred. See Wilson v. Beard, 426 F.3d 653, 665-66 (3d Cir. 2005) ("If a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts (as they did here) deny that request on the basis of an inadequate state ground, the petitioner has not 'failed to develop the factual basis of [the] claim in State

court proceedings' for purposes of § 2254(e)(2). For this reason, we conclude that § 2254(e)(2) did not preclude the District Court from holding a hearing on [Petitioner's] <u>Batson</u> claim.") (footnotes omitted). Where the federal habeas court determines that a petitioner did not "fail to develop" the state court record, then the decision about whether to hold an evidentiary hearing is left to the discretion of the federal court. <u>Campbell v. Vaughn</u>, 209 F.3d 280, 287 (3d Cir. 2000). In exercising its discretion, the court should "focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." <u>Id.</u>

Here, Morris not only sought an evidentiary hearing in state court on his claims in the second PCRA petition, he also submitted the same evidence in support of his allegation of his counsel's conflict of interest as he does here. (Resp. Ex. "16," Second Amended PCRA Petition). That evidence, coupled with the fact that it has gone unchallenged by the Commonwealth, along with his request for a hearing in state and federal court leads to the conclusion that Petitioner was diligent in his efforts and did not "fail to develop" his claims in state court. Moreover, an evidentiary hearing on the conflict of interest claim has the potential to advance Morris's claim for relief. Based on the discussion above, if the facts are as Morris asserts them, then under the dictates of <u>Gideon</u>, <u>Cuyler</u>, and <u>Morelli</u>, Morris was not provided with the protection of an attorney who advocated on his behalf with undivided loyalty, and Morris's fundamental life and liberty interests were compromised as a result. On this basis, Morris would be entitled to relief from his conviction. Consequently, this Court exercises its discretion and grants an evidentiary hearing on Morris's claim that he was denied his constitutional right to effective assistance of counsel on the grounds that his trial attorney had a conflict of interest.

In light of the determination to hold an evidentiary hearing on the conflict of interest claim, and given the potential consequences implicit in that inquiry, the Court will not address the merits of the Petitioner's remaining claims at this time. Instead, those claims will be held in abeyance pending the resolution of the conflict claim.

The accompanying Order shall enter today.


Dated: June 20, 2007                    /s/ Joseph H. Rodriguez
                                        Joseph H. Rodriguez, United States District Judge