## United States District Court
## For the Eastern District of Pennsylvania

| | | |
|---|---|---|
| KELVIN X. MORRIS, | : | |
| | : | |
| Petitioner, | : | Civil No. 01-3070 |
| | : | |
| v. | : | |
| | : | |
| JEFFREY BEARD, Acting Secretary | : | |
| Pennsylvania Department of Corrections | : | |
| CONNER BLAINE, Superintendent, | : | |
| State Correctional Institution at Greene; | : | |
| JOSEPH P. MAZURKIEWICZ, | : | |
| Superintendent, State Correctional | : | OPINION |
| Institution at Rockview, | : | |
| | : | |
| Respondents. | : | |
| | : | |

## I. General Background

Presently before the Court is the Petition for a Writ of Habeas Corpus filed by Kelvin X. Morris ("Morris" or "Petitioner"). The factual and procedural history of this case has been the subject of numerous opinions by the state and federal courts. It has been nearly thirty years since Petitioner was before the trial court. For the sake of brevity, and efficiency, the Court direct's the readers' attention to the three federal opinions in this case, which comprehensively set forth the factual and procedural history of this case: Morris v. Beard, 01-CV-3070, 2007 WL 1795689 (E.D. Pa. June 20, 2007) (hereinafter "Morris -4"), Morris v. Beard, 01-CV-3070 (E.D. Pa. April 1, 2008) (hereinafter "Morris-5"), and Morris v. Beard, 633 F.3d 185 (3d Cir. 2011) (hereinafter

"Morris-6").[1]

On November 30, 1983, a jury convicted Morris of first-degree murder and robbery in the Court of Common Pleas of Philadelphia County. Following a penalty phase hearing, the same jury sentenced Morris to death.  After denying post-trial motions, on September 8, 1987, the trial court imposed the death sentence and a consecutive sentence of ten to twenty years imprisonment on the robbery conviction. Over the subsequent 18 years, Morris filed appeals and petitions for post-conviction relief in Pennsylvania state courts, and two petitions for a writ of habeas corpus in federal court. The second federal petition was filed in June 2001, subjected to a temporary stay and subsequent orders for new and supplemental briefing and, ultimately, transferred to the United States District Court for the District of New Jersey in May 2006.

On June 20, 2007, this Court ruled that defense counsel's failure to conduct a reasonable investigation of mitigating evidence in anticipation of Morris's capital sentencing hearing, failure to present available mitigating evidence at that hearing, and failure to make a sufficient argument at that hearing violated Morris's Sixth Amendment right to effective assistance of counsel.  The Court granted relief to Morris under 28 U.S.C. § 2254 by vacating the sentence of death.  In addition, an evidentiary hearing on Morris's claim of ineffective assistance of counsel was ordered on Petitioner's claim that trial counsel operated under a conflict of interest depriving him of his Sixth Amendment

---

[1] The state court decisions referenced herein will be referred to follows: direct appeal Commonwealth v. Morris, 564 A.2d 1226 (Pa. 1989) ("Morris-1"); first PCRA Commonwealth v. Morris, 684 A.2d 1037 (Pa. 1996) ("Morris-2"); and second PCRA Commonwealth v. Morris, 822 A.2d 684 (Pa. 2003) ("Morris-3").

right to the effective assistance of counsel.

On October 24, 2007, the Commonwealth of Pennsylvania and counsel for Petitioner questioned trial counsel, who was the only witness presented at the evidentiary hearing. Post-hearing briefing followed and, on April 1, 2008, this Court ruled that trial counsel's dual representation of Petitioner and Petitioner's brother, who was also a suspect in the murder, constituted an actual conflict and, therefore, granted Petitioner relief under 28 U.S.C. § 2254 by vacating the judgment of conviction. See Morris-5. The remainder of Petitioner's claims were dismissed as moot without prejudice. Id.

Although the Commonwealth did not challenge the Court's Order vacating the sentence of death, it did appeal on the grounds that the Court erred in holding the evidentiary hearing and in ordering a new trial. The Third Circuit Court of Appeals affirmed the decision to conduct an evidentiary hearing and also affirmed the Court's finding that Petitioner did not waive his Sixth Amendment right to conflict free counsel. See Morris-6, 633 F.3d at 196, 198. However, the Third Circuit vacated the order for a new trial and remanded for further development of the record on the issue of whether the conflict of interest adversely affected Petitioner. Id. at 201. In so ruling, the Third Circuit directed that a new evidentiary hearing be held consistent with the opinion. Id. Therefore, the Court will conduct an evidentiary hearing to determine the merits of Petitioner's claim in Count I.

There are several other claims advanced by Petitioner that challenge his conviction. These claims were not previously considered by this Court in Morris-4 or Morris-5 because they became moot when the Court granted relief on Count I. Now that

the merits of Count I have been the subject of appeal and are now, again, before the Court for resolution, the parties agree that for the sake of completeness the remainder of the claims should be adjudicated, regardless of the Court's conclusion on the reevaluation of the merits of Count I.  And so, the following claims are before the Court:

CLAIM I      Petitioner's Claim That Trial Counsel Had a Conflict of Interest in That He Simultaneously Represented Petitioner and Petitioner's Brother;

CLAIM III      Whether Trial Counsel Was Ineffective in Failing to Investigate and Present Evidence That Petitioners Mental State Including His Brain Damage and Psychiatric Illnesses, Rendered Him Incapable of Intelligently and Voluntarily Waiving His Miranda Rights;

CLAIM IV      Whether Petitioner's Conviction Was Based upon Constitutionally Reliable Identification Evidence;

CLAIM V      Whether Petitioner Trial and Appellate Counsel Ineffectively Failed to Conduct an Adequate Investigation And, Consequently, Failed to Discover Exculpatory Testimony;

CLAIM VI      Whether Petitioner Was Denied His Confrontation and Due Process Rights When the Trial Court Precluded the Defense from Cross-examining a Prosecution Witness Concerning His Juvenile Record and Where the Prosecutor Allegedly Misrepresented the Witness' Record;

CLAIM VII      Whether the Prosecution Failure to Disclose Exculpatory Evidence Is Defaulted;

CLAIM VIII      Whether the Admission of Evidence of an Unrelated Offense Violated Petitioner's Sixth, Eighth, and Fourteenth Amendment Rights and His Corresponding Rights under the Pennsylvania Constitution;

CLAIM IX      Whether the Prosecutor Made Improper Statements During Closing at the Guilt Phase;

4

CLAIM XII   Whether Petitioner the Commonwealth Used its
Preemptory Strikes in a Racially Discriminatory
Manner;

CLAIM XVII  Whether the Trial Court's Instructions Denied
Petitioner a Fair Trial by Incorrectly Stating
Pennsylvania Law Regarding the Use of Prior
Statements of Identification and Failing to Provide an
Adequate Cautionary Instruction on Identification
Testimony;

CLAIM XVIII Whether Trial Counsel Was Ineffective in Failing to
Investigate and Present Critical Impeachment
Evidence;

CLAIM XIX  Whether Trial Counsel Was Ineffective in Failing to
Properly Investigate the Circumstances of Petitioner's
Arrest and Statement to Police, And, as a Result,
Failed to Impeach the Commonwealth Witnesses and
Properly Prepare and Litigate a Motion to Suppress;

CLAIM XXI  Whether Petitioner Was Entitled to Discovery and an
Evidentiary Hearing Regarding Witness Participation
in the Philadelphia District Attorney's Office Witness
Security Program;

CLAIM XXII Whether the District Attorney Who Prosecuted the
Case Had a Conflict of Interest Because He Was
Related to the Owners of the Pep Boys Store Where
the Murder Occurred;

CLAIM XXIV Whether the Cumulative Errors of Counsel.

## II. Procedural History

All of the claims attacking the guilt phase of Morris' trial were set forth in Morris'

Second Pennsylvania Post-Conviction Relief Act, 42 Pa. C. S. § 9541 et seq. ("PCRA")

Petition and the Amended Supplement to that Petition (collectively "the Second PCRA

Petition").[2]  As explained in Morris-4, on December 21, 1999, the PCRA trial court found

that it lacked jurisdiction to review the claims because the second petition had been filed

beyond the one-year statute of limitation of the PCRA. Commonwealth v. Morris, No.

409-413, slip. op. (Pa. Commw. Ct. Dec. 21, 1999).  Because the court concluded that it

lacked jurisdiction, it did not address any claim on the merits.[3]  After thorough

consideration of whether Morris' claims were procedurally defaulted, this Court ruled,

relying on Bronshtein v. Horn, 404 F.3d 700 (3d Cir. 2005), that the claims were not

procedurally defaulted and could proceed because the one-year time limitation had not

been firmly established or regularly applied at the time of Morris' default.  Although the

Third Circuit affirmed this portion of the Court's order in Morris-4, the Government

contends that two recent Supreme Court decisions in Beard v. Kindler, 130 S.Ct. 612

(2009) and Walker v. Martin, 131 S.Ct. 1120 (2011), call this holding into question.

      The Court will not revisit its prior holding that Morris' claims may proceed

despite being filed beyond the one-year limitation period of the PCRA.  In Lark v.

Secretary of Pa. Dept. Of Corrections, 645 F.3d 596, 613 (3d Cir. 2011), the Third Circuit

stated that "The Supreme court's holdings in Walker and Kindler have not affected our

holding in Bronshtein that prior to 1998 capital petitioner's in Pennsylvania could rely

---

[2]As detailed in Morris-4, Morris filed this PCRA petition *pro se*, in the
Pennsylvania County Court of Common Pleas on December 12, 1996. New counsel filed
an amended PCRA petition on October 27, 1997. The second petition, together with the
supplemental petitions, raised twenty-six claims.

[3] The Court noted the possibility that some of the penalty phase claims were
disposed of on the merits, but the majority of the claims were not reviewed because of
the procedural default. The Government argues that some of the guilt phase claims were
also adjudicated on the merits.

on state courts to relax procedural rules, including the one-year PCRA time bar."
Moreover, the Supreme Court recently denied *certiori* in Kindler. See Wetzel v. Kindler,
No. 11-48, 2012 WL 117815 (U.S., Jan. 17, 2012). As a result, Morris' claims remain
properly before this Court.

Before this Court can address the merits of the numerous claims listed above, it
must first determine whether any of the claims present issues that warrant an
evidentiary hearing.  While the merits of Count I will be the subject of an evidentiary
hearing, as directed by the Third Circuit, the parties disagree over whether there is any
basis to grant an evidentiary hearing on the remainder of the guilt phase claims.
Therefore, the Court must determine whether, as to each claim, there is a bar to holding
an evidentiary hearing and, if not, whether an evidentiary hearing is merited.  There are
several considerations that are relevant.

### III. Standards of Review

### A. Merits Analysis Under § 2254

As this Court previously explained in Morris-4, Petitioner exhausted the state
remedies and a merits review on all of the claims is warranted despite the procedural
default.  The Court also established the standard of review for the pending claims.
Where a state court has adjudicated the merits of a claim, the federal habeas court's
standard of review is narrow; it must apply the deferential standards of the AEDPA. See
Hameen v. Delaware, 212 F.3d 226, 248 (3d Cir. 2000). Under those deferential
standards, federal habeas relief must be denied unless the adjudication was: (1)
"contrary to, or involved an unreasonable application of, clearly established Federal law,
as determined by the Supreme Court of the United States;" or (2) "based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2); Jacobs v. Horn, 395 F.3d 92, 99 (2005). A federal habeas court must presume that a state court's findings of fact are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. Id.

A state court decision is "contrary to" Supreme Court precedent under § 2254(d)(1) where the state court reached a "conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  A state court decision is an "unreasonable application" under § 2254(d)(1) if the court "identifies the correct governing legal rule from the Supreme Court's cases, but unreasonably applies it to the facts of a particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407; Jacobs, 395 F.3d at 100.

These deferential standards of review do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Jacobs, 395 F.3d at 100 (quoting Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002)). If it is not clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined under United States Supreme Court law, "it may be presumed that the state court adjudicated the claim on the merits in the

8

absence of any indication or state-law procedural principles to the contrary." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784-5 (2011) (citation omitted).  But where it is clear that a procedural reason underscores the decision, federal habeas courts apply pre-AEDPA standards of review. <u>Id.</u>; <u>see also</u> <u>Jacobs</u>, 395 F.3d at 100. Prior to AEDPA, federal habeas courts conducted a *de novo* review over pure legal questions and mixed questions of law and fact. <u>Jacobs</u>, 395 F.3d at 100 (citing <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001)). The state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence under § 2254(e)(1). <u>Jacobs</u>, 395 F.3d at 100.

### B.  Claims Raised in Second PCRA Petition and Federal Habeas Petition

In this case, all of Morris's claims in his second PCRA petition were procedurally defaulted; the state court refused to review them based on Morris's failure to file those claims within Pennsylvania's PCRA one-year limitations period. (<u>See</u> <u>Morris-4</u> Part I. E.) Ordinarily, this Court would consequently be barred from reviewing those claims. However, because the state procedural rule used to dismiss those claims was not an "independent and adequate" ground to bar federal habeas review, (<u>see</u> <u>Morris-4</u> Part II. B.), a merits review by this Court is not barred. And because none of the claims presented for the first time in the second PCRA petition were reviewed by the state courts on the merits, this Court does not proceed under AEDPA's deferential standard of review for those claims.  For any claim that had been previously litigated on the merits, either on direct appeal or in Morris's first PCRA petition, this Court will apply AEDPA's deferential standards.

### C. Evidentiary Hearing

Efficiency mandates that any other claim meriting an evidentiary hearing be presented during the evidentiary hearing on Count I.  The purpose of this opinion is to identify those claims that fit into that category.  Of course, where the state court's factual determinations are at issue, those findings are presumed to be correct; rebuttable only upon a showing of clear and convincing evidence to the contrary. 28 U.S.C. § 22549e)(1); Campbell v. Vaughn, 209 F.3d 280, 290 (3d Cir. 2000).

Under AEDPA, there are several considerations relevant to the propriety of an evidentiary hearing conducted by the federal habeas court. With certain exceptions, the federal habeas court retains discretion to hold an evidentiary hearing if doing so will advance petitioner's claim. See Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).  The threshold inquiry, however, is whether or not the state court adjudicated petitioner's claim on the merits.  See Cullen v. Pinholster, 131 S.Ct. 1388, 1400-1, 179 L.Ed.2d 557 (2011).

### 1. Claims Not Adjudicated On the Merits

The guilt phase claims set forth in Counts III, IV, VII, XVII, XVIII, and XIX, that were not adjudicated on the merits, are reviewed *de novo*.  Likewise, portions of the claims set forth in the following counts are also subject to review under this standard: Count V as to witnesses Stokes and Willie; Count VI as to the Brady violation, Count VII as to witness Handy, Count IX as to cumulative error and Count XXI in part.  These claims are not subject to the "highly deferential," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), and "difficult to meet," Harrington v. Richter, 562 U.S. –,  –, 131 S.Ct. 770, 786 L.Ed.2d 624 (2011), standard espoused by 28 U.S.C. §

2254(d).  See Pinholster, 131 S.Ct. at 1398.  Rather, the relevant inquiry for an

evidentiary hearing on these claims is whether such a hearing is prohibited by 28 U.S.C.

§ 2254(e)(2).  See Morris v. Beard, 633 F.3d 185, 193 (3d Cir. 2011).  That statute

provides:

> (e)(2) If the applicant has failed to develop the factual basis of a claim in
> State court proceedings, the court shall not hold an evidentiary hearing on
> the claim unless the applicant shows that--
> > (A) the claim relies on--
> > > (i) a new rule of constitutional law, made retroactive to cases
> > on collateral review by the Supreme Court, that was previously
> > unavailable; or
> > > (ii) a factual predicate that could not have been previously
> > discovered through the exercise of due diligence; and
> > (B) the facts underlying the claim would be sufficient to establish by
> > clear and convincing evidence that but for constitutional error, no
> > reasonable factfinder would have found the applicant guilty of the
> > underlying offense.

Under 28 U.S.C. § 2254(e)(2), "a habeas court is barred from holding an

evidentiary hearing unless the petitioner was diligent in his attempt to develop a factual

basis for his claim in the state court." Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir.

2010); see also Williams v. Taylor, 529 U.S. 420, 435, 120 S.Ct. 1479, 146 L.Ed.2d 435

(2000). In Morris-6, the Third Circuit recognized, in the technical sense, that Petitioner

was "diligent" in advancing his claims set forth in Count I— and ostensibly all of the

claims in Second PCRA— and that the claim, as set forth in the Second PCRA,

adequately "develop[ed] a factual basis . . . in state court." Id. at 194-5.  The Third

Circuit's reasoning applies with equal force to all of Petitioner's claims that were

similarly advanced in the Second PCRA Petition.  As such, there is no procedural bar to

holding an evidentiary hearing on these claims.  Id.

For these claims, the Court's decision to hold an evidentiary hearing is dependent

11

upon a determination that "such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474, 127 S.Ct. 1933.  A hearing would advance a petitioner's claim where petitioner can make "a prima facie showing" that "would enable [him] to prevail on the merits of the asserted claim. Palmer, 592 F.3d at 393.  No evidentiary hearing is required "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474, 127 S.Ct. 1933.

Moreover, even though there is no procedural impediment to conducting an evidentiary hearing, AEDPA's statutory scheme is designed to strongly discourage "[f]ederal courts sitting in habeas [from being an] alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Id., at 437, 120 S.Ct. 1479; see also Richter, 562 U.S., at ––––, 131 S.Ct., at 787.  ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions"); Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing").  For the reasons that follow in Part IV, the Court will exercise its discretion to hold an evidentiary hearing on the claims in Counts III, V, XVIII, XIX and XXIV.

## 2. Claims Adjudicated on the Merits

The guilt phase claims set forth in Count VIII were adjudicated on the merits in the state court and are consequently reviewed under the AEDPA rubric of 28 U.S.C. § 2254(d).  Portions of the claims set forth in the following counts are also subject to

review under this standard: Count V as to witnesses Johnson and Flowers and Wise and

Clark, Count VI as to the direct appeal, Count VII as to witness Johnson, portions of

Count IX, Count XII as to the McMahon Tape, and portions of Counts XXII and XXIV.

Recent Supreme Court precedent directs that an evidentiary hearing on any claim

adjudicated by the state court is improper. <u>Pinholster</u>, 131 S.Ct. at 1401.  "If a claim has

been adjudicated on the merits by a state court, a federal habeas petitioner must

overcome the limitation of § 2254 (d)(1) on the <u>record that was before that state court</u>."

<u>Id.</u> at 1400 (emphasis added).  For Count VIII and portions of Counts V, VI, VII, IX, XII,

this Court's review is limited to the record before the state court and no new evidence

may be considered.

## IV. Analysis

The parties agree that an evidentiary hearing would not be useful to resolve

Counts IV, VI, and IX.  The Court has reviewed the Petition and for the reasons that

follow, will exercise its discretion to hold an evidentiary hearing on the claims set forth

in Counts III, V, XVIII, XIX and portions of XXIV.  The remaining claims will be decided

on the papers in a decision issued at a later date, contemporaneous to resolution of the

claims at issue in the evidentiary hearing.

### A. Count I: Petitioner's Claim That Trial Counsel Had a Conflict of Interest in That He Simultaneously Represented Petitioner and Petitioner's Brother.

Kelvin must "demonstrate that an actual conflict of interest adversely affected his

lawyer's performance." <u>United States v. Morelli</u>, 169 F.3d 798, 810 (3d Cir. 1999)

(quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980))

(internal quotation marks omitted).  If Kelvin can make this showing, he "need not

13

demonstrate prejudice in order to obtain relief." <u>Cuyler</u>, 446 U.S. at 349–50, 100 S.Ct. 1708; <u>Morelli</u>, 169 F.3d at 810.

<u>Morris-6</u> remanded to this Court the issue of whether Counsel's actual conflict of interest had any bearing on Kelvin's trial. Evidence pertaining to whether Counsel's trial decisions wore born out of strategy or "loyalties to Artie and his own financial stake in Artie's civil suit" will be probed at the evidentiary hearing. 633 F.3d at 199.

### B. Count III: Whether Trial Counsel Was Ineffective in Failing to Investigate and Present Evidence That Petitioners Mental State Including His Brain Damage and Psychiatric Illnesses, Rendered Him Incapable of Intelligently and Voluntarily Waiving His Miranda Rights.

Petitioner contends that counsel was ineffective in failing investigate and present evidence that Petitioner's mental state, including his brain damage and psychiatric illnesses, rendered him incapable if intelligently and voluntarily waiving his <u>Miranda</u> rights. This argument was raised for the first time in the second PCRA and is, for the reasons expressed in Part III. B, reviewed <u>de novo</u>. The Court has reviewed the claims and concludes that an evidentiary hearing is merited.

Subsequent to his arrest, and after being informed of his rights pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Detective Sergeant Thomas W. Newsome testified at the Suppression Hearing that Morris gave the following statement: "I did it to keep up with the crowd." N.T. 11/23/83, 21, 31-36, 44-45.  Morris argues that counsel was ineffective in failing to investigate, develop, and put forth evidence of his impaired mental health, evidence of which would have convinced the trial court to suppress his statement to Detective Newsome.  Due to counsel's ineffectiveness, Morris contends neither the trial court nor the jury ever knew of Morris'

14

impaired mental capacity.  For these reasons, Morris contends that the admission of this statement and counsel's failure to challenge its admission violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 1. Waiver Standards

There are "two distinct dimensions" to the consideration of whether a suspect has waived his fifth amendment Privilege.  Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. (internal quotations marks and citations omitted); Edwards v. Arizona, 451 U.S., at 482, 101 S.Ct., at 1883; Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).

A confession is not voluntary when it is obtained in violation of a defendant's due process rights.  "Certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."  Miller, 474 U.S. at 109, 106 S.Ct. 445.  There are other considerations relevant to this inquiry, including "the totality of the circumstances surrounding the

15

interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant." United States v. Sriyuth, 98 F.3d 739, 749 (3d Cir. 1996) (citations omitted).

"[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Evidence of "coercive police activity" is a mandatory component of a finding that a confession is involuntary and in violation of the Fourteenth Amendment. Id. at 167, 107 S.Ct. 515. of a due process violation.

Miranda holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S., at 444, 475, 86 S.Ct., at 1612, 1628. "The Miranda warnings [. . . ] ensur[e] that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851 (1987).

Thus, the finding of waiver is appropriate "where the totality of the circumstances 'reveal both an uncoerced choice and the requisite level of comprehension.'" Moran, 475 U.S. at 421, 106 S.Ct. 1135.

## 2. Legal Standard under Strickland v. Washington

In Morris-4, this Court set out the governing standard for ineffective assistance in counsel. The Court reincorporates that discussion here.

The United States Constitution protects the fundamental right to a fair trial, and the Sixth Amendment defines the basic elements of a fair trial: a speedy and public trial,

by a jury, with knowledge of the criminal charges and the ability to subpoena and confront witnesses, and with the assistance of counsel. The right to counsel, which is crucial to ensure the integrity of the trial process, has evolved into a constitutional right to have the reasonably effective assistance of counsel. "That a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the constitutional command." Strickland v. Washington, 466 U.S. 668, 685 (1984).

When seeking to overturn a conviction or a death sentence based on ineffective assistance of counsel, a convicted defendant must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. The defendant also must show that the deficient performance caused prejudice to the defense. Id. at 687.  Counsel must act with "reasonableness under prevailing professional norms" as guided by "American Bar Association standards and the like." Id. at 688.  A court evaluating counsel's performance must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.  "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id.

Strategic choices made after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." Id.  "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable

17

professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 690-91.

Under Strickland, the court's first function is to identify the prevailing professional norms that existed at the time of Morris's sentencing with regard to investigation and presentation of mitigating evidence in a death penalty case, then determine whether trial counsel's conduct at sentencing fell below these norms and, if so, whether the petitioner suffered prejudice thereby. One source for determining the prevailing professional norms is found in the American Bar Association standards for criminal justice. Strickland, 466 U.S. at 688; Wiggins v. Smith, 539 U.S. 510, 524 (2003) (recognizing ABA Guidelines as "standards to which we long have referred as 'guides to determining what is reasonable'" with respect to the investigation and presentation of mitigating evidence in capital cases).

Although the first ABA Guidelines for capital defense work were adopted in February 1989, more than five years after Morris was sentenced to death, the 1989 guidelines simply reflected prevailing norms in the profession that had already existed. See American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 1989, Introduction, located at http://www.abanet.org/deathpenalty/resources/docs/ 1989Guidelines.pdf (hereinafter "1989 ABA Guidelines"). Consequently, they are effective standards by which to judge

the reasonableness of counsel's conduct in this case. See Marshall v. Cathel, 428 F.3d 452 (3d Cir. 2005) (using ABA guidelines as prevailing professional norms even though case had been tried in 1986 because "even then [counsel] well knew that 'the unique nature of modern capital sentencing proceedings . . . derives from the fundamental principle that death is different.'") (quoting Schiro v. Farley, 510 U.S. 222, 238 (1994)); Hamblin v. Mitchell, 354 F.3d 482, 487 (6th Cir. 2003) (concluding that although the case was tried before the 1989 ABA guidelines were published, the 1989 and 2003 standards represented prevailing professional norms under Strickland because the standards were merely codification of "longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.").

Under those guidelines, counsel representing a defendant faced with the death penalty had a duty to ensure that all reasonably available mitigating evidence is presented to the jury in the most effective possible way. 1989 ABA Guidelines, 11.8.2(D). Preparation for the sentencing phase should begin immediately upon counsel's entry into the case, and the preparation should include thorough discussions with the client about the penalty strategy. Counsel should prepare by investigating the following witnesses and evidence: (1) witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client; (2) expert witnesses to provide medical, psychological, sociological or other explanations for the offense for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc.; (3) witnesses with knowledge and opinions about the lack of effectiveness of the death penalty itself; and (4) witnesses drawn from the victim's family or intimates who are willing to speak against killing the

client. Id., Guideline 11.8.3.

In addition to investigation of mitigating evidence, the ABA Guidelines also provide  standards about counsel's duty of presentation of mitigating evidence in capital cases.  Counsel should present all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence. Id., Guideline 11.8.6.  Among the topics counsel should consider presenting are "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Wiggins, 539 U.S. at 524 (citing 1989 ABA Guideline 11.8.6).

Under Strickland, a petitioner must also demonstrate that he was prejudiced by trial counsel's deficient performance.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.  To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

### 3.  Available Mental Health Evidence

In Morris-4, the Court laid out the extensive evidence related to Morris' diminished mental capacity that was available to counsel at the time of Morris' trial. Based on counsel's failure to investigate, develop, and produce this evidence, this Court held Morris was prejudiced by his counsel's ineffectiveness and vacated the sentence of death.  Although portions of the following discussion relate only to the penalty phase, the Court finds that the conclusions with respect to the available evidence and counsel's

failures to investigate, develop, or produce that evidence apply with equal force to the guilt phase claims.  The Court inserts those portions of Morris-4 here.

Morris argues that his trial counsel failed to conduct any investigation into his background and personal history, and performed no mental health investigation in preparation for the penalty phase.  In support of his contention that there was a wealth of mitigating circumstances that should have been investigated, Morris points to, inter alia, his abusive childhood; significant history of serious mental health problems; several severe head traumas; significant impairments resulting from organic brain damage; and psychiatric evaluations and treatment on several occasions. Moreover, Morris demonstrates that there were nearly a dozen potential witnesses who would have provided an abundance of mitigating evidence about him, his background, and his impaired mental health, but that his counsel did not seek out, interview, or present testimony from these family members and friends. In addition, Morris argues that counsel failed to properly prepare him and his mother, Sarah Morris, for their penalty phase testimony. Morris further contends that his trial counsel failed to seek and obtain the available records about him, including school records and correctional records. Morris argues that counsel's failures were particularly egregious because, although counsel was aware that Morris received psychiatric treatment, he did not retain a mental health expert, did not have Morris evaluated, and did not present expert mental health testimony to the sentencing jury.

The affidavits of Morris's family members and friends and the other evidence in support of his habeas petition provide an overwhelming amount of highly compelling evidence to establish that Morris suffered an abused, neglected, and violent childhood;

endured a number of significant head traumas; and has mental health problems. Sarah Morris (the petitioner's mother), Jaime Morris and Michael Morris (the petitioner's siblings), William, Albert, and Edward Morris (the petitioner's uncles), Bernice Scott and Dora Mae Morris (the petitioner's aunts), and David Madden and Odessa Melton (close family friends) all testified about the abuse, neglect, and violence that Kelvin suffered during his childhood and about Kelvin's apparent mental problems. His father was an alcoholic who frequently became verbally abusive and beat his wife and children and who could not keep a job, leading to financial problems. Kelvin was extremely sensitive to these incidents and protective of both his parents during their fights. His father frequently beat Kelvin when Kelvin tried to stop the fighting. At one point, his mother stabbed his father in the chest, and Kelvin rushed to his father's side to try to stop the bleeding. During this incident, and many others, Kelvin deteriorated into uncontrollable shaking, crying, and screaming. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 2-10; Pet. Ex. "15," Aff. Jaime Morris, ¶¶ 2-4; Pet. Ex. "16," Aff. Michael Morris, ¶¶ 2-7; Pet. Ex. "10," Aff. William Morris, ¶¶ 7; Pet. Ex. "20," Aff. Albert Morris, ¶¶ 2–4; Pet. Ex. "21," Aff. Edward Morris, ¶¶ 2; Pet. Ex. "18," Aff. Bernice Scott, ¶¶ 2; Pet. Ex. "19," Aff. Dora Mae Morris, ¶¶ 3; Pet. Ex. "7," Aff. David Madden, ¶¶ 2).

Kelvin also exhibited odd behavior and learning problems from an early age. Three times during his childhood, he fell to the ground from varying heights, requiring hospital visits and stitches in his head. One of the family friends testified that he also was hit by a car as a child, leaving him unconscious all the way to the hospital. (Pet. Ex. "3," Aff. Odessa Melton, ¶ 3). He was described as moody, often in a trance-like state where he did not seem to hear a person who was talking to him. He suffered from

frequent, severe headaches and would swing suddenly from withdrawn and quiet to wildly agitated when he got one of those headaches. The headaches caused nausea and dizziness. He would often appear disoriented and delusional, seeming to talk to people who were not there or rant incoherently, laughing inappropriately, streaming in and out of conversations, and becoming suspicious and paranoid of others, including his teachers. He had a difficult time communicating or expressing his thoughts, and he became very confused, distraught, and upset as a result of his inability to communicate and the fact that he could not understand or control what was happening to him. His inability to remember even simple things caused serious difficulties in school and in employment. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 10, 13-17, 19-20; Pet. Ex. "15," Aff. Jaime Morris, ¶¶ 4-5, 7; Pet. Ex. "16," Aff. Michael Morris, ¶¶ 8-10; Pet. Ex. "10," Aff. William Morris, ¶¶ 2-5; Pet. Ex. "20," Aff. Albert Morris, ¶¶ 5-6, 10-14; Pet. Ex. "21," Aff. Edward Morris, ¶¶ 3–9; Pet. Ex. "18," Aff. Bernice Scott, ¶¶ 3-6, 8; Pet. Ex. "19," Aff. Dora Mae Morris, ¶¶ 4, 6-11).

His aunt testified that Kelvin could not manage his fears. When he was young, he saw his grandfather kill a chicken for dinner. Kelvin was horrified and cried uncontrollably, and he never got over seeing that chicken get killed. He became terrified of chickens and came to believe they wanted to kill him, even as an adult. (Pet. Ex. "18," Aff. Bernice Scott, ¶ 7).

The family lived in a crime-ridden neighborhood. Kelvin was exposed to criminal gang activity in school and in the neighborhood and was a witness to robberies on the street and classmates bringing guns and knives to school. Kelvin was bullied at school and on his way home, and got in numerous fights. His friend remembers Kelvin

becoming dazed several times from being hit on the head with clubs and bricks. (Pet. Ex. "7," Aff. David Madden, ¶¶ 3). When he was teenager, he was stabbed in the chest. He became anxious about going to school, and his mother often rushed him to the emergency room on Sunday nights because of his severe asthma attacks. When Kelvin was about thirteen, he and his friend became heavily involved with drinking and drugs. They drank whatever they could get, smoked marijuana, took a lot of pills, and did methamphetamine and other drugs. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 18, 21; Pet. Ex. "10," Aff. William Morris, ¶¶ 6; Pet. Ex. "7," Aff. David Madden, ¶¶ 3-4).

His mental instability crested at one point during his teenage years in an incident that his sister describes as "a complete nervous breakdown." (Pet. Ex. "15," Aff. Jaime Morris, ¶ 6). In response to one of his father's tirades, Kelvin began trembling, screaming and crashing through the house uncontrollably. His mother called the police, and Kelvin was taken to the hospital. He was prescribed Mellarill. Several days after Kelvin stopped taking the drug, his mother came home and found him in a trance on the front steps. She called the police again, and this time he stayed in the hospital for several days. (Pet. Ex. "17," Aff. Sarah Morris, ¶¶ 22-23; Pet. Ex. "15," Aff. Jaime Morris, ¶¶ 6; Pet. Ex. "16," Aff. Michael Morris, ¶¶ 7).

All of these family members and friends assert that they were available and willing to present mitigating evidence at Morris's penalty hearing, if they had had an opportunity to do so, but defense counsel never contacted them.

Morris also contends that trial counsel should have investigated and presented mental health experts to explain his bizarre behavior, diagnosed mental illness, treatment with anti-psychotic medication, childhood trauma, multiple head injuries,

24

learning problems, and an abnormal EEG. On the day before the penalty phase began,

Morris's counsel indicated to the trial court that he was having difficulty obtaining

unidentified "medical records." (N.T., 11/30/83 at 63-65). Nothing in the transcript

indicates what medical records defense counsel was talking about, what counsel's

attempts consisted of, what difficulties he encountered, or whether he succeeded in

obtaining the medical records.

Had trial counsel obtained Morris's psychiatric records, he would have learned

the following. Records from Morris's six-day stay at a psychiatric hospital in January

1977 when Morris was seventeen years old reveal, inter alia, that: (1) Morris was

involuntary committed to the facility after he became violent at home on several

occasions, one of which involved him throwing a bottle that hit his brother Artie in the

eye, necessitating removal of the damaged eye; (2) he tried to jump from a upper floor

window; (2) he entered the facility very agitated and angry, and continued to be restless

and anxious for about three days, talking about being afraid of losing control; (3) he

asked for a staff member to put him in restraints so he could control his impulsiveness;

and (4) he was treated with Haldol, Cogentin and prescribed Mellaril upon release. One

record, the Psychiatric Admission Summary, says that upon admission he was "excited,

rambling and irrelevant," his "associations were loose," there was "a pressured speech,"

"affect was inappropriate," he "appeared to be responding to auditory voices and looked

disorganized," he "was out of touch with reality," and he suffered an "acute

schizophrenic episode." Other records of the same stay, however, say that although he

was sad and guilty over the incident with his brother, his mental status upon admission

appeared normal, with no incoherence, disorientation, delusions, or hallucinations. The

impression was that Morris had an "explosive personality." (Pet. Ex. "31," Philadelphia Psychiatric Center, Discharge Summary, January 22, 1977; Psychiatric Admission Summary, January 16, 1977; Mental Status Examination, January 16, 1977). The results of his EEG were abnormal, showing "slow activity over the frontal, central and temporal areas on the left," indicating a need for additional neurological evaluation. (Id., Discharge Summary; Electroencephalography Report, January 19, 1977).

Four months after his initial psychiatric hospital stay, Morris was again hospitalized, this time for nine days in May 1977. This second stay was precipitated by violent rages against his younger brothers. Upon commitment, he was anxious, nervous, belligerent and hostile, but he subsequently calmed down. He was given Haldol, Cogentin, Dalmane, and a prescription for Mellaril. His diagnosis again was "explosive personality," and his prognosis was "guarded." (Id., Discharge Summary, May 16, 1977).

Correctional records from 1981 reveal, inter alia, that an evaluation conducted by a Virginia prison psychologist concluded that Morris was borderline retarded with a verbal IQ of 69, a non-verbal IQ of 60, and no reading skills. (Pet. Ex. "28," Virginia Department of Corrections - Adult Services, Psychological Summary, September 9, 1981). These records relate Morris's unstable childhood, alcoholic father, learning difficulties, history of street fights, psychiatric hospitalizations, and substance abuse. He was described as an "individual with a very damaged ego who is possibly brain damaged." (Id.).

Records from Morris's psychiatric treatment at Central State Hospital in Petersburg, Virginia, where he was hospitalized from January 21, 1981 through February 17, 1981, reveal further mitigating factors. These records contain, inter alia, a social

history interview conducted with Morris's mother by one of the hospital social workers. The interview reveals information about Morris's history of dizzy spells and blackouts, childhood head injuries, his personality changes, episodes of paranoia, childhood drug use, and need for psychiatric assistance, as well as his father's alcohol addiction over the previous sixteen years. (Pet. Second Supp. Mem. Ex. "2," Social History Report and Questionnaire from Central State Hospital Records).

During the second state PCRA proceedings, fourteen years after Morris's conviction, Morris's counsel requested two mental health evaluations. Dr. Carol Armstrong, a psychologist and neuropsychologist, concluded to a reasonable degree of certainty that Morris suffered from organic brain damage; an extreme mental and emotional disturbance; and multiple cognitive deficits, including impairments in memory, concept formation, flexibility, and impulse control. (Pet. Ex. "4," Aff. Carol Armstrong). Dr. Lawson Bernstein, a medical doctor and psychiatrist, concluded to a reasonable degree of certainty that Morris suffered from a number of serious and debilitating neurological, psychiatric, and cognitive impairments, including organic brain damage and post traumatic stress disorder. (Pet. Ex. "5," Aff. Lawson Bernstein). Both experts agree that this mental health information could have been developed and presented at the time of Morris's trial and sentencing.

Morris argues that such mental health testimony would have established significant mitigating evidence under two factors of Pennsylvania mitigation law that was in effect at the time of his sentencing—specifically, Section 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance") and Section 9711(e)(3) ("The capacity of the defendant to appreciate the criminality of his

conduct or to conform his conduct to the requirements of law was substantially impaired.").

The Commonwealth argues that Morris cannot base his ineffectiveness claim on the failure to produce psychiatric records because the transcript reveals that Morris instructed his trial counsel not to pursue the psychiatric records. Moreover, the Commonwealth argues, presenting the psychiatric records would have done Morris more harm than good because the indications of an explosive, violent, and dangerous personality found in the records would have been damaging to Morris at the penalty phase. The Commonwealth further argues that the sentencing jury was adequately presented with mitigating evidence in the form of the testimony of both Sarah and Kelvin Morris, and trial counsel had no reason to suspect that Kelvin suffered from an abusive or traumatic childhood.

### 4. Ineffective Assistance of Counsel

Counsel's failure to conduct an investigation into Morris' diminished mental capacity impacted his performance in the penalty portion of the trial and may have potentially impacted his performance in guilt phase of the trial.  For the same reasons that counsel was ineffective for failing to investigate and present available evidence related to Kelvin's mental health and diminished cognitive ability in the penalty phase, counsel's performance at the suppression hearing was also ineffective.  Sweet v. Tennis, 386 Fed. Appx. 342, 347 (3d Cir. 2010).

Kelvin's statement to Detective Newsome was not obtained in violation of the Fourteenth Amendment because it was "uncoerced." Sriyuth, 98 F.3d at 749.  Kelvin does not dispute that the duration and the manner of his interrogation by Detective

Newsome was not onerous.  "[C]ourts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health." Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (citations omitted).  There are no facts in the record before the suppression court that suggest that Kelvin's confession was involuntary and obtained in a manner that violated his rights under the Due Process Clause of the Fourteenth Amendment and Petitioner was not prejudiced by counsel's deficient performance as to this claim.  See Connelly, 479 U.S. at 165, 107 S.Ct. 515.

The same cannot be said for Kelvin's claim that he did not possess the "'requisite level of comprehension'" to waive his Fifth Amendment rights under Miranda.  Id. (quoting Moran, 475 U.S. at 421, 106 S.Ct. 1135).  Had counsel presented evidence of Petitioner's mental health and cognitive impairments, Petitioner's statement to Detective Newsome may have been suppressed because it appears that Petitioner lacked "awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran, 475 U.S. at 421, 106 S.Ct. 1135.  The suppression court was without the benefit of this evidence when it rendered its decision, which constitutes clear and convincing evidence of a mental deficiency.  Counsel's failure to develop and/or present this information to the court fell below professional norms.

Next, the Court must consider whether Kelvin was prejudiced by counsel's failure to offer this evidence.  The Supreme Court has explained the deference owed to strategic decisions of counsel by reference to the scope of the investigations supporting those

29

decisions:

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and strategic
> choices made after less than complete investigation are reasonable
> precisely to the extent that reasonable professional judgments support the
> limitations on investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary. In any ineffectiveness case, a
> particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments.

Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052.  Counsel's failure to conduct an

investigation into Kelvin's ability to waive his Miranda rights was unreasonable.

Counsel's failure to successfully challenge the admissibility of Kelvin's statement may

have contributed to his conviction.  Even if it alone is "not the straw that broke the

camel's back" it is one aspect of potentially many inadequacies that negatively impacted

Petitioner's trial.

At the very least, counsel should be heard on what the Third Circuit identified as

any evidence related to "Kelvin's reticence and/or strategic considerations consistent

with Kelvin's best interests" that may have caused counsel to forgo such an

investigation. Morris-6, 633 F.3d at 200.  If counsel's ineffectiveness as described in the

penalty phase can be ascribed to this Count, the evidence related to strategy is relevant

here and to the potential strategic decisions the Third Circuit suggests counsel may have

employed- as opposed to being beholden to Artie and the conflict of interest. As

explained in United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989), "counsel can hardly

be said to have made a strategic choice . . . when s/he has not yet obtained the facts on

which such a decision could be made." Under such circumstances, counsel's behavior is

"not colorably based on tactical considerations but merely upon a lack of diligence." <u>Id</u>. at 712. The body of evidence that informed counsel's strategic decisions is of paramount importance to his conflict claim; that evidence includes counsel's pursuit of evidence related to Kelvin's mental capacity.

An evidentiary hearing is merited on this Claim.

### C. Count V: Whether Petitioner Trial and Appellate Counsel Ineffectively Failed to Conduct an Adequate Investigation And, Consequently, Failed to Discover Exculpatory Testimony.

Petitioner claims that he is entitled to relief from his conviction because his trial and appellate lawyers were ineffective for failing to investigate and identify available exculpatory evidence.  Several separate failings comprise this claim.

Petitioner claims that trial counsel was ineffective for failing: (1) to interview and present eyewitnesses Ronald Johnson, Anthony Stokes, and Joseph Flowers; (2) investigate and present alibi witnesses Christine Clark and Margaretta Wise Frazier; (3) investigate the circumstances of Petitioner's alleged confession to James Willie; and (4) to investigate the yellow plastic bag the perpetrator was allegedly carrying.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that made particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691, 104 S.Ct. at 2066.  Although "[t]rial counsel is not required to interview every possible witness . . .  counsel [is] required to exercise reasonable professional judgment in deciding whether to interview [a witness]." <u>Lewis v. Mazurkiewicz</u>, 915 F.2d 106, 113 (3d Cir. 1990).  In deciding whether or not to interview a potential witness, counsel may rely on conversations with his client.  <u>Id.</u>  "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said,

31

the need for further investigation may be considerably diminished or eliminated altogether." Id. (quoting Strickland, 466 U.S. at 691, 104 S.Ct. at 2066).  "[I]n a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed." Williamson v Ward, 110 F.3d 1508, 1514 (10th Cir. 1997) (citing Coleman v. Brown, 802 F.2d 1227, 1233-34 (10th Cir. 1986)).

Here, trial counsel never interviewed some of the eyewitnesses to the murder, including Joseph Flowers, who never wavered in his identification of Artie Morris as the shooter. Trial counsel never interviewed two potential alibi witnesses for Kelvin, Christine Clark (Kelvin's then girlfriend) and Clarks' mother Margaretta (Wise) Frazier, who would have testified, allegedly, that Kelvin was at their home at the time of murder. Counsel's pre-trial investigation also did not include a thorough investigation of James Willie, a key witness for the Commonwealth, or the circumstances of Ronald Johnson's criminal history.  Finally, to the extent that it existed, counsel did not endeavor to conduct an investigation of the yellow bag carried by the shooter, as identified by Ronald Johnson.

The Court concludes that trial counsel was ineffective for failing to investigate and/or present the aforementioned witnesses and that an evidentiary hearing is merited on these claims to ascertain whether counsel's failure to investigate and then present any of these witnesses was strategically motivated.  Counsel's decision to forgo investigation may have been motivated by strategy, as explained by the Third Circuit, because of counsel's desire to shift the focus away from the possibility that the perpetrator resembled Kelvin.  That strategy may come under fire if counsel was unaware, because of inadequate investigation, of the powerful evidence inculpating

Artie.  Finally, even if Kelvin was not prejudiced by the failure to present these

witnesses, if counsel was unaware of the nature of the proposed testimony of these

witnesses, then this failure would impact the merits of the conflict claim, as counsel's

plausible strategy would have been uninformed.  Gray, 878 F.2d at 711.

Each failure alleged by Petitioner is reviewed separately, and under differing

standards of review.

### 1. Ronald Johnson, Anthony Stokes, and Joseph Flowers

The Pennsylvania Supreme Court adjudicated these claims on the merits from the

direct appeal of Petitioner.  Morris-1, 684 A.2d at 1230 n.10.  As to Joseph Flowers, the

first PCRA court found that this claim was previously litigated on direct appeal and that

Flowers testimony, if presented, would be cumulative of other defense witnesses and

unhelpful.  Morris -2, 684 A.2d at 1044-45.  As a result, the deferential standards of

AEDPA apply to these claims.  See Section III.A.

The state court's application of the Strickland standard to these claims was

contrary to and an unreasonable application of federal law because that court

erroneously applied the wrong standard:

> Ineffective assistance of counsel provides a basis for relief under the PCRA
> only when it "so undermined the truth-determining process that no
> reliable adjudication of guilt or innocence could have taken place." 42
> Pa.C.S. § 9543(a)(2)(ii). To warrant relief, a defendant must prove that the
> underlying claim is of arguable merit, counsel had no reasonable basis for
> the act or omission in question, and but for counsel's act or omission, the
> outcome of the proceedings would have been different. Commonwealth v.
> Douglas, 537 Pa. 588, 645 A.2d 226 (1994), citing Commonwealth v.
> Pierce, 515 Pa. 153, 527 A.2d 973 (1987).

Morris-2, 684 A.2d at 1042 (emphasis added).  Strickland does not require a defendant

to show that the result would have been different; the correct standard is that a

defendant show a "reasonable probability" of a different outcome.  Strickland, 466 U.S. at 694.

The Commonwealth's argument that the state court's erroneous Strickland standard language is cured by the citation of Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987), the Commonwealth's Strickland counterpart, is unavailing.  The state court put the onus on petitioner.  Thus, the state court's disposition of Petitioner's claim applied a standard contrary to the Supreme Court's standard articulated in Strickland. The Court will next consider whether the state court's disposition of Petitioner's claim was predicated upon an unreasonable application of Strickland.

a. Ronald Johnson

The Pennsylvania Supreme Court adjudicated this claim on the merits from the direct appeal of Petitioner.  As a result, the deferential standards of AEDPA apply.  See Section III.A.

Ronald Johnson, then twelve years old, was one of the boys who had been at the gas station the night of the murder. Johnson was interviewed two days after the murder, on August 12, 1980, and told detectives that he was with friends in the park at 48th and Lancaster Avenue at 4:00 a.m. on August 9, 1980, and they went to the Arco gas station to get sodas. A man carrying a plastic bag approached and told them to leave, so they ran away.[4]  Johnson ran up the block but said that he turned around and watched what happened at the Pep Boys store.  He recalled watching the man with the bag approach

---

[4]  At trial, Ronald Johnson testified that the man came from the back of the Pep Boys, walked over to the gas station and was about fifteen feet from Johnson. He testified that the gas station was well lit and that he got a look at the man's face for about two to three minutes. (N.T., 11/21/83, at 8-9).

the two men at the Pep Boys store, have a brief conversation, pull a gun, and shoot one of the men.  Johnson gave a description of the killer to the police.  A police artist drew a composite sketch of the suspect based on Johnson's description.

Johnson testified as an eyewitness on behalf of the Commonwealth.  He identified Kelvin as the perpetrator and was subject to cross-examination at the pre-trial suppression hearing by then counsel, Ms. Ercole.  Petitioner claims that Johnson's identification was coerced by police in exchange for leniency on two pending burglary charges against him.  In support of this claim, Petitioner offers an unsworn statement from Johnson, dated September 29, 1987, Pet. Mem. Ex. 24, and an affidavit dated October 23, 1997, Pet. Mem. Ex. 11.

Johnson's testimony identifying Petitioner was not unique evidence; Johnson was among others who also identified Kelvin.  To the extent that Johnson was influenced by police, assuming that counsel was effective in every other aspect, this Court cannot conclude that the jury may have reasonably reached a different verdict if Johnson's testimony was successfully impeached.  See United States v. Massac, 867 F.2d 174, 178-79 (3d Cir. 1989) (absence of perjured testimony would not have resulted in a different outcome for petitioner).  As a result, the state court's conclusion was not erroneous under a proper application of Strickland as to Johnson's testimony.

To the extent Johnson's testimony sheds light on counsel's trial strategy and adds any weight to the cumulative error analysis, evidentiary exploration of this claim is relevant.

b. Joseph Flowers

The Pennsylvania Supreme Court adjudicated this claim on the merits from the

direct appeal of Petitioner.  As a result, the deferential standards of AEDPA apply.  See
Section III.A.

Joseph Tyrone Flowers, one of the other young boys who had been at the gas
station the night of the murder, positively identified Artie Morris as the man he saw at
the gas station that night.  Flowers picked Artie out of a photo array and at the
suppression hearing, he again identified Artie, and maintained that identification even
after being shown a photo of Kelvin.  N.T. 11/15/82, 92, 134.

Despite Flowers' consistent identifications of Artie and testimony at the
suppression hearing, counsel never interviewed him as a potential witness.

> "[A]n attorney must engage in a reasonable amount of pretrial
> investigation and "at a minimum, … interview potential witnesses and …
> make an independent investigation of the facts and circumstances in the
> case." Nealy, 764 F.2d at 1177. The failure to interview eyewitnesses to a
> crime may strongly support a claim of ineffective assistance of counsel, see
> Gray v. Lucas, 677 F.2d 1086, 1093 n. 5 (5th Cir. 1982) (noting that
> attorney's failure to investigate crucial witness may constitute inadequate
> performance), cert. denied, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815
> (1983), and when alibi witnesses are involved, it is unreasonable for
> counsel not to try to contact the witnesses and "ascertain whether their
> testimony would aid the defense." Grooms v. Solem, 923 F.2d 88, 90 (8th
> Cir. 1991), cert. denied, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815."

Bryant v. Scott, 28 F.3d 1411, 1415 (5th Cir. 1994).

In denying review under the PCRA, the Pennsylvania Supreme Court stated that
Flower's testimony would not have been helpful to Kelvin's case given the familial
resemblance of the brothers which apparently would have solidified Kelvin's
identification.  In addition, the testimony of Flowers was characterized as duplicative of
other defense eyewitnesses that stated that Kelvin was not the man that they saw.
Morris -2 at 1044-45.  In sum, Flowers was of no use to Kelvin. Given that the
Pennsylvania Supreme Court determined that this claim was previously litigated, review

of this claim is foreclosed unless there is a showing of cause and prejudice or actual innocence. See Sistrunk v. Vaughn, 96 F.3d 666, 673 (3d Cir. 1996).

   The Pennsylvania Supreme Court's decision is strikingly similar to the postulate contemplated by the Court of Appeals, which speculates that any implication of Artie could have sealed the identification of Kelvin because the two resembled each other. This strategy holds only if someone other than Artie was the shooter. Counsel never endeavored to determine the viability of a strategy that targeted Artie, his civil client, as the shooter. Counsel's failure to interview eyewitnesses is unreasonable and evidence of ineffectiveness. Grooms, 923 F.2d at 90.

   The Pennsylvania Supreme Court unreasonably applied Strickland in analyzing the ineffectiveness of counsel's actions and the potential prejudice. Morris-2, at 1042. The Third Circuit has rejected the application of a "but for" standard and held that such an application is contrary to Strickland. Hummel v. Rosemeyer, 564 F.3d 290, 304-305 (3d Cir. 2009). Here, Petitioner need only show that there is a reasonable probability that he was prejudiced. Id.

   Despite Petitioner's request, the state court never held an evidentiary hearing on any of these claims and faulted Petitioner for failing to produce such evidence.[5]  An evidentiary hearing is warranted on counsel's alleged failures with respect to this claim. Campbell v. Vaughn, 209 F.3d 280, 286-87 (3d Cir. 2000)(quoting Cardwell v. Greene,

_____

   [5] There is no record of the November 12, 1986 proceeding in which the Pennsylvania Supreme Court states that Petitioner orally withdrew his application for an evidentiary hearing. There is also much confusion surrounding the impact of that hearing. At a later hearing, Judge Sabo refused to permit Flowers testimony, on the ground that it was unnecessary for him to decide the motion. Morris-4, at *7 n.9. In any event, Flowers never testified and instead offered an affidavit signed on April 3, 2004, over twenty years after the trial. Pet. Reply Ex. C. In the affidavit, Flowers alleges that he was badgered by police detectives to identify Kelvin, but that he refused to do so. Id. at ¶ 6.

152 F.3d 331, 337 (4th Cir.1998)("AEDPA and uniform case law interpreting it provide that if the habeas petition 'has diligently sought to develop the factual basis of a claim for habeas relief, but has been denied the opportunity to do so by the state court, [AEDPA] will not preclude an evidentiary hearing in federal court.'")).

Here, it appears that Petitioner sought to develop the record and was denied an evidentiary hearing.  At issue in the conflict of interest claim is whether counsel's failure to implicate Artie was strategically motivated or born out of a conflict of interest. Interviewing Flowers is germane to that count in its relationship to counsel's informed decision and to the potential resulting prejudice.  In addition, counsel's inactions are also relevant to support this claim. Petitioner may pursue evidence related to counsel's endeavors to obtain eyewitness testimony in order to formulate a viable trial strategy.

c. Anthony Stokes

Petitioner raised this claim for the first time in his Second PCRA Petition.  For the reasons set forth in Part III. B, the Court exercises de novo review of this claim.

At the time of this murder, Anthony Stokes was ten years old.  Like the other boys, counsel for Petitioner never interviewed Stokes.  Stokes submitted an affidavit in support of Petitioner's Second PCRA petition that claims that Flowers and Johnson had been "getting high" and "drinking beer" prior to the incident.  Stokes also claims that he did not initially identify Kelvin, but eventually agreed, after coercion from police, that it was Kelvin.

For the same reasons advanced previously, the totality of counsel's knowledge of the case is relevant to whether he acted out of strategy or whether he was beholden to his civil interests.  Knowledge of Anthony Stokes' proposed testimony and the

circumstances under which it was rendered are also relevant to the case.  Counsel was ineffective for investigating this witness.

Under <u>Strickland</u>, however, Petitioner must prove that he was prejudiced by counsel's actions.  Standing alone, Anthony Stokes testimony may not have been enough to save Petitioner from the guilty verdict.  However, when viewed against the backdrop of the other failures of counsel, it is possible that counsel's deficiency in this regard, when combined with the other alleged failure may have prejudiced Petitioner.  As a result, an evidentiary hearing is warranted on this issue as it pertains to both the conflict of interest claim contained in Count I and this claims set forth in Count V.

### 2. Alibi Witnesses

Petitioner claims counsel was ineffective for failing to interview and produce as witnesses Christine Clark and Margaretta Wise Frazier.  Both women would have provided an alibi for Kelvin by testifying that he was at their house at the time of the murder.  Petitioner advanced this claim on direct appeal, in his first PCRA petitioner, and again in his second PCRA petition.

On direct appeal, the Pennsylvania Supreme Court denied the claim as "baseless." <u>Morris I</u>, 564 A.2d at 1230 n.10.  The first PCRA Petition was denied on a procedural ground given that Petitioner "raised this issue on direct appeal.  Morris is barred from litigating this issue again in a PCRA petition.  42 Pa.C.S. §§ 9543(a)(3), 9544(a)(2)." <u>Morris-2</u>, 684 A.2d at 1044.  In addition, the Pennsylvania Supreme Court also considered that counsel had testified at the post-verdict evidentiary hearing that he was unaware of any alibi witnesses and would have pursued such witnesses if he was aware

they existed.  N.T. 12/8/85, p.72.[6] In support of both the direct appeal and the First

PCRA petition, Kelvin submitted unsworn statements from Clark and Wise Frazier.

The Pennsylvania Supreme Court's determination that this claim was previously

litigated triggers the adequate and independent state ground doctrine.  Petitioner is not

able to overcome the limitation in § 2254 (d)(1) on the record that was before the

Pennsylvania Supreme Court. Pinholster, 131 S.Ct. at 1400-01. As a result, he is not

entitled to an evidentiary hearing on this claim.

### a. James Willie

James Willie testified on behalf of the Commonwealth that Kelvin confessed to

committing the Pep Boys Murder.  Kelvin argues that counsel was ineffective because he

failed to investigate the circumstances of the confession, Willie's background, and the

facts surrounding the forgery of the complaint.  Because Petitioner raised this argument

for the first time in his second PCRA, for the reasons expressed in Part  Part III. B, the

Court reviews this claim de novo.

Kelvin lived with Willie in Suffolk, Virginia for a period of time.  Willie had been

accused of forging checks by Kelvin's uncle, Albert Morris.  N.T. 11/22/83 at 11-12.

Counsel sought to impeach Willie with this information, but the Commonwealth called

detective Marx as a witness.  Marx, a Suffolk police officer, testified that the forgery

complaint was initiated on October 24, 1983— after the Willie gave a written statement

to police detailing Kelvin's confession.

On cross examination, counsel sought to attack Marx's testimony, but, for the

following reasons, Petitioner claims he was unprepared.  Counsel never properly

_____

[6] During this hearing counsel could not recall if he ever spoke to Kelvin about the
possibility of an alibi.   N.T. 12/9/85, p. 42.

investigated the circumstances of the forged checks.  Had he done so, Petitioner claims

he would have learned that the forgeries occurred and were reported to the bank <u>before</u>

Willie gave the written statement to the police that detailed Kelvin's confession, not after

as Marx testified.  As a result, not only was counsel unable to impeach Willie, and

ostensibly Marx, he was unable to combat the Commonwealth's argument that the

forgery claims were made in retaliation to the written confession.

In addition, if counsel investigated, he would have learned that Willie confessed

to the police to forging the checks on November 11, 1983.  Counsel made no efforts to

obtain the FBI reports or the police reports related to the forgery claim.[7]  Willie's motive

in reporting Kelvin's confession is of significant importance.[8]  The confession is also

weighty evidence against Kelvin that may have shaped counsel's trial strategy.  It

appears that Willie's testimony was ripe for impeachment and counsel was unaware,

because of his lack of investigation.

The Government argues that the objective standard under <u>Strickland</u> obviates the

need for counsel to explain his subjective decision making, eliminating the benefit of an

evidentiary hearing.  The Court disagrees.  "Considered in the abstract, blaming Artie for

the murder was surely a plausible alternative defense strategy."  <u>Morris-6</u>, 633 F.3d at

199.  Standing alone, had the confession been excluded and or the testimony of Willie

been impeached, the weight and nature of the evidence against Kelvin shifts and with it,

the plausibility of counsel's strategic choices made at trial.  An evidentiary hearing is

---

[7] Petitioner submits an attachment to his Updated Memorandum on September 7, 2011 of a forensic analysis of the forged checks which conclude that Willie was the author.

[8] The Court notes that the parties debate whether the checks were forged.  Willie only admitted cashing the checks.

merited on this claim as such a hearing would enable Petitioner to prove that Willie's testimony was impeachable and his testimony incredible. See Landrigan, 550 U.S. at 474, 127 S.Ct. 1933.

.                          **b. Margaretta Wise Frazier and Christine Clark**

Christine Clark was Kelvin's girlfriend at the time of the murder. Margaretta Wise (now Frazier) is Ms. Clark's mother. Petitioner alleges that counsel was ineffective for failing to interview and present these women as alibi witnesses, since both would have provided testimony that Kelvin was at their house at the time of the murder.

The Pennsylvania Supreme Court found this claim was previously litigated, as it was raised on direct appeal. Morris-2, 684 A.2d at 1044. In addition, the Pennsylvania Supreme Court found that Petitioner's claim was without merit because counsel testified at a post conviction hearing that he was unaware of the existence of any alibi witnesses. Id. As a result, this claim is reviewed under the AEDPA rubric.

Recent Supreme Court precedent directs that an evidentiary hearing on any claim adjudicated by the state court is improper. Pinholster, 131 S.Ct. at 1401. Review of the record before the state court directs that this claim be dismissed as it does not provide a means for relief.

### 3. Yellow Plastic Bag

Although initially plead in the petition as a claim, by letter dated June 16, 2005, counsel for Petition withdrew this claim after preliminary investigation. As a result, it does not provide a basis for relief and is moot.

**D. Claim XVIII: Whether Trial Counsel Was Ineffective in Failing to Properly Investigate the Circumstances of Petitioner's Arrest and Statement to Police, And, as a Result, Failed to Impeach Commonwealth Witnesses and Properly Prepare a Motion to Suppress.**

Petitioner claims that counsel was ineffective for failing to investigate and present critical impeachment evidence related to Willie James and in failing to call Albert Morris to refute the Commonwealth's description of the circumstances of Willie's alleged forgeries. Petitioner presented this claim for the first time in his second PCRA and for the reasons set forth in Part III. B, the Court reviews this claim de novo.

For the reasons set forth supra. as related to Claim V, an evidentiary hearing is warranted on counsel's failures with respect to investigating the circumstances of James Willie's forgery and the impeachment of his testimony. The Court will refer to that section of the Opinion and not re-address that claim here. To the extent that the testimony of Albert Morris is related to that claim, it too may be the subject of the evidentiary hearing.

**E. CLAIM XIX: WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY INVESTIGATE THE CIRCUMSTANCES OF PETITIONER'S ARREST AND STATEMENT TO THE POLICE, AND, AS A RESULT, FAILED TO IMPEACH THE COMMONWEALTH WITNESSES AND PROPERLY PREPARE AND LITIGATE A MOTION TO SUPPRESS.**

Petitioner claims that counsel was ineffective in failing to properly investigate the circumstances of Petitioner's arrest and Petitioner's statement to the Virginia police regarding the Philadelphia murder. As a result, Petitioner claims that counsel was ineffective in failing to impeach the commonwealth's Virginia police officer witnesses and properly prepare and litigate a motion to suppress.

Petitioner presented this claim for the first time in his second PCRA and for the

reasons set forth in Part III. B, the Court reviews this claim de novo.

On this claim, Petitioner challenges the testimony of the Virginia Police officer as false, as it relates to the timing of Petitioner's confession, and subject to impeachment. During Petitioner's suppression hearing, Suffolk police lieutenant William Freeman testified that he arrested Kelvin at 1:45 p.m. on October 22, 1980. NT 11/23/83 at 9. Sargent Newsome, also of the Suffolk police department, testified that shortly before 2:00 p.m., Kelvin, after being advised of his rights, made an oral unrecorded inculpatory statement "I did it to keep up with the crowd." N.T. 11/23/83 at 17-21, 31-36, 44-45. Freeman and Newsome testified to the same at trial.  N.T. 11/23/83 at 67, 74, 82-84.

Because counsel never endeavored to obtain the police reports or otherwise investigate the circumstances of his arrest, Petitioner claims that counsel was unaware that Petitioner was actually arrested well before 1:45 and that he was subjected to interrogation by other officers prior to his statement to Newsome.  During a suppression hearing on unrelated charges in Virginia, Petitioner claimed that he was subjected to multiple interrogations and abused by the police.  In addition, Detective J.D. Bangley testified at that hearing that Petitioner was arrested at 12:15 p.m on October 22, 1980. The Virginia suppression court did not credit Petitioner's or Bangley's testimony.

Kelvin testified that he had taken LSD and smoked marijuana on the day he made the inculpatory statement.  N.T. 11/23/83 at 55-58.  Ultimately counsel argued that Petitioner was high on drugs when he blurted the inculpatory statement.  This appears to be a reasonable attack on the merits of the statement, especially when coupled with the fact that the inconsistency on the time of the arrest spans only a forty five minute period; hardly enough to convince the court that Petitioner was subjected to an unduly

long interrogation.  Officer Newsome also testified that Kelvin did not exhibit any behavior that would suggest that he was high on drugs.  Id. at 24-25.   While the inconsistencies related to the timing of the arrest and the alleged longevity of the interrogation both challenge the certainty of the oral admission, there is no reasonable probability that the confession may have been suppressed and Petitioner acquitted. Standing alone, this claim does not warrant habeas relief.

However this claim is intertwined with counsel's failures to investigate and present evidence that Petitioner's mental state rendered him incapable of intelligently and voluntarily waiving his Miranda rights set forth in Claim III.  See supra. Section IV, Part B. If Petitioner was unable to waive his Miranda rights and was subjected to lengthy interrogation, then the merits of this claim change and counsel's uniformed strategy of characterizing Petitioner as high becomes less reasonable and, with it grows the likelihood of suppression of the statement.  An evidentiary hearing is merited on this claim to the extent that knowledge of the circumstances of Petitioner's confession shaped counsel's strategy.

### E. CLAIM XXIV: CUMULATIVE ERRORS OF COUNSEL

Petitioner argues that the cumulative effect of all of the errors undermined the fairness of his trial and warrant his conviction being overturned.  "Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." Fahy v. Horn, 516 3d Cir. 169, 205 (3d Cir. 2008).  Petitioner raised portions of this claim for the first time in his second PCRA and for the reasons set forth in Part III. B, the Court reviews this claim de novo.

At this time, without resolution of all of the claims, it is premature to decide this claim. However, most of the above claims merit evidentiary hearings, if not on their own, but for the collective benefit of ferreting out the plausibility of counsel's defense strategy as it relates to the conflict claim.

> Considered in the abstract, blaming Artie for the murder was surely a plausible alternative defense strategy. Although the Commonwealth's case centered largely on eyewitness identifications of Kelvin, other evidence pointed to Artie as the shooter. Flowers, for example, never wavered from his initial identification of Artie, even when shown a photo array that included pictures of both brothers. And Linaberry—whose testimony was central to the Commonwealth's case—also initially identified Artie. Finally, the composite sketch that police drew after speaking with Johnson portrayed a suspect with a damaged eye similar to Artie's. When viewed together, this evidence was more than sufficient to support an argument that Artie was the shooter.
> Furthermore, it would be reasonable to infer that Tucker avoided this alternative defense because of his loyalty to Artie and his financial stake in Artie's civil case. As an initial matter, common sense suggests that an attorney would be wary of alienating a client with a potentially lucrative civil rights claim by accusing him of murder in open court. And as the District Court noted, Tucker testified that he never sought to investigate Artie's alibi, motive, or opportunity to commit the crime. Moreover, Tucker took actions at trial that could be construed as protecting Artie—for example, he objected when the Commonwealth asked Linaberry to name the person he initially identified and sought to prevent the admission of the composite sketch that portrayed a man with a damaged eye that resembled Artie.

633 F.3d at 199.

On remand, the Third Circuit instructs that to succeed on his petition "Kelvin must show that Tucker's conflict adversely affected his representation. Tucker's unduly truncated testimony at the evidentiary hearing raises serious questions as to whether Kelvin's reticence and/or strategic considerations consistent with Kelvin's best interests—rather than Tucker's conflict of interest—led Tucker to avoid accusing Artie of the shooting." Id. at 200 (citation omitted). Petitioner argues that accusing Artie was a

plausible defense strategy that was forsaken because of counsel's allegiance to Artie's civil suit.  To show that the proffered alternative strategy was plausible, Kelvin must demonstrate "that it possessed sufficient substance to be a viable alternative." Id. (quoting Morelli, 169 F.3d at 810).  Demonstrating that counsel was unaware of available evidence tending to show that accusing Artie was not only a plausible strategy, but a superior strategy, is relevant to Petitioner's conflict of interest claim. Indeed, as highlighted by the Third Circuit, "Tucker repeatedly suggested that if pointing the finger at Artie had been a viable strategy, he would have withdrawn from one of the representations. App. 128, 149. Tucker's failure to withdraw from either case suggests that accusing Artie of being the shooter was not, in fact, a viable strategy." Id. at 201.  As a result, counsel's awareness of available information is key to the foundation of his strategy and his ability to meaningfully confer with Kelvin and "persuade [him] of the wisdom of that strategy." Id. at 200-01.

The Court has considered the remainder of the claims and concludes that even if an evidentiary hearing is permitted, such a hearing will not advance petitioner's claims. A decision on the merits of the remaining claims shall be issued simultaneous with the Court's decision on the merits of the claims subject to the evidentiary hearing.  For the above reasons, an evidentiary hearing has the potential to "prove the petition's factual allegations [and] entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474, 127 S.Ct. 1933.  Consequently, this Court exercises its discretion and grants an evidentiary hearing on Petitioner's claims that he was denied his constitutional right to effective assistance of counsel on the grounds that his trial attorney had a conflict of interest and was ineffective for failing to conduct an adequate investigation, for the

reasons stated herein.

## V. CONCLUSION

For the reasons stated herein and those detailed in <u>Morris-6</u>, 633 F.3d 185 (3d Cir. 2011), an evidentiary hearing is merited on the claims contained in Counts I, III, V (in part), XVIII, XIX, and XXIV.  A decision on the remaining Counts (IV, VI, VII, VIII, IX, XII, XVII, XXI, and XXII) will be issued in an Opinion following the evidentiary hearing in this matter.

An appropriate Order shall issue.


Dated: October 4, 2012


 s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
United States District Judge